**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| **S.E.B.M., a minor, by and through her next friend, MARIA MENDEZ FELIPE,** ) ) ) | |
| ) | **CIVIL ACTION** |
| **Petitioner,** ) | |
| ) | **Case No.** |
| **v.** ) | |
| ) | |
| **THE UNITED STATES OF AMERICA,** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT UNDER FEDERAL TORT CLAIMS ACT

## INTRODUCTION

1.      This matter arises from implementation of the 2017 "pilot program" for the inhumane and unconstitutional plan that would become known as "Family Separation." The government's policy of forcibly taking children from their parents that caused extraordinary trauma to thousands of children and families began in 2017, long before most of this country was aware of what was occurring, and it ensnared the young Plaintiff, who was two years old at the time. The trauma suffered by Plaintiff—who is now six years old—as well as to other parents and other young children was no incidental by-product of the government's policy. Instead, it was the very point. The government sought to inflict emotional distress in order to deter parents and children from seeking asylum in this country.

2.      Executive branch officials intended to use the trauma resulting from family separations, and the consequent media reporting about that trauma, to deter future asylum seekers.

Federal officials at the highest levels made no secret of the purpose of this policy and, in fact, made repeated public statements acknowledging the policy's purpose.

3.    In total, the government has acknowledged that between July of 2017 and June 2018, it separated nearly 4,000 children from their parents or guardians after they crossed the southwestern U.S. border.[1] Additional government reporting indicates that the number of families separated likely is much higher.[2]

4.    After forcibly taking children from their parents, the government inflicted further trauma when it delayed providing information to parents and children of each other's whereabouts or well-being, failed to facilitate adequate communication between the parents and children during their separation and failed to implement any system for tracking the children to ensure that the families could be reunited.

5.    The young Plaintiff in this action fell victim to the Administration's policy when federal officers forcibly separated her and her father at the border. After the separation, the child was detained at immigration holding centers and foster homes and was never reunited with her father. Her father was deported to Guatemala on approximately November 28, 2017, and her mother died in Guatemala in mid-October 2017, leaving her alone in the U.S. in the custody of the Office of Refugee Resettlement, a division of the Department of Health and Human Services.

---

[1] Joint Status Report at 1, 10, *Ms. L. v. U.S. Immigration and Customs Enf't*, No. 18- cv-00428 DMS MDD (S.D. Cal. Sept. 9, 2019) [*Ms.* L], ECF No. 465 (the government acknowledged that, for the original class, as many as 2,814 children were separated from their parents, and has so far acknowledged an additional 986 children as part of the expanded class); *see also* Office of the Inspector General, U.S. Dep't of Health & Human Servs., OEI-BL-18-00511, Separated Children Placed in Office of Refugee Resettlement Care 11 (Jan. 17, 2019) [hereinafter HHS OIG Report I].
[2] *See* HHS OIG Report I, *supra* note 1, at 1, 6, 13 (reporting that "thousands of children may have been separated . . . before the accounting required by the Court [in *Ms. L.*]").

Throughout this whole time, the government provided only limited information to the Plaintiff's father about his daughter's whereabouts and well-being and afforded only minimal opportunities for the Plaintiff and her father to communicate. As a result of the totality of the government's actions, the Plaintiff suffered, and continues to suffer, substantial and ongoing trauma.

6.      The government's Family Separation policy was cruel and inhumane, and it was unlawful. The United States is liable for the conduct that harmed Plaintiff under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1) and 2671-2680 ("FTCA").

7.      The egregious deprivations of basic human rights that Plaintiff experienced while in U.S. custody, the forced separation from her father, her subsequent detention, and the failure to reunify her with her family all constitute negligence and intentional infliction of emotional distress caused by government officers and supervisors.

8.      Plaintiff's detention and separation violated the U.S. Constitution's clearly established due process rights governing immigration detainees and the constitutional right to family integrity. As such, this tortious conduct is not subject to the FTCA's discretionary function exception, or any other such exception.

9.      The government's tortious conduct caused Plaintiff to suffer substantial damages, including physical pain and suffering, mental and emotional pain and anguish, and other losses that continue today and, according to physicians who have treated separated children, will last a lifetime.

10.    Plaintiff brings this action under the FTCA seeking compensation for the extraordinary harms she suffered at the hands of the federal government.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 2674, 1331, and 1346(b).

12.     On January 2, 2020, Plaintiff submitted an administrative claim to the U.S. Department of Homeland Security ("DHS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE"). There has been no final disposition of the Plaintiff's administrative claim and, as six months have passed since the submission of her claim, it is deemed finally denied. 28 U.S.C. § 2675(a). Accordingly, Plaintiff has exhausted all potential administrative remedies.

13.     Venue is proper in this District under 28 U.S.C. § 1402(b) because S.E.B.M. and her father crossed into the U.S. in New Mexico, and the injury occurred when they were detained and separated in New Mexico.

## PARTIES

14.     Plaintiff, S.E.B.M., currently six years old, was two years old at the time of her forced separation from her father described in this Complaint. Plaintiff is a citizen of Guatemala, but she has resided in Florida since approximately January 8, 2018 in the custody of her grandmother.

15.     Maria Mendez Felipe ("Grandmother") is Plaintiff's paternal grandmother and immigration sponsor with whom she has lived since her release from the custody of the U.S. Department of Health and Human Services ("HHS") on January 8, 2018.

16.     Defendant United States of America is the appropriate defendant under the FTCA. 28 U.S.C. §§ 1346(b), 2671, *et seq.*

17.    All federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with federal agencies including, but not limited to, the Department of Justice ("DOJ"), the Department of Homeland Security ("DHS"), Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE").

## STATEMENT OF FACTS

### The 2017 Pilot Program for Family Separation

18.    From the outset, curbing the number of individuals seeking asylum in the United States was a central focus of the Trump Administration's immigration policy.[3]

19.    As early as February 2017, shortly after President Trump's inauguration, his Administration, chiefly DOJ and DHS, began formulating the plan to separate parents from their

---

[3] *See, e.g.*, *U.S. Judge Bars Trump Administration From Enforcing Asylum Ban*, CNBC, Nov. 20, 2018, https://www.cnbc.com/2018/11/20/immigration-policy-judge-bars-us-from-enforcing-trump-asylum-ban.html#:~:text=A%20federal%20judge%20barred%20the%20Trump%20administration%20on,Judge%20Jon%20S.%20Tigar%20issued%20a%20temporary%20; Shaw Drake & Edgar Saldivar, *Trump Administration Is Illegally Turning Away Asylum Seekers*, ACLU, Oct. 30, 2018, https://www.aclu.org/blog/immigrants-rights/trump-administration-illegally-turning-away-asylum-seekers; Nick Miroff & Josh Dawsey, *The Advisor Who Scripts Trump's Immigration Policy*, WASH. POST, Aug. 17, 2019, https://www.washingtonpost.com/graphics/2019/politics/stephen-miller-trump-immigration/; Emma Platoff, Alexa Ura, Jolie McCullough & Darla Cameron, *While Migrant Families Seek Shelter From Violence, Trump Administration Narrows Path to Asylum*, TEXAS TRIBUNE, July 10, 2018, https://www.texastribune.org/2018/07/10/migrant-families-separated-border-crisis-asylum-seekers-donald-trump/; Maria Sacchetti, Felicia Sonmez & Nick Miroff, *Trump Tightens Asylum Rules, Will Make Immigrants Pay Fees to Seek Humanitarian Refuge*, WASH. POST, Apr. 30, 2019, https://www.washingtonpost.com/politics/trump-issues-memo-calling-for-changes-to-handling-of-asylum-cases/2019/04/29/df41b5f2-6adb-11e9-be3a-33217240a539_story.html; Glenn Thrush, *U.S. to Begin Blocking Asylum Seekers From Entering Over Mexican Border*, N.Y. TIMES, Jan. 24, 2019 https://www.nytimes.com/2019/01/24/us/politics/migrants-blocked-asylum-trump.html; Yeganeh Torbati & Kristina Cooke, *Trump Administration Moves to Curb Migrants' Asylum Claims*, REUTERS, Nov. 8, 2018, https://www.reuters.com/article/us-usa-immigration-asylum/trump-administration-moves-to-curb-migrants-asylum-claims-idUSKCN1ND35K.

children in order to deter other families from coming to the United States. Pursuant to this pilot program, separations were occurring in significant numbers for almost one year before the Administration announced its "Zero Tolerance" policy in April 2018.[4]

20.     A leading advocate and driving force in the Government's decision to begin referring family unit adults for prosecution was Attorney General Jefferson Sessions.[5] However, as revealed in the recent report of the Office of the Inspector General for the Department of Justice that the Office of the Deputy Attorney General (DAG), Rod Rosenstein, was also responsible.[6]

21.     The pilot program, also known as the "El Paso Initiative" or "the Initiative", was started in March 2017 when CBP's El Paso Sector, which included the state of New Mexico, changed its policy and began referring family unit adults for criminal prosecution.[7]

22.     The Government's haphazard and chaotic execution of the pilot program foreshadowed many of the child separation issues that would later present themselves in 2018 during implementation of the official zero tolerance policy.[8] Through this early Initiative, the Government separated approximately 281 individuals in families, including the Plaintiff, between July and November 2017.[9]

23.     In early March 2017, then Secretary of Homeland Security John Kelly confirmed that DHS was considering family separation, stating, "Yes, I'm considering [that], in order to deter

---

[4] Staff of the Subcommittee on Immigration and Citizenship, H.R. Comm. on the Judiciary, 116th Cong., The Trump Administration's Family Separation Policy: Trauma, Destruction, and Chaos 2-3 (Oct. 2020) [hereinafter "H.R. Comm. on the Judiciary Report"].

[5] Office of the Inspector General, U.S. Dep't of Justice, 21-028, Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Department of Homeland Security and Health and Human Services 1 (Jan. 2021) [hereinafter "DOJ OIG Report"].

[6] *Id.* at 42.

[7] *Id.* at 13.

[8] *Id.*

[9] HHS OIG Repot 1, *supra* note 1, at 3.

movement along this terribly dangerous network. I am considering exactly that. [Children] will well cared for as we deal with their parents."[10]

24.     The Administration was well aware that these separations would cause enormous trauma to the children and parents. In fact, the Administration intended for the publicity concerning the trauma suffered by asylum seekers to deter other would-be asylum seekers from seeking refuge in the United States out of fear of facing the same trauma.

25.     Administration officials at the highest levels thus planned and implemented a policy of separating families both knowing that the policy would cause severe harm to the people it affected and specifically intending that it would cause such harm.[11]

26.     The Administration also proceeded to pursue this policy despite the many warnings from agencies and organizations about the potential harm of such a policy. For example:

    i.   In September 2016, the Advisory Committee on Family Residential Centers issued a report that determined that "[t]he best interests of the child should be paramount in all custody decisions regarding family members apprehended by DHS," and warned that "separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children."[12]

_____

[10] Daniella Diaz, Kelly, *DHS is Considering Separating Undocumented Children from Their Parents at the Border*, CNN (Mar. 7, 2017), https://www.cnn.com/2017/03/06/politics/john-kelly-separating-children-from-parents-immigration-border/index.html.
[11] *Policy Options to Respond to Border Surge of Illegal Immigration*, (Dec. 16, 2017), https://www.documentcloud.org/documents/5688664-Merkleydocs2.html (hereinafter "Policy Options"); *see also* Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, WASH. POST, June 19, 2018, https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/?utm_term=.6fce092b57af.
[12] U.S. Immigration & Customs Enf't, Dep't of Homeland Security., Rep. of the DHS Advisory Committee on Family Residential Centers 2 (2016), *available at* https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.

ii.  Commander Jonathan White, former Deputy Director of ORR for the
Unaccompanied Alien Children's ("UAC") Program, testified before Congress that,
starting in February 2017, he repeatedly warned those devising the policy that
separating children from their parents would likely harm the children, including
"significant potential for traumatic psychological injury to the child."[13]
Administration officials ignored Commander White's warnings up through the day
he left ORR (on March 15, 2018), just weeks before the Family Separation policy
was launched across the entire southern border, and they continued to disregard his
warnings thereafter.

iii.  On March 3, 2017, press reports revealed that DHS had been considering a policy
of separating mothers and children who cross the border illegally in order to deter
families from migrating to the United States.[14] The day after the press reports, the
American Academy of Pediatrics responded with a statement opposing DHS's
proposed family separation program, warning that:

> Federal authorities must exercise caution to ensure that the emotional and
> physical stress children experience as they seek refuge in the United States
> is not exacerbated by the additional trauma of being separated from their
> siblings, parents or other relatives and caregivers. Proposals to separate
> children from their families as a tool of law enforcement to deter immigration

---

[13] Jeremy Stahl, *The Trump Administration Was Warned Separation Would Be Horrific for
Children, Did It Anyway,* SLATE, July 31, 2018, https://slate.com/news-and-
politics/2018/07/the-trump-administration-was-warned-separation-would-be-horrific-for-
children.html; *see also Examining the Failures of the Trump Administration's Inhumane Family
Separation Policy: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm
on Energy & Commerce,* 116th Cong. (Feb. 7, 2019) (testimony of Commander Jonathan White).
[14] Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating Women,
Children at Mexico Border,* REUTERS (Mar. 3, 2017), https://www.reuters.com/article/us-usa-
immigration-children-idUSKBN16A2ES.

are harsh and counterproductive. We urge policymakers to always be mindful that these are vulnerable, scared children.[15]

**The Decision to Criminally Prosecute Parents Who Entered with their Children: DOJ's Failure to Promote and Follow a Reasonable Declination Procedure**

27.     The decision to criminally prosecute adults illegally entering the country as part of a family unit represented a significant change in DOJ and DHS practice. Previously, when adults with children were apprehended crossing the border, in most cases the adult would not be referred to DOJ for criminal prosecution. This was done, in part, to conserve the resources of DOJ prosecutors and avoid having them take on misdemeanor prosecutions.[16] Instead, DHS would either detain and administratively remove the family from the United States or give the family a Notice to Appear before an Immigration Judge and release them on their own recognizance into the community where they would await their hearing in Immigration Court.[17] This latter practice was derogatorily termed "catch and release."[18]

28.     The change in policy to prosecute the parents was not universally welcomed.  One U.S. Attorney from a border state who was initially reluctant to begin accepting family unit adult referrals for prosecution because of the potential consequences associated with the separation of families, prophetically advised his colleagues, "History would not judge [prosecuting family units] kindly."[19]  However, this prescience, like other warnings, went unheeded by the DOJ and DHS.

---

[15] Fernando Stein & Karen Remley, Am. Acad. Of Pediatrics, AAP Statement Opposing Separation of Mothers and Children at the Border (Mar. 4, 2017), https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/immigrantmotherschildrenseparation.asp.
[16] DOJ OIG Report, *supra* note 5, at 4.
[17] *Id.* at 1-2.
[18] On April 6, 2018, Trump administration directed the Attorney General and the DHS Secretary to take steps to end "catch and release" on the same date Sessions issued the zero tolerance policy. *See* DOJ OIG Report, *supra* note 5, at 2.
[19] *Id.* at 13.

29.     In August 2017, around the time of the Plaintiff's entry into the United States, the District of New Mexico (DNM) provided CBP's El Paso Sector with criteria for referring adults for prosecution when apprehended with their children.[20] The DNM criteria stated that CBP should refer for prosecution an adult who is part of a family unit when the following criteria was met: a) "a close familial relationship could not be established", b) "when the child in the family unit was at least 10 years old", or c) "when other aggravating circumstances were present that warranted prosecution of the family unit adult."[21] These criteria were clearly not adhered to in the Plaintiff's case, or there would have been no separation.[22]

30.     Even among the various U.S. Attorneys' Offices in the border states, there was no uniformity in the criteria used in deciding whether or not to separate children from their families. In the Western District of Texas, for example, prosecutorial decisions that could lead to separation were based on various factors such as the maturity of the child, the child's ability to provide identifying information such as nationality and home address, the language spoken by the family, the criminal history of the parent(s), and whether a family relationship could be reasonably established.[23] Key to the determination of whether to separate was whether the child could effectively communicate where they were from, where they lived, their address, where they were

---

[20] *Id.* at 14.

[21] *Id.* at 14-15.

[22] Later in May 2018, CBP advised WDTX officials that it would be presenting adults in family units who entered in the El Paso Sector to the U.S. Attorney's Office (USAO) for prosecution. According to this directive, cases would be presented to the U.S. Attorney for prosecution where the children are older than five years of age, after conducting a medical screening. If the family unit included children under the age of five, then those cases were no tot be presented unless the second parent is present, and the father will then be presented for prosecution and separated from the family. This directive, which applied to New Mexico, was not followed by CBP in S.E.B.M.'s case. *see* DOJ OIG Report, *supra* note 5, at 36.

[23] *Id.* at 18.

going to, who they were going to meet.[24] Proper application of these criteria within the DNM would not have led to the separation of the Plaintiff.

31.      According to DAG Rosenstein, various U.S. Attorneys' Offices must not have understood their ability to decline prosecuting in circumstances in which the separated child spoke only a "pre-Columbian" language, noting that the basis for approving these declinations was that the separated child would be unable to communicate with DHS or HHS officials with whom the child would be placed.[25] He concluded: "If somebody got the idea that they were supposed to be just like a soldier, prosecuting every case without regards to the facts, that didn't come from me."[26] This miscommunication from DOJ to the border U.S. Attorneys profoundly impacted the Plaintiff who was basically nonverbal and spoke only Aketeko.

32.      A significant miscalculation on the part of the DOJ decision makers resulted in the families being separated. The Attorney General and other senior DOJ officials did not adequately understand the extent of the family separation process that they were implementing, and they harbored unfounded expectations about the process that were inconsistent with the realities in the Southwest border districts.[27]

33.      What was not recognized by the DOJ was the fact that when a child enters the country as part of a family unit, and the parent is transferred to the U.S. Marshals' Service (USMS) custody, DHS erroneously designated the child as an Unaccompanied Alien Child (UAC). The Trafficking Victims Protection Reauthorization Act (TVPRA) requires DHS to place UACs into ORR custody within 72 hours, absent exceptional circumstances.[28]

---

[24] *Id.*
[25] *Id.* at 42.
[26] *Id.*
[27] *Id.* at 49.
[28] 8 U.S.C § 1232(b)(3)

34.     Further, at most CBP stations, staffing and space limitations related to children (who must be held separately from unrelated adults under the consent decree in *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.*, Case No. 2:85-cv-04544, 8 (9th Cir. July 5, 2017))  often resulted in the transfer of children to ORR custody even quicker than the 72-hour limit, often as soon as the adult is referred to DOJ for prosecution and arrangements could be made for transportation and transfer of the child to ORR custody.[29]

35.     Attorney General Sessions and the DOJ operated under an unfounded expectation of a brief prosecution followed by an immediate reunification of the family while the child remained in DHS custody.  Inexcusably lost on the DOJ leadership, were key details in this process including the average sentencing practices in the relevant federal districts and how that impacted the TVPRA's 72-hour rule requiring how long the children could lawfully be detained.[30]  Based on the average sentencing practice during implementation of the zero tolerance policy, it would not have been possible to reunite most parents with their children immediately after sentencing and prior to the child's placement with HHS, which had to occur within 72 hours of apprehension.[31]  In the Plaintiff's case, her father was released from the Marshall's custody ten days after the separation, by which time she had been placed in an ORR shelter in Brownsville, Texas.

36.     Without an adequate understanding of these two vital parameters, the restrictions on holding UACs and the actual prosecution process of the parents, the government was totally

---

[29] DOJ OIG Report, *supra* note 5, at 50.
[30] *Id.*
[31] *Id.* at 53.

unprepared for what would happen to the children after separation and the result of this failure was catastrophic.[32]

37.     As an indication of DAG Rosenstein's lack of comprehension of the law governing the facts of family separation, he asked then DHS Deputy Secretary whether it was possible to change the 72-hour requirement if it was not feasible to meet the deadline. The DHS Deputy Secretary had to advise the DAG that that the 72-hour rule was from a judicial order arising from the *Flores* case, which had been brought against then-Attorney General Janet Reno. After learning DHS Deputy Secretary's response that, in addition to the *Flores* settlement, the 72-hour requirement was also codified in federal law under the TVPRA, Rosenstein responded, "That's a law. But it does not require the government to stop filing criminal charges when appropriate."[33]

**Interagency Failures**

38.     DOJ has been found by the Office of the Inspector General to have also failed to effectively coordinate with the U.S. Marshals Service (USMS), Department of Homeland Security (DHS), the U.S. Department of Health and Human Services (HHS), or the federal courts.[34]

39.     In addition to DOJ's miscommunications, DHS failed to apprise ORR, the agency charged with receiving the separated children, that the numbers of unaccompanied minors would be on the rise and why. Despite the fact that the El Paso sector pilot program resulted in over 281

---

[32] Significantly, the DOJ OIG review of the pilot program and the subsequent implementation of a family separation policy found that the Attorney General's Office expectations of how the family separation process would work significantly underestimated its complexities and demonstrated a deficient understanding of the legal requirements related to the care and custody of UACs. *See* DOJ OIG Report, *supra* note 5, at i.

[33] *Id.* at 54; Rosenstein was further informed that "border patrol stations are not designed or staffed to house children for any extended period of time and many are over 100% capacity. So it becomes a real issue on many fronts." *Id.*

[34] *Id.* at p..49

family separations in just four months, neither CBP, nor any DHS component, divulged the existence of the program to ORR.[35]

40.     By September 2017, almost two months after the pilot program began, ORR leadership started to express concern with the increasing number of children, including infants, that were being transferred to ORR custody after separation from a parent. ORR was largely left in the dark for the entirety of the pilot program as DHS failed to provide a meaningful response to any of ORR's communications and concerns about the agency's ability to accommodate these separated children.[36]

41.     At the end of the pilot program, CBP headquarters became aware of a "deficiency" in its records systems that prevented government officials from tracking separated children and their parents.[37] Although CBP headquarters was aware of the failures in tracking separated parents and children, they failed to implement any changes to the records systems to fix the problem.[38] This failure led to the monumental difficulties in reuniting families.

42.     As late as May 4, 2018, when DHS approved the adoption of the zero tolerance policy based on the results of the pilot program it had not first confirmed whether the various technology-related challenges documented and reported from the pilot program had been resolved.[39] In fact, CBP instructed field personnel to use spreadsheets to track separations because changes within the database were still pending. One senior CBP official noted that key

---

[35] H.R. Comm. on the Judiciary Report, *supra* note 4, at 7.

[36] *Id.* at 8-9.

[37] Office of Inspector General, U.S. Dep't. of Homeland Security, OIG-20-06, DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families (Nov. 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf.

[38] *Id.* at 14-15.

[39] DOJ OIG Report, *supra* note 5, at 32.

stakeholders had pressured DHS to implement the policy in early May 2018 before all deficiencies within the databases were resolved.[40]

43.    Although concerns about family separations had been identified by DOJ prosecutors, judges, and other stakeholders during the pilot program, DAG Rosenstein stated that that he was not aware that DHS would have difficulty tracking separated children.[41]

44.    Furthermore, DOJ did not have specific discussions with DHS prior to instituting zero tolerance but "assumed" that DHS knew what would happen to the separated children. DAG Rosenstein told the DOJ Office of Inspector General in an interview, "I wouldn't have asked for assurances because I would have assumed that they have appropriate systems in place."[42]

45.    Even as family separations continued to increase in the absence of a formal policy, then Secretary of Homeland Security Kirstjen Nielsen began efforts to formally develop and implement such a policy.

46.    On April 6, 2018, Attorney General Sessions announced the implementation of "Zero Tolerance" policy along the southwest border, mandating the prosecution of all adults who crossed the border between official ports of entry, thereby extending to the entire southern border the practices of criminal prosecution and family separation previously tested in the El Paso pilot program.[43]

---

[40] *Id.* at 32-33.
[41] *Id.* at 33.
[42] *Id.* at 34.
[43] U.S. Dep't of Justice, *Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry* (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry; U.S. Dept. of Justice, *Memorandum for Federal Prosecutors Along the Southwest Border* (Apr. 6, 2018), https://www.justice.gov/opa/press-release/file/1049751/download.

47.     On June 20, 2018, as widespread bi-partisan condemnation of the Trump Administration's actions mounted, President Trump signed Executive Order 13841, "Affording Congress an Opportunity to Address Family Separation," directing CBP to maintain "family units" and effectively ending the family separation policy.[44] Again, the announcement was made without prior notice to implementing agencies.[45]

**Harm to Families**

48.     From early 2017 through the time period at issue in this Complaint, senior government officials made the express choice to intentionally cause pain and suffering to parents and children, including very small children like this Plaintiff.

49.     It is well established that forcibly separating families causes severe harm to children. Scientific and medical evidence shows that the trauma caused by separating a child from his or her parent is likely to have extraordinarily harmful and long-lasting effects on the child's development. Such trauma can and did cause permanent emotional and behavioral problems and brain damage.[46]

---

[44] Affording Congress an Opportunity to Address Family Separation, Exec. Order No. 13, 841, 83 Fed. Reg. 29,435 § 1 (June 25, 2018).

[45] H.R. Comm. on the Judiciary Report, *supra* note 4, at 16.

[46] *See, e.g.*, Allison Abrams, Damage of Separating Families: The Psychological Effects on Children, PSYCHOL. TODAY (June 22, 2018), https://www.psychologytoday.com/us/blog/nurturing-self-compassion/201806/damage-separating-families (Children who are separated from a parent "develop insecure/disorganized attachment and persisting high levels of stress."); id. ("[T]he effects of mother-child separation on children's aggressive behavior are early and persistent."); Sarah Reinstein, Family Separations and the Intergenerational Transmission of Trauma, CLINICAL PSYCHIATRY NEWS (July 9, 2018), https://www.mdedge.com/psychiatry/article/169747/depression/family-separations-and-intergenerational-transmission-trauma ("[C]hildhood trauma is associated with emotional dysregulation, aggression against self and others, difficulties in attention and dissociation, medical problems, and difficulty with navigating adult interpersonal relationships."); Jeremy Raff, "The Separation Was So Long. My Son Has Changed So Much.": U.S. Border Guards Took a 6-Year-Old Honduran Boy from His Mother, and Ultimately Returned a Deeply Traumatized Child, THE ATLANTIC, Sept. 7, 2018, https://www.theatlantic.com/politics/archive/2018/09/trump-family-

50.    A recent Physicians for Human Rights (PHR) investigation, based on psychological evaluations of asylum-seeking parents and children who were separated by the U.S. government in 2018, found pervasive symptoms and behaviors consistent with trauma; most family members met diagnostic criteria for at least one mental health condition, such as post-traumatic stress disorder, major depressive disorder, or generalized anxiety disorder consistent with, and likely linked to, the trauma of family separation.[47] Significantly, PHR finds that the U.S. government's treatment of asylum seekers through its policy of family separation constitutes cruel, inhumane, and degrading treatment and, in all cases evaluated by PHR experts, rises to the level of torture.[48]

51.    The trauma to the separated children was aggravated by the fact that many children, especially those like the Plaintiff with language barriers, did not understand why they had been separated, causing some children to believe their parents had abandoned them. Serious

---

separation-children-border/569584/ ("The trauma of separation 'can disrupt the architecture of a child's brain[.]' . . . Prolonged separation weaponizes a child's fight-or-flight response, elongating it into toxic stress that can damage health in both the short and long term[.]"); Olga Khazan, Separating Kids From Their Families Can Permanently Damage Their Brains: A Pediatrician Explains How the Trauma of Family Separation Can Change Biology, THE ATLANTIC, June 22, 2018, https://www.theatlantic.com/health/archive/2018/06/how-the-stress-of-separation-affects-immigrant-kids-brains/563468/ (Separating a child from his or her parents "can permanently affect . . . children's brains, especially if it occurs early in childhood. Studies show that high levels of cortisol[, a stress hormone induced by separation]    can suppress the immune system and change the architecture of a developing brain[.] Another stress chemical, corticotropin-releasing hormone, can damage the hippocampus, which plays a major role in learning and memory.").

[47] Physicians for Human Rights, "You Will Never See Your Child Again:" The Persistent Psychological Effects of Family Separation 3 (2020), https://phr.org/wp-content/uploads/2020/02/PHR-Report-2020-Family-Separation-Full-Report.pdf,    (last    visited November 18, 2020).

[48] As defined by the United Nations Convention Against Torture, torture is an act 1) which causes severe physical or mental suffering, 2) done intentionally, 3) for the purpose of coercion, punishment, intimidation, or for a discriminatory reason, 4) by a state official or with state consent or acquiescence. In the cases that PHR documented, U.S. officials intentionally carried out actions causing severe pain and suffering, in order to punish, coerce, and intimidate Central American asylum seekers to give up their asylum claims, in a discriminatory manner.

psychological harm to children and families was a foreseeable result of Department of Homeland Security implementation of the forced family separation policy.

52.     It was within the government's power to prevent separation through use of alternatives to detention, to reduce the duration of separation through a reunification plan, and to ensure timely information about the wellbeing, whereabouts, and contact information for children and parents by setting up appropriate information and communications channels.

53.     Instead, the U.S. government failed to exercise due care and failed to take reasonable measures to minimize the predictable psychological harms that resulted from its policy to separate parents and children.

**Legal Framework**

54.     On June 26, 2018, in *Ms. L. v. U.S. Immigration and Customs Enf't,* 302 F. Supp. 3d 1149, 1161-67 (S.D. Cal. 2018)*,* the class action brought on behalf of the separated families, United States Federal District Court Judge Sabraw ordered the government to reunify families. The class-wide preliminary injunction, among other things, prohibited the government from separating parents from their minor children in the future, absent a determination that the parent is unfit or presents a danger to the child; prohibited the deportation of any detained parent before reunification with his or her separated children; and ordered the government to reunify parents separated from children under the age of five within fourteen days, and with children aged five and older within thirty days.

55.     Judge Sabraw criticized the agencies for their callous treatment of families: "[W]hat was lost in the process was the family. The parents didn't know where the children were, and the

children didn't know where the parents were. And the government didn't know, either."[49] Judge Sabraw found that the government's family separation violated the constitutional right to family integrity.[50]

56.     Family unity is a fundamental principle of child welfare law and recognizes that in order to thrive, children must remain in the care of their families where they are loved, nurtured, and feel safe. As such, as Judge Sabraw ruled, the separation of Plaintiff from her father violated Plaintiff's constitutional right to family integrity. The Supreme Court has consistently recognized that the parent-child relationship is constitutionally protected, *see, e.g., Quillon v. Walcott*, 434 U.S. 246, (1978); *Wisconsin v. Yoder*, 406 U.S. 205, 231–233 (1972); *Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923), and that it is constitutionally important for children to remain with their parents. *See Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligation the state can neither supply nor hinder.")

57.     Furthermore, under long-standing legal obligations, imposed by regulations and by consent decree, the federal officers who took custody of Plaintiff violated multiple non-discretionary duties that were designed to protect families, and particularly young children. Among

---

[49] Transcript of Status Conference at 58, *Ms. L.*, No. 18-cv-00428-DMS-MDD, ECF No. 164 (S.D. Cal. July 27, 2018).

[50] *See Ms. L.* v. *U.S. Immigration and Customs Enf't*, 302 F. Supp. 3d 1149, 1161-67 (S.D. Cal. 2018) (finding that plaintiffs had stated a legally cognizable claim for violations of their substantive due process rights under the Fifth Amendment to the United States Constitution based on their allegations that the government had separated them from their minor children, and kept them separated from their minor children, while they were held in immigration detention and without a showing that they were unfit parents or otherwise presented a danger to their children); *Ms. L.*, 310 F. Supp. 3d at 1142-46 (finding that plaintiffs were likely to succeed on the merits of their substantive due process claim); see also *Smith* v. *Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 845 (1977) (liberty interest in family relationships has its source in "intrinsic human rights").

other things, those non-discretionary obligations impose a duty on federal officers not to separate immigrant families that are arrested together, to prioritize release of minors to family members over shelters, to allow detained children to have contact with family members who were arrested with them, and to ensure prompt release of minors held in immigration custody. In its treatment of Plaintiff, the government violated all of these obligations.

58.    ICE and CBP have well-established legal obligations to ensure the prompt release of minors in their custody and to favor preserving family unity whenever possible. *See Flores v. Reno,* No. 85-cv-4544, ECF. No. 177 (C.D. Cal. July 24, 2015); 8 C.F.R. § 1236.3. The *Flores* consent decree remains binding on the United States and significantly limits the circumstances, duration, and manner of immigration detention of minor children.

59.    The *Flores* consent decree imposes standards for the treatment of detained minors and recognizes their vulnerability of being detained without a parent or guardian. It requires, among other matters, that immigration officers permit minors contact with family members who were arrested with the minor. DHS and its agents violated its obligations under the *Flores* consent decree and 8 C.F.R. § 1236.3 by not prioritizing family unity and instead needlessly separating Plaintiff from her father.

60.    CBP and ICE officers violated their non-discretionary obligations to follow their own internal policies and standards when they separated S.E.B.M. According to section 1.9 of the National Standards on Transport, Escort, Detention and Search ("TEDS) entitled "Family Unity," "CBP will maintain family unity to the greatest extent operationally feasible, absent a legal requirement of an articulable safety or security concern that requires separation."[51] TEDS Section

---

[51] National Standards on Transport, Escort, Detention, and Search, U.S. Customs & Border Protection at 4 (Oct. 2015), https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf.

5.6 regarding the detention of "At-Risk Populations" states, "Generally family units with juveniles should not be separated."[52] There was no legal requirement or safety and security considerations that required CBP to separate S.E.B.M. from her father; therefore, their separation by CBP violated the agency's own standards.

61.    Within a short time after apprehending S.E.B.M. and her father, federal authorities were informed by the father that the child's grandmother lived in Florida, which is where they intended to live. Yet, S.E.B.M. was taken from her father and then confined first to a shelter and then two foster homes for months, before finally being transferred to her grandmother in Florida. Clearly other alternatives were available besides separating the father and child, and even if the separation was to be effectuated, it could have been done in a manner far less traumatic than what transpired.  But sparing trauma to these families was not on the government's agenda.

62.    The negligent failure to unite S.E.B.M. with her grandmother in a timely manner significantly delayed the discovery of the trauma inflicted upon S.E.B.M.

**S.E.B.M.'s Separation from her Father**

63.    S.E.B.M. is a six-year-old girl from San Miguel Acatan, Huehuetenango, Guatemala. At the time that she was separated from her father at the border, she was just two years old, weighed about 25 pounds and was approximately 25 inches tall and she had a very limited spoken vocabulary at the time. The only language that she did speak is an indigenous language, Akateko.

64.    S.E.B.M. traveled to the U.S. with her father. The journey to the U.S. took approximately 15 days.

---

[52] *Id.* at 22.

65.    On approximately July 31, 2017, S.E.B.M. and her father crossed into the U.S. along with a group of others at or near Santa Teresa, New Mexico. They turned themselves in to CBP officials and were transported to the Santa Teresa CBP Station in New Mexico.

66.    Although S.E.B.M. was accompanied by her father, CBP documents incongruously designated her as an "unaccompanied alien child." In fact, paperwork completed by CBP officials at the Santa Teresa CBP Station indicate that "all pertinent information was obtained from the subject's father due to the fact that the subject is a juvenile," recognizing that S.E.B.M. was apprehended and detained with her parent; she was not unaccompanied.

67.    S.E.B.M. and her father spoke an indigenous language, Akateko, though her father understands a little Spanish. However, the CBP officers who encountered and processed S.E.B.M. and her father spoke to them in Spanish only. At no point did the CBP officers call an Akateko interpreter to assist with the interview or help explain immigration documents to S.E.B.M.'s father in his own language. At no point did CBP call or utilize an Akateko interpreter to explain to S.E.B.M. why she was being separated from her father or where she was being taken.

68.    Prior to being separated, S.E.B.M. and her father spent one night together at a CBP station in a cell that they shared with several other men.

69.    Upon information and belief, S.E.B.M.'s father provided the CBP officials with his daughter's birth certificate that revealed him to be her father. The CBP officials kept this document and others that S.E.B.M.'s father had in his possession.

70.    Upon information and belief, shortly after they were apprehended, S.E.B.M.'s father provided the CBP officials with contact information for his mother, who lives in Immokalee, Florida. He indicated to the CBP officials that his mother was in possession of their identity documents to further prove S.E.B.M.'s relationship to her father.

71.     Before S.E.B.M. and her father were separated, CBP officials permitted her father to call his mother in Immokalee, Florida. The CBP officials had told her father to contact his mother to inform her that he would be transferred to a jail.

72.     S.E.B.M. was forcibly taken away from her father on or about August 1, 2017 and put in a different room. Her father was holding her when they took her away, and the officers took S.E.B.M. from his arms. Her father was told that they were taking her somewhere else, to a place where children go. It was the last time S.E.B.M. would see her father.

73.     When the separation occurred, S.E.B.M. was crying and very distraught. Her father tried to comfort and soothe her, but she was too young to comprehend what was happening. She was barely able to say "*papa*" at the time.

74.     Federal officers had no reason to believe that Plaintiff's father was an unfit parent, and no justification for separating them. In separating Plaintiff from her father, then confining her in a shelter for more than five months, the government violated its non-discretionary obligation to maintain family integrity as guaranteed by the due process clause of the Fifth Amendment.

75.     Federal officers failed to use due care to minimize the trauma that was caused to S.E.B.M.

76.     S.E.B.M.'s father was not provided any information about what would happen to his daughter after they were separated. All the immigration officials told her father was that they would be reunited at some point after he spent a few days in a jail, but that never occurred. Her father asked if he could take his daughter with him but was told, "Children can't go where you are going." Because the father was not told what was happening to him and his child, he was unable to explain to his daughter in the only language she understands what was occurring or to offer her comfort that she would be alright or to assure her that he was not abandoning her. Instead, she was

left with a frightening and inexcusable experience of abandonment with no knowledge of what was happening to her and her father.

**S.E.B.M.'s Father's Fate**

77.     After the separation, S.E.B.M.'s father was transferred to the custody of the U.S. Marshal's Service and transported by bus in handcuffs and leg shackles to a jail. He was subsequently charged only with a misdemeanor charge of entering and attempting to enter the United States at a time and place other than as designated by Immigration Officers under 8 U.S.C. § 1325(a)(1) (entry without inspection.)

78.     After her father pled guilty to the misdemeanor illegal entry, he was sentenced to time served and then transferred back to ICE custody and transported to the El Paso Service Processing Center on or about August 10 or August 11, 2017, where he remained for over three months until he was finally deported from the U.S. on or about November 28, 2017.

79.     At the detention center, S.E.B.M.'s father asked the officers if they had any information about his daughter but was told they had none.

80.     While in ICE custody, S.E.B.M.'s father was told that he would see his daughter "soon" or "tomorrow." At one point, he was told that S.E.B.M. would have to go to immigration court, even though she was just two years old, and that he had to wait to be reunited with S.E.B.M. Her father believed that one day the officials would return S.E.B.M. to him and that they would depart the U.S. together.

81.     During his detention, S.E.B.M.'s father was extremely anxious and worried about the wellbeing of his daughter. Without any information from ICE, he wondered where she had been taken, how she was doing, and if she had been hurt. He was even concerned that she had been deported back to Guatemala alone where there was no one to care for her. From detention,

S.E.B.M.'s father called S.E.B.M.'s mother in Guatemala, to tell her that S.E.B.M. had been taken away and that he had no information on how she was doing after the separation. S.E.B.M.'s mother became ill from the stress of knowing her daughter was separated from her father.

82.     However, after three months of waiting in ICE custody, S.E.B.M.'s father began to give up hope of their reunification. He stopped believing the officers when they told him he would see his daughter again.

83.     He was told to sign a document before he was removed from the U.S. The document was not translated or explained to him in Akateko, and he did not understand what he was signing.

84.     S.E.B.M.'s father was ultimately deported to Guatemala without his daughter on or about November 28, 2017.

**S.E.B.M. in ORR Custody**

85.     After S.E.B.M. was erroneously designated an "unaccompanied alien child," she was transferred to the Clint Border Patrol Station and subsequently placed in the care of ORR, IES Hidalgo d/b/a Child Placing Agency of Brownsville, Texas as the care provider.

86.     Because of her age and language barrier, S.E.B.M. was unable to provide details concerning where she and her father had planned on living or a phone number to contact her family.

87.     S.E.B.M. was subsequently placed in a two-parent foster home. The foster parents would bring S.E.B.M. to IES Hidalgo to see her case manager, visit with a counselor, and make calls to her parents.

88.     In her meetings with ORR case managers and counselors, S.E.B.M. was reportedly quiet and shy. She did not say much to the ORR staff when they prompted her with questions about how she was doing, and she appeared uncomfortable in new environments. The case manager

noted that S.E.B.M. had a small scratch on her temple, and the foster parents explained that S.E.B.M. repeatedly scratched herself there, and the wound would not heal.

89.    Starting on September 29, 2017, approximately two months after S.E.B.M. was separated from her father, her case manager began to facilitate calls between S.E.B.M. and her father. However, because her father was in an ICE detention facility in El Paso, Texas, he was only permitted to speak to S.E.B.M. when ORR and ICE permitted him to do so, and the calls were only allowed to be approximately five minutes. S.E.B.M. was inconsolable and often cried throughout the calls, speaking little if at all. The brevity, infrequency, and difficulty of communicating due to the limitations of these phone calls delayed S.E.B.M.'s family from learning of her emotional trauma. In addition, calls often did not go through or her father was unable to access the phone to speak to her.

90.    S.E.B.M.'s mother died in mid-October 2017. S.E.B.M. was informed by a counselor for ORR that her mother died, but due to her age, S.E.B.M. was unable to process this information.

91.    As of October 31, 2017, S.E.B.M. remained in ORR because the agency had not identified a potential sponsor. Her father remained detained separately by ICE.

92.    On or about November 21, 2017, the ORR case manager indicated that he was working on a "Family Reunification Packet" due to S.E.B.M.'s family choosing her grandmother to sponsor her. By early December 2017, ORR was waiting for S.E.B.M.'s grandmother's fingerprints to be processed in order to accept her as a sponsor.

93.    On or about December 21, 2017, S.E.B.M. was moved to another foster home "to accommodate the placement needs."

94.     On January 8, 2018, after approximately 160 days in ORR custody, S.E.B.M. was discharged from ORR custody to live with her sponsor, her grandmother, who had been identified by the father in August as their intended destination in the U.S.

95.     S.E.B.M. continues to live with her grandmother in Immokalee, Florida.

**Injury and Harm to S.E.B.M.**

96.     The mental and emotional harm suffered by S.E.B.M. was severe, especially when considering the impact of such a traumatic experience on small children, who have a special vulnerability to mental harm.

97.     The trauma to this young child was exacerbated by the fact that she was unable to comprehend her surroundings or her predicament due to her age and inability to understand English or Spanish.

98.     When S.E.B.M. first moved to Immokalee, Florida to live with her paternal grandmother, she was very shy, did not speak, and often hid behind people.

99.     According to her grandmother, S.E.B.M. cried often in the months following her release from ORR custody. She did not sleep well and would barely eat. S.E.B.M.'s grandmother had to constantly console her and feed her as she was unable to eat on her own.

100.     S.E.B.M. often appeared frightened, particularly at night. She was scared to go outside or leave her home. S.E.B.M. would cling to her grandmother, who had to carry her everywhere she went. S.E.B.M. would also cry and follow after her male relative every time he left the home.

101.     The mental and emotional harm to S.E.B.M continues to this day.

## COUNT 1

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

102.    S.E.B.M. realleges the allegations in paragraphs 1-101 as if they were fully alleged herein.

103.    The forceful separation of parent and child in this case was extreme and outrageous.

104.    By engaging in the acts described in this Complaint, the federal officers and officials employed by the Defendant engaged in extreme and outrageous conduct with the intent to cause or a reckless disregard of the likelihood of causing harm to the Plaintiff.

105.    The Plaintiff has suffered extreme and severe mental and emotional distress of such substantial and enduring nature that no reasonable person should have to endure.

106.    There is a direct causal connection between the conduct of the Defendant in this case and the Plaintiff's mental and emotional distress.

107.    Under the Federal Tort Claims Act, the United States is liable to Plaintiff for intentional infliction of emotional distress.

## COUNT II
## NEGLIGENCE

108.    S.E.B.M. realleges all of the allegations in paragraphs 1-101 as if they were fully alleged herein.

109.    The federal officers employed by the Defendant referenced in paragraphs 1-101 owed a duty to Plaintiff to act with ordinary care and prudence so as not to cause harm or injury to Plaintiff.

110.    By engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiff.

111.    As a direct and proximate result of the referenced conduct, Plaintiff suffered substantial damages.

112.    Under the Federal Tort Claims Act, the United States is liable to Plaintiff for negligence.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, S.E.B.M. respectfully request:

A.  Compensatory damages;

B.  Attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and

C.  Such other and further relief as the Court deems just and appropriate.

**RESPECTFULLY SUBMITTED** this 5th day of February 2021.

FREEDMAN BOYD HOLLANDER GOLDBERG
URIAS & WARD, P.A.

*/s/ David H. Urias*
David H. Urias
Josh B. Ewing
20 First Plaza Center, NW, Suite 700
Albuquerque, NM 87102
P: (505) 842-9960
dhu@fbdlaw.com
jbe@fbdlaw.com

*Counsel for Plaintiff*

s/ Lisa Lehner
Lisa Lehner, Fla. Bar 382191
Jennifer Coberly, Fla. Bar No. 930466
AMERICANS FOR IMMIGRANT JUSTICE
6355 NW 36 Street, Suite 2201
Miami, FL 33166
P: (305) 573-1106 Ext. 1995
jcoberly@aijustice.org
llehner@aijustice.org

*Counsel for Plaintiff*
*Pro Hac Vice Admission Pending*

/s/ Ian Ross
Ian M. Ross, Fla. Bar No. 091214
Erica L. Perdomo, Fla. Bar No. 105466
STUMPHAUZER FOSLID SLOMAN ROSS
   & KOLAYA, PLLC
Two South Biscayne Blvd., Suite 1600
Miami, FL 33131
(305) 614-1400
iross@sfslaw.com
eperdomo@sfslaw.com

*Counsel for Plaintiff*
*Pro Hac Vice Admission Pending*