**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

S.E.B.M., a minor, by and through her next friend,
MARIA MENDEZ FELIPE,

      Plaintiff,

v.                                          No. 21-cv-00095-JHR-LF

THE UNITED STATES OF AMERICA,

      Defendant.

## DEFENDANT UNITED STATES' MOTION TO DISMISS

Defendant United States of America respectfully moves to dismiss this action for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

Plaintiff S.E.B.M., a minor, brings this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671-80. Plaintiff alleges that in 2017, the United States government began a pilot program called the "El Paso Initiative" to separate parents from their children upon unlawful entry in order to deter other families from entering. Pursuant to this alleged pilot program, Plaintiff was separated from her father on August 1, 2017 following their unlawful entry into the United States near Santa Teresa, New Mexico. She remained in the custody of the Office of Refugee Resettlement ("ORR") in Texas for roughly five months while awaiting placement with her grandmother in Florida. Plaintiff asserts that the forcible separation from her father constituted intentional infliction of emotional distress ("IIED") and that the government was negligent in failing to reunify Plaintiff with her family.

The United States has denounced the prior practice of separating children from their families at the United States-Mexico border and committed itself to family reunification. *See* Exec. Order No. 14011, 86 Fed. Reg. 8273 (Feb. 2, 2021) ("Establishment of Interagency Task Force on

the Reunification of Families"). Nevertheless, the Court should dismiss this action for lack of subject matter jurisdiction because the United States has not waived its sovereign immunity for these claims under the FTCA.

Defendant notified Plaintiff's counsel of this Motion, and Plaintiff is opposed.

## BACKGROUND

### A.      Legal Framework for Noncitizens Entering the United States Unlawfully

Under the Immigration and Nationality Act ("INA"), any noncitizen[1] present in the United States without being admitted or paroled is inadmissible and subject to removal. *See* 8 U.S.C. §§ 1182(a)(6)(A)(i), 1225(b)(2)(A), 1229a. Such individuals may also be subject to prosecution for criminal immigration violations, including entering the United States "at any time or place other than as designated by immigration officers." 8 U.S.C § 1325(a)(1).

Noncitizens present in the United States without being admitted are considered "applicant[s] for admission" and are "inspected by immigration officers" to assess the validity of their claims. *See* 8 U.S.C. §§ 1225(a)(1), (a)(3), (b). The INA "mandate[s] detention of applicants for admission until certain [removal] proceedings have concluded." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018). Specifically, such applicants "shall be detained pending a final determination of credible fear of persecution and, if found not to have such fear, until removed." 8 U.S.C. §§ 1225(b)(1)(B)(iii)(IV) and (b)(2)(A). The detention of noncitizens is further authorized by 8 U.S.C. § 1226(a), which provides that a noncitizen "may be arrested and detained pending a decision on whether [he or she] is to be removed from the United States."

---

[1] Except when quoting from a statute or other source, the United States will use the terms "noncitizen" and "noncitizen unaccompanied child" instead of "alien" and "unaccompanied alien child" or "UAC."

The Department of Homeland Security ("DHS") may in its "discretion" grant parole and release such individuals only under prescribed circumstances on a "case-by-case basis." 8 U.S.C. § 1182(d)(5); 8 C.F.R. §§ 235.3(b)(2)(iii) and (b)(4)(ii). The federal government possesses statutory authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1).

**B.    Legal Framework for Immigration Custody and Release of Minors**

Federal law authorizes the United States to provide for the custody and care of noncitizen unaccompanied children (also referred to as "unaccompanied alien children" or "UACs") in the United States. *See* 6 U.S.C. § 279; 8 U.S.C. § 1232. Specifically, the ORR (which is within the Department of Health and Human Services) is charged with "the care and placement of unaccompanied alien children who are in Federal custody by reason of their immigration status." 6 U.S.C. § 279(b)(1)(A); *see also* 8 U.S.C. § 1232(b)(1). A noncitizen unaccompanied child is one: (1) who "has no lawful immigration status in the United States"; (2) who "has not attained 18 years of age"; and (3) "with respect to whom . . . there is no parent or legal guardian in the United States; or . . . no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2).

Under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), "[e]xcept in the case of exceptional circumstances, any department or agency . . . shall transfer the custody of such child to [ORR] not later than 72 hours after determining that such child is an unaccompanied alien child." 8 U.S.C. § 1232(b)(3). ORR must place noncitizen unaccompanied children "in the least restrictive setting that is in the best interest of the child." *Id*. § 1232(c)(2)(A). However, ORR "shall not release such children upon their own recognizance." 6 U.S.C. § 279(b)(2)(B).

In addition to this legal framework, the federal government entered into a consent decree known as the *Flores* Agreement,[2] enforced in the Central District of California that "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the [immigration authorities]." *Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016) (citing *Flores* Agreement ¶ 9). Under the *Flores* Agreement, DHS must transfer minors to a non-secure, licensed facility within certain time limits. *Id*. at 902-03 (quoting *Flores* Agreement ¶ 12(A)). However, the *Flores* Agreement "does not address . . . the housing of family units and the scope of parental rights for adults apprehended with their children," and it "does not contemplate releasing a child to a parent who remains in custody, because that would not be a 'release.'" *Id*. at 906; *see also United States v. Dominguez-Portillo*, No. 17-MJ-4409, 2018 WL 315759, at *9 (W.D. Tex. Jan. 5, 2018) (noting that the *Flores* Agreement "does not provide that parents are entitled to care for their children if they were simultaneously arrested by immigration authorities"). Nor does the *Flores* Agreement provide any rights to adult detainees, including any right to release. *Flores*, 828 F.3d at 908; *see also Dominguez-Portillo*, 2018 WL 315759, at *14-15; *Bunikyte v. Chertoff*, No. 07-164, 2007 WL 1074070, at *16 (W.D. Tex. Apr. 9, 2007). While the *Flores* Agreement gives preference to the releasing of minors to a parent, this "does not mean that the government must also make a parent available; it simply means that, if available, a parent is the first choice." *Flores*, 828 F.3d at 908.

**C.     Prior Executive Branch Directives Regarding Immigration Enforcement**

In January 2017, then-President Trump issued Executive Order No. 13767 ("EO 13767"), stating that "[i]t is the policy of the executive branch to . . . detain individuals apprehended on suspicion of violating Federal or State law, including Federal immigration law, pending further

---

[2] *See Flores v. Sessions*, No. 85-cv-4544 (C.D. Cal. Feb. 2, 2015) (Doc. 101).

proceedings regarding those violations." Exec. Order No. 13767 § 2(b), 82 Fed. Reg. 8793 (Jan. 3, 2017). EO 13767 directed DHS to "ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country to the extent permitted by law," and to exercise its parole authority "only on a case-by-case basis in accordance with the plain language of the statute . . . and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole." *Id*. §§ 6, 11(d).

On April 11, 2017, then-Attorney General Sessions issued a memorandum to all federal prosecutors regarding a renewed commitment to criminal immigration enforcement. *See* Memorandum from the Attorney General to All Federal Prosecutors on Renewed Commitment to Criminal Immigration Enforcement (Apr. 11, 2017).[3] He requested that federal law enforcement prioritize the prosecution of several immigration offenses, including illegal entry under 8 U.S.C. § 1325, noting that "[c]onsistent and vigorous enforcement of key laws will disrupt organizations and deter unlawful conduct." *Id*. at 1. Moreover, he requested that U.S. Attorneys' offices along the border "work with the U.S. Department of Homeland Security and any other appropriate agency to develop a set of guidelines for prosecuting such violations." *Id*. at 1-2.

On April 6, 2018—after all of the events set forth in the Complaint—Attorney General Sessions issued a "Memorandum for Federal Prosecutors along the Southwest Border." U.S. DOJ, News Release: Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry (April 6, 2018), DOJ 18-417, 2018 WL 1666622 (the "Zero Tolerance Memorandum"). The Zero Tolerance Memorandum directed federal prosecutors along the southwest border "to adopt a policy

---

[3] *Available at* https://www.justice.gov/opa/press-release/file/956841/download (last visited May 3, 2021).

to prosecute all Department of Homeland Security referrals of section 1325(a) violations, to the extent practicable." *Id*. Accordingly, DHS referred for prosecution adult noncitizens—including those traveling with children—who unlawfully entered the United States on the southwest border in violation of § 1325 or other statutory provisions authorizing criminal prosecution. Minor children of those adults were then designated as noncitizen unaccompanied children and transferred to ORR custody.

On June 20, 2018, then-President Trump signed Executive Order 13841, which stated that it was "the policy of this Administration to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources." Exec. Order No. 13841 § 1, 83 Fed. Reg. 29435 (June 20, 2018). On January 26, 2021, the Acting Attorney General issued a memorandum rescinding the April 2018 Zero Tolerance Memorandum. *See* Memorandum from the Acting Attorney General to All Federal Prosecutors on Rescinding the Zero-Tolerance Policy for Offenses Under 8 U.S.C. § 1325(a) (Jan. 26, 2021).[4] On February 2, 2021, President Biden signed an Executive Order to create a task force to identify children separated from their families at the border and make recommendations to facilitate reunification and provide services and support to the children, including trauma and mental health services. *See* Exec. Order No. 14011 § 4, 86 Fed. Reg. 8273 (Feb. 2, 2021) (revoking Executive Order 13841).

## D.    Allegations in Plaintiff's Complaint[5]

Plaintiff alleges that on July 31, 2017, when she was then-two years old, she and her father crossed into the United States at or near Santa Teresa, New Mexico, after a 15-day journey from their native Guatemala. Doc. 1 ¶¶ 63-65. They turned themselves in to Customs and Border

---

[4] *Available at* https://www.justice.gov/ag/page/file/1360706/download (last visited May 3, 2021).

[5] Defendant restates Plaintiff's factual allegations from the Complaint for purposes of this Motion only, without any admission or concession as to their accuracy.

Protection ("CBP") officials and were transported to the Santa Teresa CBP station, where they spent a night together. *Id*. ¶¶ 65, 68. Plaintiff's father was permitted to call his mother in Immokalee, Florida. *Id*. ¶ 71.

On August 1, 2017, Plaintiff was separated from her father, who was transferred to the custody of the U.S. Marshals Service and charged with entering and attempting to enter the United States at any time or place other than as designated by immigration officers in violation of 8 U.S.C. § 1325(a)(1). *Id*. ¶¶ 35, 72, 77. After pleading guilty, he was sentenced to time served and transferred to the custody of U.S. Immigration and Customs Enforcement ("ICE"). *Id*. ¶ 78. He was detained at the El Paso Service Processing Center, where he remained until he was deported on November 28, 2017. *Id*.

Within ten days of the separation, Plaintiff was transferred to the Clint Border Patrol station and, based on her designation as a noncitizen unaccompanied child, transferred to the custody and care of ORR, and placed with IES Hidalgo d/b/a Child Placing Agency of Brownsville, Texas. *Id*. ¶¶ 35, 85. Plaintiff was placed in a foster home, and her foster parents brought her to IES Hidalgo to see her case manager, visit with a counselor, and make calls to her parents. *Id*. ¶ 87. In mid-October 2017, Plaintiff's mother, who was still in Guatemala, passed away. *Id*. ¶¶ 81, 90.

In November 2017, ORR was working on a "Family Reunification Packet" based on Plaintiff's family choosing her grandmother—who lived in the United States—to sponsor her. *Id*. ¶ 92. In December 2017, Plaintiff was briefly moved to another foster home while ORR waited for her grandmother's fingerprints to be processed in order to accept her as a sponsor. *Id*. ¶¶ 92-93. On January 8, 2018, Plaintiff was discharged from ORR custody to live with her grandmother in Immokalee, Florida, where she continues to live. *Id*. ¶ 95.

In January 2020, Plaintiff alleges that she submitted an administrative claim under the FTCA. Because the claim was not finally disposed of within six months, Plaintiff deemed the claim denied and filed this action on February 5, 2021. *Id.* ¶ 12. Plaintiff alleges two claims pursuant to the Federal Tort Claims Act: a claim for IIED and a claim for negligence. *Id.* ¶¶ 102-12.

## ARGUMENT

## I.    The Court Lacks Subject Matter Jurisdiction under the FTCA.

The federal government is immune from liability absent its consent, and the terms of that consent define a court's jurisdiction to entertain a suit against the government. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). Absent a specific waiver, sovereign immunity bars the suit. *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). The FTCA "waive[s] the sovereign immunity of the United States for certain torts committed by federal employees acting within the scope of their employment." *Brownback v. King*, 141 S. Ct. 740, 746 (2021) (internal quotation marks omitted).

An FTCA claim "is actionable if it alleges the six elements of [28 U.S.C.] § 1346(b), which are that the claim be:

> [1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

*Id.* (quoting 28 U.S.C. § 1346(b) (internal quotation marks omitted; alterations in original)). Because "in the unique context of the FTCA, all elements of a meritorious claim are also jurisdictional, . . . a plaintiff must plausibly allege all six FTCA elements not only to state a claim upon which relief can be granted but also for a court to have subject-matter jurisdiction over the claim." *Id.* at 749. Hence, an "FTCA plaintiff[] bears the burden of proof to establish that the court

possesses subject-matter jurisdiction based upon analogous [state law] private liability." *Pappas v. United States*, 617 F. App'x 879, 882 (10th Cir. 2015).

"The liability of the United States under the FTCA is subject to the various exceptions contained in [28 U.S.C.] § 2680," including the discretionary function and due care exceptions set forth in 28 U.S.C. § 2680(a). *United States v. Gaubert*, 499 U.S. 315, 322 (1991). The plaintiff bears the burden of alleging facts that place her claims facially outside these exceptions. *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1542 & n.11 (10th Cir. 1992).

Here, Plaintiff has not met her burden to plausibly allege facts showing that there is a private person analog for her claims or that her claims fall outside either the discretionary function or due care exceptions to the FTCA. Accordingly, the Court should dismiss her claims for lack of subject matter jurisdiction.

### A.      There Is No Private Person Analog for Plaintiff's Claims.

The FTCA governs claims against the United States only if "the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also id.* § 2674 (authorizing tort recovery against the United States only "in the same manner and to the same extent as a private individual under like circumstances"). The Supreme Court has recently clarified that a court should assess whether a plaintiff's "FTCA claims plausibly allege[] the six elements of § 1346(b)(1) as a threshold matter," including whether there is a private person analog. *Brownback*, 141 S. Ct. at 749-50 & n.9. If the court determines that any of these elements was "not plausibly alleged," it must "dismiss[] those claims for lack of subject-matter jurisdiction." *Id.* at 750 n.9.

The applicable law is "the whole law of the State where the act or omission occurred," including conflicts-of-laws principles. *Richards v. United States*, 369 U.S. 1, 11 (1962). However, "[n]either the text of the FTCA nor *Richards* provides any guidance . . . when the alleged acts or

9

omissions occur in more than one state." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 758 (2004) (Ginsburg, J., concurring) (quoting *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 181 (3d Cir. 2000) (alteration in original)). "Courts have adopted at least five different approaches to determine which acts count in deciding which state's choice-of-law principles apply under § 1346(b):

> (1) applying different rules to different theories of liability; (2) choosing the place of the last allegedly-wrongful act or omission; (3) determining which asserted act of wrongdoing had the most significant effect on the injury; (4) choosing the state in which the United States' physical actions could have prevented injury; and (5) determining where the 'relevant' act or omission occurred."

*Draughon v. United States*, 103 F. Supp. 3d 1266, 1281 (D. Kan. 2015) (citing *Gould Elecs.*, 220 F.3d at 181). Although the "Tenth Circuit has not addressed the question," at least one district court in the circuit has adopted the "last significant act or omission" rule set forth in *Gould Electronics* and endorsed by Justices Ginsburg and Breyer in their concurrence in *Sosa*. *Id*. "Given the lack of on-point controlling authority in this Circuit and the persuasive reasoning of the Third Circuit and the concurring justices in *Sosa*," *id*., this Court should also follow the "last significant act or omission" rule.

Applying "the last significant act or omission" rule to this case favors the application of New Mexico law to Plaintiff's IIED claim and Texas law to her negligence claim. Here, the only act or omission alleged by Plaintiff that occurred in New Mexico is the physical separation from her father shortly after their entry. Soon thereafter, Plaintiff was transferred to ORR custody in Brownsville, Texas and remained in ORR custody until released to her grandmother. Doc. 1 ¶¶ 85, 94, Because Plaintiff alleges negligent failure to reunite her with her grandmother in a timely manner, *id*. ¶ 62, the last significant act or omission took place in Texas, and Texas' choice-of-law rules should apply.

"Texas uses the *Restatement*'s 'most significant relationship' test to decide choice-of-law issues." *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000) (citing *Restatement (Second) of Conflicts of Laws* §§ 6, 145 (1971)). "Factual matters to be considered when determining which state has the 'most significant relationship' include where the injury occurred, where the conduct causing the injury occurred, where the parties reside, and where the parties' relationship is centered." *McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 702 (5th Cir. 2014). "Texas law requires a claim-by-claim choice of law analysis." *Fearrington v. Bos. Sci. Corp.*, 410 F. Supp. 3d 794, 800 (S.D. Tex. 2019).

Here, under the most-significant relationship test, New Mexico law should apply to Plaintiff's IIED claim given that Plaintiff alleges in her IIED claim that "the forceful separation of parent and child in this case was extreme and outrageous[,]" Doc. 1 ¶ 103, and that this separation occurred in New Mexico, *see id.* ¶ 13 (noting that "the injury occurred when they were detained and separated in New Mexico"). Texas law should apply, however, to the negligence claim because the acts and omissions occurred while Plaintiff was in Texas.[6]

### 1.    There Is No Private Person Analog for the IIED Claim under New Mexico Law.

For IIED claims, New Mexico "has adopted the approach used in the *Restatement (Second) of Torts* § 46." *Baldonado v. El Paso Nat. Gas Co.*, 176 P.3d 277, 283 (N.M. 2008) (internal quotation marks omitted). A plaintiff alleging IIED must show "(1) the conduct in question was extreme and outrageous; (2) the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal

---

[6] This is the same result if the Court applies New Mexico's choice-of-law rules. "In tort actions, New Mexico courts follow the doctrine of lex loci delicti commissi and apply the law of the place where the wrong took place." *Mosley v. Titus*, 762 F. Supp. 2d 1298, 1314 (D.N.M. 2010) (citing *Torres v. State*, 894 P.2d 386, 390 (N.M. 1995)).

11

connection between the defendant's conduct and the claimant's mental distress." *Id.* (internal quotation marks omitted). However, as New Mexico courts recognize, "'conduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances.'" *Id.* at 285 (quoting *Restatement (Second) of Torts* § 46 cmt. g) (alteration omitted)). "The actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress." *Restatement (Second) of Torts* § 46 (1965) (citing an example of a landlord threatening to evict "A and her children," who are "destitute, ill, and unable to pay their rent"; while the "conduct is heartless, he has done no more than the law permits him to do, and he is not liable to A for her emotional distress").

Here, a potential private person analog could be a private individual with legal custody of a child taking the child away from a parent who lacks the ability to retain physical custody. Once Plaintiff's father was placed into the custody of the U.S. Marshals Service for prosecution and Plaintiff became a noncitizen unaccompanied child under federal law, CBP was required to "transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours" later. 8 U.S.C. § 1232(b)(3); *see also* Doc. 1 ¶ 33 (noting that TVPRA "requires DHS to place UACs into ORR custody within 72 hours"). Because the separation was legally permitted, it would be privileged under New Mexico law. *See, e.g.*, *Galicia v. United States*, No. CV 13-0105 MCA/LAM, 2015 WL 12696086, at *2 (D.N.M. Feb. 24, 2015) (finding that a Border Patrol agent's actions "in arresting and detaining Plaintiff" and "removing Plaintiff to Mexico" did not constitute IIED under New Mexico law because these actions "were authorized by law"); *accord Allen v. Walker*, 810 So. 2d 1090, 1091 (Fla. Dist. Ct. App. 2002) (holding that a school principal's decision to release a child to her father, who had a court order awarding him full legal and physical

custody, was not extreme and outrageous conduct notwithstanding grandparents' specific instructions not to let the father pick up the child); *Rushing v. Bosse*, 652 So. 2d 869, 876 (Fla. Dist. Ct. App. 1995) (dismissing grandparents' IIED claim based on attorney's facilitation of adoption, where "the child was brought to [the attorney] by her mother, who had legal custody of the child"); *cf. Renaud v. St. Lawrence Cty.*, 650 N.Y.S.2d 367, 368-69 (App. Div. 1996) (finding no extreme and outrageous conduct where police allowed "a mother legally entitled to custody" to "regain physical custody from the children's paternal grandparents who had no custodial rights").

Because Plaintiff has not plausibly alleged conduct that would constitute IIED under New Mexico law, the Court should dismiss this claim for lack of subject matter jurisdiction.

### 2. There Is No Private Person Analog for the Negligence Claim under Texas Law.

Plaintiff's negligence claim consists of the conclusory allegation that "[b]y engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiff." Doc. 1 ¶ 110. The only negligent conduct that Plaintiff specifically alleges is the "negligent failure to unite S.E.B.M. with her grandmother in a timely manner." *Id*. ¶ 62. As discussed above, Texas law should apply to this claim.

"To maintain a negligence claim under Texas law, a plaintiff must show the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *Kristensen v. United States*, 993 F.3d 363, 368 (5th Cir. 2021) (internal quotation marks omitted). Here, a potential private person analog could be the failure of a private foster home or adoption agency to place a child with a grandparent within a certain time frame.[7] There do not appear to be any cases

---

[7] While Texas law imposes requirements on the Texas Department of Family and Protective Services to promptly place a child with a qualified relative, *see* Tex. Fam. Code § 264.753, the FTCA "requires a court to look to the state-law liability of *private* entities, not to that of public entities, when assessing liability under the FTCA." *United States v. Olson*, 546 U.S. 43, 45-46

in Texas recognizing such a duty, and at least one court has rejected a similar theory. *See Walding v. United States*, No. CIV.A. SA08CA124-XR, 2009 WL 902423, at *15 (W.D. Tex. Mar. 31, 2009) (dismissing FTCA negligence claim based on erroneous placement of a noncitizen unaccompanied child in an adult facility, since there is no "claim under Texas law against a private party for negligent placement of a minor in an adult facility"); *accord Anderson v. Nebraska*, No. 4:17-CV-3073, 2018 WL 3009115, at *7 (D. Neb. June 15, 2018) (rejecting the plaintiff's invitation "[t]o infer a tort duty of foster parents to reunite children with their natural parents").[8]

### 3.    Only the Federal Government Has the Authority to Enforce Federal Immigration Laws.

Furthermore, there is no basis for liability under the FTCA where, as here, a plaintiff alleges "a type of conduct that private persons could not engage in, and hence could not be liable for under local law." *United States v. Agronics Inc.*, 164 F.3d 1343, 1346 (10th Cir. 1999) (internal quotation marks omitted). The alleged harms here stem from the federal government's decision to enforce federal immigration laws and hold Plaintiff's father in secure adult detention pending his immigration proceedings, rendering Plaintiff "unaccompanied" and resulting in her placement in the care and custody of ORR. The United States has not waived its sovereign immunity for such

---

(2005) (internal quotation marks omitted; emphasis added). Consequently, any duties of state agencies are inapplicable in determining whether there is a private person analog under the FTCA.

[8] To the extent Plaintiff contends that ORR was negligent *per se* because it violated a statutory duty pursuant to 8 U.S.C. § 1232(c)(2)(A) by not placing her in "the least restrictive setting that is in the best interest of the child," "[i]t is virtually axiomatic that the FTCA does not apply where the claimed negligence arises out of the failure of the United States to carry out a [federal] statutory duty in the conduct of its own affairs." *United States v. Agronics Inc.*, 164 F.3d 1343, 1345 (10th Cir. 1999) (internal quotation marks omitted; alteration in original); *see also Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019) ("The state-law, private-analogue duty requirement precludes the imposition of FTCA liability based solely on the breach of a federally created duty. . . ."); *accord Pappas v. United States*, 617 F. App'x 879, 883 (10th Cir. 2015) (holding that violations of Bureau of Prisons regulations could not serve as the basis for an FTCA claim because the "regulations have no application outside of the Bureau of Prisons").

decisions to enforce federal law because there is no private person counterpart. *See McGowan v. United States*, 825 F.3d 118, 127 (2d Cir. 2016) (rejecting prisoner's FTCA claim of wrongful confinement in a segregation unit because "[p]rivate persons cannot establish facilities to detain other persons"); *accord Cortez v. E.E.O.C.*, 585 F. Supp. 2d 1273, 1291 (D.N.M. 2007) ("There is no FTCA liability, because there is no private analogue to the EEOC's work in processing and investigating discrimination charges.").

Because a private person would not be liable for IIED or negligence under state law, Plaintiff cannot establish a jurisdictional element of her FTCA claims. Consequently, the Court should dismiss these claims for lack of subject matter jurisdiction.

B.     **The Discretionary Function Exception Bars Plaintiff's Claims.**

Even assuming that Plaintiff has plausibly alleged a private person analog for each of her claims, the Court still lacks jurisdiction due to the discretionary function exception. The discretionary function exception to the FTCA preserves the United States' sovereign immunity for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984). Plaintiff bears the burden of showing that the FTCA's discretionary function exception does not apply. *See Hardscrabble Ranch, LLC v. United States*, 840 F.3d 1216, 1220 (10th Cir. 2016). "To avoid dismissal of an FTCA claim under the discretionary-function exception, a plaintiff must allege facts that place its claim facially outside the exception." *Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1130 (10th Cir. 1999).

To determine whether the challenged conduct falls within the discretionary function exception, courts engage in a two-pronged analysis, known as the *Berkovitz* test, determining: (1) "whether the challenged conduct 'involves an element of judgment or choice,'" rather than "'a federal statute, regulation, or policy that specifically prescribes a course of action for an employee to follow'"; and if so, (2) "'whether that judgment is the kind that the discretionary function exception was designed to shield,'" *i.e.*, a judgment with policy implications. *Kiehn v. United States*, 984 F.2d 1100, 1102-03 (10th Cir. 1993) (quoting *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988) (alteration omitted)). "If the discretionary function exception applies to the challenged governmental conduct, the United States retains its sovereign immunity and the district court lacks subject matter jurisdiction to hear the suit." *Domme v. United States*, 61 F.3d 787, 789 (10th Cir. 1995).

### 1.    Plaintiff Has Not Alleged Any Mandatory, Specific Directive Violated by Defendant.

Under the first prong of *Berkovitz*, Plaintiff must "identify what mandatory statutes, regulations or directives have allegedly been violated with specificity." *Hammonds v. United States*, Civ. No. 16-1230 GBW/KRS, 2018 WL 1399183, at *5 (D.N.M. Mar. 19, 2018) (citing *Daigle*, 972 F.2d at 1539-40). Here, Plaintiff identifies a plethora of purportedly mandatory directives, but none of these directives is sufficient to defeat the discretionary function exception.

**The U.S. Constitution:** Plaintiff first contends that her "detention and separation violated the United States Constitution's clearly established due process rights governing immigration detainees and the constitutional right to family integrity," and therefore, "this tortious conduct is not subject to the FTCA's discretionary function exception." Doc. 1 ¶ 8; *see also id*. ¶ 74.

The Tenth Circuit has never held that the discretionary function exception applies only when the underlying conduct was constitutional. As Judge Ebel has noted, "[t]here is nothing in

the language of the discretionary function exception that suggests that that is the relevant inquiry." *Ramirez v. Reddish*, No. 2:18-CV-00176-DME-MEH, 2020 WL 1955366, at *28 (D. Utah Apr. 23, 2020); *see also Linder v. United States*, 937 F.3d 1087, 1090 (7th Cir. 2019) ("[T]he theme that 'no one has discretion to violate the Constitution' has nothing to do with the Federal Tort Claims Act, which does not apply to constitutional violations."). "Moreover, such a determination of whether the employee acted unconstitutionally in a given case would typically require a full-blown examination of the federal employee's conduct that the discretionary function exception is designed to avoid." *Ramirez*, 2020 WL 1955366, at *29 (noting that determining whether a search or seizure was objectively unreasonable "will typically require a lengthy and detailed analysis" that, in the context of a waiver of sovereign immunity, "would make no sense whatsoever").

Accordingly, even assuming, *arguendo*, that a due process violation occurred,[9] that would not take Plaintiff's FTCA claims outside the reach of the discretionary function exception in the Tenth Circuit.[10] *See Awad v. United States*, 807 F. App'x 876, 881 (10th Cir. 2020) ("Even if they were mistaken, the DEA agents made a discretionary determination that probable cause to arrest Awad existed."); *Ramirez*, 2020 WL 1955366, at *33 ("The Task Force members might have

---

[9] The existence of a substantive due process right to family integrity in the immigration context is not supported by precedent. *See, e.g.*, *Cervantes v. INS*, 510 F.2d 89, 92 (10th Cir. 1975) ("The incidental impact on aliens' minor children caused by the enforcement of duly-enacted conditions on aliens' entrance and residence does not create constitutional problems."); *accord Reyna as next friend of J.F.G. v. Hott*, 921 F.3d 204, 210 (4th Cir. 2019) ("On the merits, we, like the district court, have been unable to find a substantive due process right to family unity in the context of immigration detention pending removal.").

[10] Other Courts of Appeals have held that the discretionary function exception does not immunize a government action alleged to be unconstitutional. *See, e.g.*, *Loumiet v. United States*, 828 F.3d 936, 944 (D.C. Cir. 2016) (citing cases). However, the Tenth Circuit has not adopted this reasoning. *See Ramirez*, 2020 WL 1955366, at *29 (noting that Tenth Circuit precedent does not require a constitutional analysis to determine whether the discretionary function exception applies); *id*. at *30-32 (conducting a lengthy analysis of *Loumiet*'s flawed reasoning); *see also Martinez v. United States*, 822 F. App'x 671, 678 (10th Cir. 2020) (noting that the Tenth Circuit "has not addressed this issue").

abused their discretion by acting unconstitutionally but that does not negate the fact that the manner in which an arrest warrant is executed involves a great deal of discretion. 28 U.S.C. § 2680(a) specifically does not limit the assertion of sovereign immunity only to acts that are constitutional."). The Court should therefore "decline[], without explicit congressional, Supreme Court, or Tenth Circuit direction, to superimpose such an involved and detailed analysis of the constitutionality of the federal employee's conduct challenged under the FTCA into the otherwise straightforward inquiry . . . for determining whether the discretionary function exception should apply." *Ramirez*, 2020 WL 1955366, at *29.

**Federal regulation:** Plaintiff suggests that a regulation, 8 C.F.R. § 1236.3, creates a "legal obligation to ensure the prompt release of minors in their custody and to favor preserving family unity whenever possible." Doc. 1 ¶ 58. But this regulation does not apply in these circumstances, as it applies only to "[j]uveniles for whom bond has been posted, for whom parole has been authorized, or who have been ordered released on recognizance." 8 C.F.R. § 1236.3(b). Plaintiff does not allege that she satisfies any of these criteria. Even for juveniles covered by the regulation, the decision to simultaneously release a detained family member in order to accept custody of the juvenile "shall be evaluated on a discretionary case-by-case basis." 8 C.F.R. § 1236.3(b)(2). And the regulation also expressly recognizes that there may be "cases where the parent . . . . is in Service detention" and provides for release to other individuals in those circumstances. *Id*. § 1236.3(b)(3). Thus, this regulation does not create a mandatory duty to release the family together. Plaintiff therefore cannot show that this regulation is a source of a mandatory duty violated by Defendant.

***Flores* Agreement:** Plaintiff also alleges that "DHS and its agents violated its obligations under the *Flores* consent decree . . . by not prioritizing family unity and instead needlessly

separating Plaintiff from her father." Doc. 1 ¶ 59.[11] However, "[t]he Settlement does not contemplate releasing a child to a parent who remains in custody, because that would not be a 'release.'" *Flores*, 828 F.3d at 906; *see also id.* at 909 (noting that the *Flores* Agreement "provides no affirmative release rights for parents"). Moreover, while the *Flores* Agreement "grants class members a right to preferential release to a parent over others," that "does not mean that the government must also make a parent available; it simply means that, if available, a parent is the first choice." *Id.* at 908.

Tellingly, Plaintiff points to no language in the *Flores* Agreement requiring detention of a juvenile with her parent or release of both the juvenile and the parent so that they can stay together. As several courts have recognized, "[n]either *Flores* nor any federal rule or statute mandates the simultaneous release of parents and children from detention." *Bunikyte*, 2007 WL 1074070, at \*16; *see also United States v. Vasquez-Hernandez*, 314 F. Supp. 3d 744 (W.D. Tex. 2018), *aff'd*, 924 F.3d 164 (5th Cir. 2019) (noting that "none of [the *Flores* Agreement] provisions suggest that minors should be released to an adult who has been charged with, and is being detained for, an immigration offense"). Hence, Plaintiff cannot show any violation of the Flores Agreement.

**CBP Policy:** Plaintiff also asserts that "CBP and ICE officers violated their non-discretionary obligations to follow their own internal policies and standards when they separated S.E.B.M." Doc. 1 ¶ 60. In particular, Plaintiff cites CBP's National Standards on Transport, Escort, Detention and Search ("TEDS"), which provide that "CBP will maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security

---

[11] Plaintiff also alleges that the *Flores* Agreement requires "that immigration officers permit minors contact with family members who were arrested with the minor," Doc. 1 ¶ 59, but does not specifically allege how Defendant violated this requirement. Indeed, the Complaint alleges that Plaintiff spoke with her father by telephone on numerous occasions. *See id*. ¶¶ 87, 89.

concern that requires separation" and that "[g]enerally family units with juveniles should not be separated." *See* TEDS §§ 1.9, 5.6.[12]

The language quoted by Plaintiff does not create a mandatory, specific duty to keep her with her father. In *Tippett v. United States*, 108 F.3d 1194 (10th Cir. 1997), the Tenth Circuit addressed discretionary guidelines that used similar language, including "feasible" and "should." There, the Court considered whether agency guidelines created a mandatory duty for a Yellowstone National Park ranger to protect the plaintiff from a dangerous animal. The operative guidelines provided that "[t]he destruction of a native animal is acceptable only when relocation is not a feasible alternative; the animal was injured or deceased through human-induced impacts . . . ; or human safety is a concern . . . ." *See id*. at 1198. Another guideline provided that a road "should be temporarily closed by any NPS employee when imminent life threatening or potential serious injury situations exist." *Id*. The court concluded that implementation of both these guidelines implicated the exercise of discretion. *Id.* at 1199.

A policy that uses terms such as "feasible" and "should" did not unequivocally require that Plaintiff remain with her father. *See, e.g*., *Lane v. United States*, 918 F. Supp. 864, 870 (E.D. Pa. 1996) (holding that where statute provided that agency "shall, to the maximum extent feasible," seek out prisoners of war and provide them with information, "Congress explicitly left it to the [agency] to decide the manner and means of carrying out its directive"); *Cuevas v. Westerman*, No. 1:14-CV-133, 2016 WL 11529760, at *6 (S.D. Tex. Nov. 10, 2016) (finding policy requiring CBP to assign two agents to guard a detainee in the hospital to be discretionary, where the policy used terms such as "if manpower permits" and "whenever operationally feasible"); *Gould Elecs.*

---

[12] *Available at* https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf (last visited May 3, 2021).

*Inc. v. United States*, No. CIV.A.99-1130, 2002 WL 27834, at *8 (E.D. Pa. Jan. 10, 2002) (holding that executive order's use of "so far as feasible" language "is clearly precatory" and "is not sufficiently specific or mandatory to remove the element of choice from defendant for the purposes of the discretionary function [exception]"); *see also Weissich v. United States*, 4 F.3d 810, 814 (9th Cir. 1993) (noting that use of the word "should" in a policy "is suggestive, not mandatory"); *Whalen v. United States*, 29 F. Supp. 2d 1093, 1097 (D.S.D. 1998) ("Obviously, statements discussing what 'should' be done cannot be considered mandatory.").

Contrary to Plaintiff's allegation that "[t]here was no legal requirement" for CBP to separate her from her father, Doc. 1 ¶ 60, Defendant was authorized to prosecute the father, and required by statute to transfer her to ORR custody once she became a noncitizen unaccompanied child under federal law because her father was placed into criminal custody. *See* 8 U.S.C. § 1232(b)(3). Accordingly, TEDS is of no assistance to Plaintiff. Similarly, while Plaintiff alleges negligent failure to reunite her with her grandmother in a timely manner, *id.* ¶ 62, in the exercise of its discretion, ORR is responsible for the decisions regarding the health and safety of children in the government's care and custody. *See* 6 U.S.C. §§ 279(a), (b)(1)(A), (b)(1)(C); *see also* 8 U.S.C. § 1232(b)(1). Plaintiff does not—and cannot—point to a mandatory, specific timeline for release of children to custodians.

## 2. Decisions Relating to Detention and Placement of Noncitizen Unaccompanied Children Are Grounded in Public Policy.

Because Plaintiff has failed to allege a mandatory, specific directive violated by Defendant, she automatically fails the second step of *Berkovitz*. *See Ball v. United States*, 967 F.3d 1072, 1079 (10th Cir. 2020) ("We *presume* that a government agency's acts are grounded in policy when no statute, regulation, or policy sets forth a required course of conduct; the challenger must allege facts showing otherwise." (emphasis in original)).

The facts alleged by Plaintiff fall short of showing that the actions taken by the government are not "susceptible to policy analysis." *Gaubert*, 499 U.S. at 325. Perhaps to avoid the discretionary function exception, Plaintiff states that the government implemented the family separation policy "both knowing that the policy would cause severe harm to the people it affected and specifically intending that it would cause such harm." Doc. 1 ¶ 25. But "[a]pplication of *Berkovitz*'s second prong does not require proof of the thought processes of the pertinent decisionmakers." *Elder v. United States*, 312 F.3d 1172, 1182 (9th Cir. 2002). Indeed, under the second prong, "courts should not inquire into the actual state of mind or decisionmaking process of federal officials charged with performing discretionary functions." *Franklin Sav. Corp*., 180 F.3d at 1135; *see also Merando v. United States*, 517 F.3d 160, 164 (3d Cir. 2008) ("The [discretionary function] exception's purpose is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." (internal quotation marks omitted)).

The decision to separate Plaintiff from her father stemmed from the discretionary decision to detain and prosecute her father. But these types of decisions are at the core of the discretionary function exception. "As a general matter, law enforcement decisions surrounding the investigation and prosecution of crimes . . . involve the exercise of discretion." *JGE through Tasso v. United States,* 772 F. App'x 608, 612 (10th Cir. 2019). Because prosecutorial decisions are "exclusively within the province of the executive branch," they are "exactly the type of conduct the discretionary function exception was intended to protect from judicial branch interference." *Hobdy v. United States*, 968 F.2d 20 (10th Cir. 1992) (Table), 1992 WL 149871, at *2 (10th Cir. June 26, 1992) (internal quotation marks omitted); *see also Gray v. Bell*, 712 F.2d 490, 513 (D.C. Cir. 1983)

("Prosecutorial decisions as to whether, when and against whom to initiate prosecution are quintessential examples of governmental discretion . . . .").

In the immigration context, such decisions implicate myriad policy considerations, including allocating limited agency resources such as "time, legal resources, and detention capacity," as well as confronting issues affecting "diplomacy, foreign policy, and the security of the nation." *Blanco Ayala v. United States*, 982 F.3d 209, 218 (4th Cir. 2020) (internal quotation marks omitted). Hence, the discretionary function exception applies to the decision to prosecute and detain Plaintiff's father. *See Mirmehdi v. United States*, 689 F.3d 975, 984 (9th Cir. 2012) (holding that the discretionary function applies to "the decision to detain an alien pending resolution of immigration proceedings" because the decision "is explicitly committed to the discretion of the Attorney General and implicates issues of foreign policy"); *Pena Arita v. United States*, 470 F. Supp. 3d 663, 686-87 (S.D. Tex. 2020) (holding that "prosecutorial judgment is a matter of choice, and obviously grounded in considerations of public policy—such as the United States Attorney General's priorities and United States Attorneys' discretion—that is intended to be shielded by the discretionary function exception").

What followed after the decision to detain Plaintiff's father includes Plaintiff's separation from her father, designation as a noncitizen unaccompanied child, transfer to ORR custody, placement in foster care, and eventual placement with her grandmother. These decisions, which are bound up in the discretionary detention decision, are part of a "continuum" constituting "a single immigration enforcement process." *Blanco Ayala*, 982 F.3d at 215. "A decision that is a component of an overall policy decision protected by the discretionary function exception also is protected by this exception." *Zumwalt v. United States*, 928 F.2d 951, 955 (10th Cir. 1991). Consequently, all of these subsequent events are protected by the discretionary function exception.

Even if the Court considers the post-detention decisions as distinct events, the discretionary function exception would still apply. Decisions regarding where to place children such as Plaintiff are discretionary, since ORR must place the child "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A). Deciding what is in a child's best interest surely "involve[s] a great element of judgment or choice." *Gaubert*, 499 U.S. at 329 (internal quotation marks omitted). Moreover, the decision is grounded in public policy, including considerations of the child's health, safety, and welfare. Similarly, deciding to release a child to a sponsor implicates policy decisions, including determining whether the child will be safe and ensuring "that the proposed custodian is capable of providing for the child's physical and mental well-being." *Id*. § 1232(c)(3)(A). Where a decision implicates health or safety, courts consistently conclude it is based on policy considerations. *See, e.g.*, *Walding v. United States*, 955 F. Supp. 2d 759, 771-72 (W.D. Tex. 2013) ("[I]t is clear that the ultimate choice of facility for housing unaccompanied alien children is a decision vested with policy considerations."); *Steele v. United States*, No. 09-CV-01557CMACBS, 2010 WL 2501200, at *7 (D. Colo. June 15, 2010) (holding that decisions regarding how to protect prisoners were "based on social and economic policy considerations that underlie all of the [Bureau of Prisons'] decisions regarding how best to provide for the safety, health, and welfare of inmates").

Because Plaintiff has failed to allege facts that take her FTCA claims outside the discretionary function exception, the Court should dismiss the Complaint for lack of jurisdiction. *See Warren v. United States*, 244 F. Supp. 3d 1173, 1178 (D.N.M. 2017) (granting motion to dismiss where the complaint "fail[ed] to make the requisite allegations establishing that the discretionary function exception does not bar the Court's jurisdiction").

### C.     The Due Care Exception Also Bars Plaintiff's Claims.

The Court also lacks jurisdiction under the due care exception. Under the FTCA's "due care" exception, the United States is not liable for "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid." 28 U.S.C. § 2680(a). This exception "bars tests by tort action of the legality of statutes and regulations." *Dalehite v. United States*, 346 U.S. 15, 33 (1953), *partially overruled on other grounds as recognized in Rayonier Inc. v. United States*, 352 U.S. 315, 319 (1957); *see also Ascot Dinner Theatre, Ltd. v. Small Bus. Admin*., 887 F.2d 1024, 1029 (10th Cir. 1989) (holding that the due care exception barred an FTCA claim alleging that a regulation is facially discriminatory under the First Amendment or was unconstitutional as applied by a federal agency). Hence, when a complaint alleges "acts performed in furtherance of applicable statutes and an applicable regulation, . . . [a] suit cannot be maintained under the [Federal] Tort Claims Act," "even though the regulation may be irregular or ineffective." *Powell v. United States*, 233 F.2d 851, 854-55 (10th Cir. 1956).

In deciding whether the due care exception bars a claim, courts undertake a two-part analysis: first "determin[ing] whether the statute or regulation in question specifically proscribes a course of action for an officer to follow," and second, "if a specific action is mandated, . . . inquir[ing] as to whether the officer exercised due care in following the dictates of that statute or regulation." *Welch v. United States*, 409 F.3d 646, 652 (4th Cir. 2005). "If due care was exercised, sovereign immunity has not been waived." *Id*.

Here, the United States plainly was authorized by statute to prosecute Plaintiff's father as well as to make custody determinations related to that prosecution. In turn, the United States had a statutory duty to place Plaintiff in the custody and care of ORR within 72 hours after the determination that she was a noncitizen unaccompanied child. *See* 8 U.S.C. § 1232(b)(3); *see also*

Doc. 1 ¶ 33 (acknowledging that "TVPRA requires DHS to place UACs into ORR custody within 72 hours, absent exceptional circumstances"); *id*. ¶ 37 (referring to the "72-hour requirement" and "72-hour rule"). Furthermore, once Plaintiff was in ORR custody, ORR is required to make certain safety and suitability assessments before placing a noncitizen unaccompanied child with a person, including Plaintiff's grandmother. *See id.* § 1232(c)(3)(A).

ORR exercised due care in executing these statutory requirements. While Plaintiff contends that she "was erroneously designated an 'unaccompanied alien child,'" Doc. 1 ¶ 85, Plaintiff uses a literal definition of "unaccompanied" rather than the statutory definition, *see id*. ¶ 66 (noting that Plaintiff "was apprehended and detained with her parent; she was not unaccompanied."). A child is a noncitizen unaccompanied child if "(i) there is no parent or legal guardian in the United States; <u>or</u> (ii) no parent or legal guardian in the United States is able to provide care and physical custody." 6 U.S.C. § 279(g)(2)(C) (emphasis added). Hence, even when a parent is present in the United States, a child can still be unaccompanied if the parent "is not available to provide what is necessary for the child's health, welfare, maintenance, and protection." *D.B. v. Cardall*, 826 F.3d 721, 734 (4th Cir. 2016).

Here, Plaintiff's father was detained and being criminally prosecuted, Doc. 1 ¶ 78, and therefore unavailable, *see United States v. Vasquez-Hernandez*, 924 F.3d 164, 168 (5th Cir. 2019) (noting that "once the parents were arrested and detained in adult facilities, their children became 'unaccompanied' for purposes of § 1232(b)(3)"). Plaintiff's mother was in Guatemala, not the United States. Doc. 1 ¶ 81. While Plaintiff's grandmother was in Florida, there is no allegation that she was Plaintiff's legal guardian during the time in question. *Id*. ¶ 70; *accord Doe v. Off. of Refugee Resettlement*, 884 F.3d 269, 278 (5th Cir. 2018) (per curiam) (Jones, J., specially concurring in part and dissenting in part) ("The reference to 'legal guardian' [in 6 U.S.C.

§ 279(g)(2)(C)(ii)] clearly means a guardian whose existence predated the child's being apprehended at the international border; otherwise, such a guardian could be called upon to assume the child's care and custody."). Because no parent or legal guardian was available to provide care and custody, Plaintiff was properly designated a noncitizen unaccompanied child.

Furthermore, ORR complied with statutory requirements in placing Plaintiff with her grandmother as her sponsor, including requiring fingerprinting. *See* Doc. 1 ¶ 92; 8 U.S.C. § 1232(c)(3)(A) (requiring, *inter alia*, "verification of the custodian's identity"). Although Plaintiff complains of the government's "negligent failure to unite [her] with her grandmother in a timely manner," Doc. 1 ¶ 62, she does not explain why her time in foster case was unreasonable in light of the mandatory safety and suitability assessments, which include "a determination that the proposed custodian is capable of providing for the child's physical and mental well-being" and "an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." 8 U.S.C. § 1232(c)(3)(A). Plaintiff has alleged no facts to show that her placement in foster care while these assessments were being completed was inappropriate.

Plaintiff "does not claim that the [government] officers carried out their responsibilities in an inappropriate manner, or in any way deviated from the statute[s'] requirements." *Welch*, 409 F.3d at 652. "Absent any allegation of such a deviation it cannot be said that the officers acted with anything other than due care." *Id*. Consequently, the Court lacks jurisdiction over the FTCA claims under the due care exception. *See id.* at 653.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss the Complaint.

Respectfully Submitted,

FRED J. FEDERICI
Acting United States Attorney

*/s/ Christine H. Lyman 5/3/21*
CHRISTINE H. LYMAN
Assistant United States Attorney
P.O. Box 607
Albuquerque, New Mexico 87103
(505) 224-1532; Fax: (505) 346-7205
Christine.Lyman@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2021, I filed the foregoing pleading electronically through the CM/ECF system which caused all parties or counsel to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

*/s/ Christine H. Lyman 5/3/21*
CHRISTINE H. LYMAN
Assistant United States Attorney