**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| S.E.B.M., a minor, by and through her next friend, MARIA MENDEZ FELIPE, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 21-cv-00095-JHR-LF ) |
| THE UNITED STATES OF AMERICA, | ) ) |
| Defendant. | ) ) |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
UNITED STATES' MOTION TO DISMISS COMPLAINT**

Plaintiff S.E.B.M. brings this action under the Federal Tort Claims Act ("FTCA") asserting claims of intentional infliction of emotional distress ("IIED") and negligence. In 2017, when S.E.B.M. was only two years old, the United States ("Defendant"), through government actors, forcibly tore her from her father's arms and isolated her from virtually all communication. She has not seen her father since that forcible separation more than four years ago.

S.E.B.M.'s separation was part of a broader government practice of separating thousands of vulnerable families aimed at deterring them from seeking asylum in the United States. These brutal tactics inflicted physical and emotional trauma, and ongoing physical and mental health consequences. Contrary to Defendant's attempt to characterize the family separation practice as run-of-the-mill immigration enforcement, it was anything but that. Not only was the practice unprecedented, but as the American Academy of Pediatrics stated, it amounted to "child abuse."[1]

---

[1] Sam Baker, *Top Pediatrician Says Family Separation is "Child Abuse,"* Axios (June 19, 2018), *available at* https://bit.ly/3IIUYlL.

Four courts across the country have already rejected Defendant's efforts to dismiss virtually identical FTCA claims at the pleading stage. *See Nunez Euceda v. United States*, No. 2:20-CV-10793-VAP (GJSx), 2021 WL 4895748, at *3 (C.D. Cal. Apr. 27, 2021); *R.Y.M.R. v. United States*, No. 1:20-cv-23598-KMW, Dkt. 23 (S.D. Fl. Feb. 5, 2021); *A.P.F. v. United States*, 492 F. Supp. 3d 989, 994 (D. Ariz. 2020); *C.M. v. United States*, No. 19-CV-05217, 2020 WL 1698191 (D. Ariz. Mar. 30, 2020).[2]

This Court should similarly reject Defendant's skewed reading of the Complaint and refuse to dismiss the case without any discovery into how and why a two-year-old child was forcibly taken from her father for years. *First*, Defendant's arguments mischaracterize the Complaint, treating Plaintiff's claims as attacking the government's general authority to enforce the immigration laws. This distracts from the claims really at issue—the cruel, unnecessary, and illegal separation of Plaintiff and her resulting treatment—none of which is dictated by the enforcement of immigration laws. *Second*, the discretionary function exception does not apply because violations of constitutional rights are at issue, Defendant's actions breached numerous federal directives, and none of Defendant's misconduct involved the type of policy decisions the exception was designed to shield. *Third*, the due care exception is inapplicable because there is neither a statutory nor regulatory mandate requiring federal officers to separate immigrant families, nor a plausible argument that any duty was performed with "due care." *Fourth*, subject matter jurisdiction exists because private persons would be liable for Defendant's actions under "like circumstances." Defendant's Motion to Dismiss (ECF No. 16) ("Mot.") should be denied.

---

[2] Only one court has dismissed FTCA claims relating to family separation. *See Pena Arita v. United States*, 470 F. Supp. 3d 663 (S.D. Tex. 2020). As discussed below, that cursory lone ruling is unpersuasive and distinguishable.

## BACKGROUND

Defendant began its practice of separating families in 2017. Compl. ¶ 1. Thousands of children, hundreds just babies and toddlers like Plaintiff, were taken from their parents in an unlawful attempt to deter immigrants from seeking asylum in the United States. *Id.* ¶ 2. Parents begged for their children not to be taken, helplessly standing by while their children screamed for help. Parents and children were given no indication where their family members were being taken or when they would be reunited. *Id.* ¶ 4. Defendant moreover made no real effort to keep track of families in custody, ensuring that reunification would be near impossible. *Id.* ¶ 41. To this day, many children like Plaintiff have still not reunited with their parents. *Id.* ¶ 5.

Defendant often used criminal prosecution as a pretext for separation, transferring parents into U.S. Marshal's Service custody for misdemeanor illegal entry prosecutions. *Id.* ¶¶ 27-37. Their children, who remained in Customs and Border Patrol ("CBP") custody, were then deemed to be "unaccompanied" minors and transferred to the Office of Refugee Resettlement ("ORR"). *Id.* ¶ 33. For those parents prosecuted, most, like S.E.B.M.'s father, received a sentence of time served. *Id.* ¶ 78. Still, federal officials used these prosecutions to separate parent and child *indefinitely*, refusing to return the child even *after* their parent was released from jail. In summer 2018, a federal court ended the practice, declaring Defendant's conduct "brutal [and] offensive," concluding that "separating [parents] from their minor children . . . without any showing that the parent is unfit or presents a danger to the child," "shock[ed] the contemporary conscience." *Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1145-46 (S.D. Cal. 2018).

Plaintiff S.E.B.M. and her father were among those subject to this cruel practice. S.E.B.M. crossed into the United States with her father near Santa Teresa, New Mexico. Compl. ¶ 65. She was two years old, essentially preverbal, and understood only Akateko, an indigenous

Guatemalan language. *Id.* ¶ 63. Shortly after crossing the border, S.E.B.M. and her father turned themselves in to CBP and were brought to a Border Patrol station in New Mexico, where they were detained for one day. *Id.* ¶ 65. Plaintiff's father provided contact information for his mother (S.E.B.M.'s grandmother) who lived in Florida and who could take custody of S.E.B.M. *Id.* ¶ 61.

The next day, without warning, CBP officers forcibly removed S.E.B.M. from her father's arms while she cried out for him. *Id.* ¶¶ 72-73. S.E.B.M.'s father was then transferred to the custody of the Marshal's Service and charged with misdemeanor illegal entry under 8 U.S.C. § 1325(a)(1). *Id.* ¶ 77. After he pled guilty and was sentenced to time served, the father was transferred back into Immigration and Customs Enforcement ("ICE") custody, approximately ten days after the forcible separation from his daughter. *Id.* ¶ 78. But he was never reunited with her. When he asked for information about his daughter, he was not given any. *Id.* ¶ 79. Officials tormented him by saying that he would see his daughter "soon" or "tomorrow" despite having no plans to reunite them. *Id.* ¶ 80. S.E.B.M.'s father remained in DHS custody for more than three months, until November 28, 2017, when he was removed to Guatemala. *Id.* ¶¶ 83-84.

Meanwhile, S.E.B.M. was designated an "unaccompanied" minor and sent first to an ORR facility in Texas, and then to various foster homes. *Id.* ¶¶ 85, 87, 93. Given that she was a two-year-old speaker of an indigenous language, the government effectively ensured she would have no way to communicate with anyone. It was two months after the separation before Defendant even began allowing S.E.B.M. to contact her father by phone. Those scant calls lasted five minutes and mostly involved an inconsolable S.E.B.M. crying. *Id.* ¶ 89. And because CBP withheld information about S.E.B.M.'s whereabouts from her father, he could not explain to S.E.B.M. what was happening. *Id.* ¶ 76. As a result, S.E.B.M. was isolated from nearly all communication for five months, during a critical stage in the development of a two-year-old.

Defendant kept this little girl in custody for 160 days before finally releasing her to her grandmother in January 2018—even though it was aware from day one that she had a grandmother in Florida. *Id*. ¶¶ 61, 94.

The government's separation of S.E.B.M. from her father has inflicted lasting trauma on her. While still in ORR custody, S.E.B.M. began repeatedly scratching her face, leaving noticeable scars. *Id*. ¶ 88. And even after she was released to her grandmother, S.E.B.M. would not speak and often hid behind others. *Id*. ¶ 98. For months, she would neither eat nor sleep, and cried frequently. *Id*. ¶ 99. Too scared to go outside, she needed her grandmother to carry her wherever she went. *Id*. ¶ 100. Her mental and emotional harm continues to this day, when, after more than four years, she has still not seen her father.

## ARGUMENT

To survive a motion to dismiss, Plaintiff need only allege facts that, taken as true, would plausibly establish the elements of her FTCA claims and place those claims facially outside the FTCA's exceptions. *Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1130 (10th Cir. 1999). Plaintiff readily meets this standard. She alleges that her prolonged, forcible separation and mistreatment constitute tortious conduct compensable under the FTCA. Neither the discretionary function exception nor the due care exception applies to Plaintiff's allegations. *See infra* Sections I, II. And because Defendant is liable to the same extent as "a private individual under like circumstances," Plaintiff states a claim under the FTCA. 28 U.S.C. § 2674. *See infra* Section III.

A common flaw permeates Defendant's motion: Defendant mischaracterizes Plaintiff's claims and so attacks a straw man. Plaintiff's FTCA claims arise from the malicious conduct of government officials, including allegations that Defendant tore Plaintiff from her father's arms, withheld information about each family member's whereabouts, isolated Plaintiff from nearly all

5

communication, refused to reunite Plaintiff with her father after he left criminal custody, delayed Plaintiff's release to her grandmother, and used criminal prosecutions as a pretext to separate small children from their parents. Compl. ¶¶ 27-37, 67, 72, 76, 78-80, 89, 94.

Rather than explain why Plaintiff's allegations fail to state a claim, Defendant recasts those allegations as arising from its general "decision to enforce federal immigration laws." Mot. 14; *see id.* 15, 22, 25, 26. But in no conceivable sense can these brutal actions be deemed routine discretionary immigration enforcement actions. Plaintiff does not contest the government's *general* prosecutorial and detention authority. Instead, she challenges the government's conduct resulting in her prolonged separation and cruel treatment. Defendant cannot parse the Complaint to skirt the real issues. As master of her complaint, "[i]t is for [Plaintiff] to pursue the theory of liability [s]he deems best, and it is not for [Defendant] to decide which [conduct] serves as the basis for [her] claim." *Margheim v. Buljko*, 855 F.3d 1077, 1087 (10th Cir. 2017). Indeed, Defendant has attempted to mischaracterize identical FTCA claims in multiple courts, and those courts have repeatedly "reject[ed] the United States' re-categorization of Plaintiffs' factual allegations." *A.P.F.*, 492 F. Supp. 3d. at 996; *see also C.M.*, 2020 WL 1698191, at *4 (refusing to "parse the Complaint" in the way Defendant characterizes it); *Nunez Euceda*, 2021 WL 4895748, at *3 (denying motion to dismiss). In addition to the flaws in each of Defendant's specific arguments, its mischaracterization of Plaintiff's claims should be rejected.

**I.     The Discretionary Function Exception Does Not Apply to Plaintiff's Claims**

Defendant's conduct is not protected by the discretionary function exception ("DFE"). In *Berkovitz v. United States*, 486 U.S. 531, 536 (1988), the Supreme Court interpreted the exception to apply only when the challenged conduct was *both* (1) discretionary in that it

"involve[d] an element of judgment or choice," and (2) the "the kind [of judgment] that the discretionary function exception was designed to shield." Defendant meets neither requirement.

### A.  The Government's Conduct Was Not Discretionary

#### 1.  The Government Lacks Discretion to Violate the Constitution

Officials lack discretion where federal law "prescribes a course of action for [its] employee to follow." *Berkovitz*, 486 U.S. at 536. *Berkovitz* involved federal statutes and regulations, but the same principle applies where the Constitution supplies the prescription, because the government has no discretion to violate the Constitution any more than it has discretion to violate a federal statute or regulation.

Although the Tenth Circuit has not yet addressed this question, it has recognized that the vast majority of circuits to do so have concluded that the DFE does not immunize tortious conduct that violates the Constitution, any more than it immunizes tortious conduct that violates federal statutes and regulations. *See Martinez v. United States*, 822 F. App'x 671, 676 (10th Cir. 2020) ("Most circuits . . . have held conduct is not discretionary when it 'exceeds constitutional bounds.'"); *see also Loumiet v. United States*, 828 F.3d 935, 943 (D.C. Cir. 2016) ("[T]he FTCA's discretionary-function exception does not provide a blanket immunity against tortious conduct that a plaintiff plausibly alleges also flouts a constitutional prescription."); *Limone v. United States*, 579 F.3d 79, 102 (1st Cir. 2009) (Challenged "conduct was unconstitutional and, therefore, not within the sweep of the discretionary function exception."); *Myers & Myers, Inc. v. USPS*, 527 F.2d 1252, 1261 (2d Cir. 1975) ("It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally . . . ."); *U.S. Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988) ("Federal officials do not possess discretion to violate constitutional rights or federal statutes."); *Medina v. United States*, 259 F.3d 220, 225 (4th Cir.

2001) ("[F]ederal officials do not possess discretion to violate constitutional rights or federal statutes."); *Sutton v. United States*, 819 F.2d 1289, 1293 (5th Cir. 1987) ("[A]ction does not fall within the discretionary function exception of § 2680(a) when governmental agents exceed the scope of their authority as designated by statute or the Constitution."); *Raz v. United States*, 343 F.3d 945, 948 (8th Cir. 2003) (alleged actions "fall outside the FTCA's discretionary-function exception because [Plaintiff] alleged they were conducted in violation of his First and Fourth Amendment rights."); *Nurse v. United States*, 226 F.3d 996, 1002 n.2 (9th Cir. 2000) ("[T]he Constitution can limit the discretion of federal officials such that the FTCA's discretionary function exception will not apply.").

This Court should follow the overwhelming majority of circuits that have refused to allow the DFE to shield unconstitutional conduct. As the D.C. Circuit explained in *Loumiet*, "[a] constitutional limit on governmental power, no less than a federal statutory or regulatory one . . . circumscribes the government's authority even on decisions that otherwise would fall within its lawful discretion." 828 F.3d at 944. "The discretionary function exception applies only to conduct that involves the *permissible* exercise of policy judgment." *Berkovitz*, 486 U.S. at 539 (emphasis added). By violating the Constitution, a federal official necessarily steps outside his permissible scope of discretion. To hold otherwise would yield an "illogical result: the FTCA would authorize tort claims against the government for conduct that violates the mandates of a statute, rule, or policy, while insulating the government from claims alleging on-duty conduct so egregious that it violates the more fundamental requirements of the Constitution." *Loumiet*, 828 F.3d at 944-45; *see Owen v. City of Independence*, 445 U.S. 622, 649 (1980) (The government "has no discretion to violate the Federal Constitution; its dictates are absolute and imperative.") (internal quotation marks omitted).

The only two circuits to have held otherwise are not persuasive. In *Shivers v. United States*, 1 F.4th 924 (11th Cir. 2021), *petition for cert. filed* (U.S. Nov. 5, 2021) (No. 21-682), the Eleventh Circuit reasoned that because the terms of the DFE do not expressly carve out unconstitutional conduct, it must protect such conduct. *Id*. at 930. But the statute, § 2680(a), also does not expressly carve out statutory, regulatory, or policy violations, yet the Supreme Court has nevertheless held that such violations plainly lie outside the DFE. *See Berkovitz*, 486 U.S. at 536. The question is whether the conduct is based on a "discretionary function or duty," 28 U.S.C. § 2680(a), and unconstitutional conduct lies outside the bounds of government discretion.

And in *Linder v. United States*, 937 F.3d 1087 (7th Cir. 2019), the Seventh Circuit reasoned that the FTCA is a means to seek damages for common-law torts, not for constitutional violations. *Id*. at 1090. But this confuses the DFE with the merits of an FTCA claim. Plaintiff is not raising a constitutional claim as the basis for liability. Under the FTCA, there must be a state law basis for liability, which is precisely what Plaintiff alleges here. The issue is whether Defendant can shield itself from FTCA liability under the DFE where the state tort *also* violates the Constitution. Defendant cannot. *See Loumiet*, 828 F.3d at 945-46 ("A plaintiff who identifies constitutional defects in the conduct underlying her FTCA tort claim . . . does not thereby convert an FTCA claim into a constitutional damages claim against the government."). In short, the Constitution is relevant not because it supplies the cause of action here, but because it precludes Defendant from invoking the DFE as a shield against compensating for a non-discretionary tort.

Defendant attempts to defend the minority view by arguing that evaluating the constitutionality of alleged misconduct would require too "'involved and detailed [an] analysis.'" Mot. 18 (quoting *Ramirez v. Reddish*, No. 2:18-CV-00176-DME-MEH, 2020 WL 1955366, at

*29 (D. Utah Apr. 23, 2020)). But courts in this circuit regularly decide whether plaintiffs allege plausible constitutional violations at the motion to dismiss stage. *See, e.g.*, *Brown v. Montoya*, 662 F.3d 1152, 1168-69 (10th Cir. 2011) (plaintiff made out due process violation); *Peterson v. Jensen*, 371 F.3d 1199, 1203 (10th Cir. 2004) (same for Fourth Amendment violation). Nor does Defendant explain why assessing constitutional violations would require any more involved and detailed an analysis than assessing statutory or regulatory ones. In any event, *Ramirez* reached its conclusion because it was addressing FTCA claims at the summary judgment stage in a posture where material facts were in dispute. 2020 WL 1955366, at *29. Here, at the motion to dismiss stage, where the court must assume the truth of Plaintiff's allegations, the analysis is far less involved. Thus, as the majority of circuits have held, the DFE cannot insulate tortious conduct under state law that also violates the Constitution.

### 2.   There is No Question Defendant's Conduct Violated the Constitution

It has long been clear that the intentional, prolonged, and forcible mistreatment and separation of a child from her parent is unconstitutional, absent some reason to believe the parent presents an imminent danger to the child. Here, government officials intentionally and forcibly separated Plaintiff from her father without any determination that he was an unfit parent, left her without any information about her father, isolated her from nearly all communication, and did not reunify her with her grandmother for five months. Compl. ¶¶ 27-37, 67, 72, 76, 78-80, 89, 94. Addressing nearly identical allegations, the court in *Ms. L.* explained:

> These allegations sufficiently describe government conduct that arbitrarily tears at the sacred bond between parent and child, and is emblematic of the "exercise of power without any reasonable justification in the service of an otherwise legitimate governmental objective[.]" *Lewis*, 523 U.S. at 846. Such conduct, if true, as it is assumed to be on the present motion, is brutal, offensive, and fails to comport with traditional notions of fair play and decency. At a minimum, the facts alleged are sufficient to show the government conduct at issue "shocks the conscience" and violates Plaintiffs' constitutional right to family integrity.

302 F. Supp. 3d at 1167. Likewise, other courts have "easily conclude[d]" that separated family members were "likely to succeed on . . . their claim[] that their continued separation . . . violates their right to family integrity under the Fifth Amendment." *Jacinto-Castanon de Nolasco v. ICE*, 319 F. Supp. 3d 491, 499 (D.D.C. 2018); s*ee W.S.R. v. Sessions*, 318 F. Supp. 3d 1116, 1125 (N.D. Ill. 2018) (prolonged separation violated child's "specific[] and concrete[]" "right to reunify with his parent in immigration custody, after the parent's criminal detention ends and absent parental unfitness or danger to the child."). Indeed, the government itself has "agree[d] that a constitutional violation occurred when the Government separated children from their parents" as part of the same immigration practice Plaintiff challenges here. *J.S.R. by and through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 741 (D. Conn. 2018).[3] Thus, numerous courts addressing FTCA claims about Defendant's family separation practice have held that Defendant's patent violation of the Constitution places its conduct outside the DFE. *C.M.*, 2020 WL 1698191, at *4; *A.P.F.*, 492 F. Supp. 3d at 996-97; *Nunez Euceda*, 2021 WL 4895748, at *3.[4]

---

[3] Defendant argues that no right to family integrity exists in the immigration context. Mot. 17, n.9 (citing *Cervantes v. INS*, 510 F.2d 89, 92 (10th Cir. 1975) and *Reyna as next friend of J.F.G. v. Hott*, 921 F.3d 204, 210 (4th Cir. 2019)). But those cases involved only the question of whether the government may transfer a detained parent farther away from a non-detained child or may deport a parent with a child living in the U.S. The court in *Ms. L.* correctly distinguished those types of cases and held that the right to family integrity attached where families arriving in the United States were *initially detained together*. *See* 302 F.Supp.3d at 1165.

[4] The lone district court to have dismissed FTCA claims relating to family separation is against the weight of authority, incorrect, and distinguishable. *Pena Arita*, 470 F. Supp. 3d at 686-87. *Pena Arita* concluded in one paragraph that the DFE barred that challenge because the decision to prosecute is discretionary. *Pena Arita's* analysis was based on the text of the Zero Tolerance Memo, *id.*, but Plaintiff's separation here predated the Memo. Compl. ¶¶ 19, 72. More importantly, Plaintiff alleges more than the fact of separation, but that officers forcibly separated her, isolated her from nearly all communication, and refused to reunite her and her father after he left criminal custody. Compl. ¶¶ 67, 72, 76, 80, 94. *Pena Arita* did not address whether this conduct fell under the DFE. Finally, *Pena Arita* did not address whether the DFE applies even where the state tort alleged amounts to a constitutional violation, as it does here.

### 3. Defendant Also Violated the *Flores* Agreement and Numerous Other Federal Directives

Defendant's conduct was separately nondiscretionary because it violated its duties under the *Flores* Agreement and numerous other federal directives. Compl. ¶¶ 58-60. As Defendant acknowledges, Mot. 3-4, the *Flores* class action litigation, brought on behalf of minor children held in immigration detention, resulted in a consent decree that remains binding on the United States. Stipulated Settlement Agreement, *Flores v. Reno*, No. 85-cv-4544 (Jan. 17, 1997) (the "*Flores* Agreement"). Among other things, the *Flores* Agreement requires the government to house minors in facilities that provide "contact with family members arrested with the minor." *Id*. ¶ 12.A. It also states that "[u]pon taking a minor into custody, the [government] shall make and record the prompt and continuous efforts on its part toward family reunification." *Id*. ¶ 18. It requires the government to release children from federal custody "without unnecessary delay" to available sponsors. *Id.* ¶ 14.

Plaintiff plausibly alleges violations of these mandatory duties. Defendant ensured Plaintiff was essentially isolated from all communication and prevented her from contacting her father for two months. Compl. ¶ 89. After those two months, Defendant allowed only infrequent and short calls. *Id*. ¶¶ 52, 89.[5] And for months, Defendant made *no* effort to reunify Plaintiff with a family member let alone making "prompt and continuous efforts . . . toward family reunification." *Flores* Agreement ¶ 18. When Plaintiff and her father turned themselves in to CBP, the father gave CBP contact information for Plaintiff's grandmother. Compl. ¶ 61. Yet

---

[5] Defendant contends that Plaintiff did not specifically allege how it violated this requirement, but the Complaint states, among other things, that Plaintiff's calls to her father were brief, infrequent, and often impeded by ORR and ICE practices. *See* Compl. ¶ 89. Again, Defendant is attempting to parse the Complaint in a manner inappropriate at the motion to dismiss stage.

Defendant did not indicate that it was working on placing Plaintiff with her grandmother until November 21, 2017, approximately four months after her separation. *Id.* ¶ 92.

Defendant simply ignores these specific allegations. Instead, it argues that the *Flores* Agreement does not require "the detention of a juvenile with her parent or release of both the juvenile and the parent," Mot. 19, but that argument does not grapple with the specific allegations in the Complaint or the relevant *Flores* directives, which "specifically prescribe[] a course of action for an employee to follow" concerning the treatment of children in immigration custody. *Berkovitz*, 486 U.S. at 536.

In addition to the *Flores* Agreement, Defendant's conduct also violated several regulations and internal directives requiring the government to prioritize family unity, including 8 C.F.R. § 1236.3 and the National Standards on Transport, Escort, Detention, and Search ("TEDS"). Compl. ¶ 58-60. Defendant argues that these directives are not sufficiently mandatory to eliminate its discretion but that is incorrect. Mot. 18, 19-21. For example, TEDS section 1.9 provides that "CBP will maintain family unity to the greatest extent operationally feasible, absent a legal requirement of an articulable safety or security concern that requires separation." It thus mandates family unity unless it would be infeasible, contrary to law, or present a security concern. Here, at the motion to dismiss stage, the Court cannot ignore the Complaint's allegations and assume that Defendant indefinitely separated Plaintiff because of security or feasibility concerns. Thus, by violating these prescriptions, the government acted outside the bounds of its discretion and thus outside the protection of the DFE.

**B.  Defendant's Deliberate Cruelty Was Not a Decision Subject to Policy Analysis**

Defendant's conduct separately fails the second *Berkovitz* requirement, which requires that even where the government exercises some level of discretion, that discretion must be "the

kind that the discretionary function exemption was designed to shield." 486 U.S. at 536.

"Decisions that require choice are exempt from suit under the FTCA only if they are susceptible to policy judgment and involve an exercise of political, social, or economic judgment." *Duke v. Dep't of Agric.*, 131 F.3d 1407, 1410 (10th Cir. 1997) (cleaned up). Of course, because "nearly every government action is, at least to some extent, subject to policy analysis," courts must "resist invitations to shield actions implicating only the faintest hint of policy concern." *Usoyan v. Republic of Turkey*, 6 F.4th 31, 45 (D.C. Cir. 2021) (cleaned up). Discretionary actions that are not "based on the purposes that the regulatory regime seeks to accomplish" are not shielded from liability. *United States v. Gaubert*, 499 U.S. 315, 325 n.7 (1991).

Here, Plaintiff alleges that government officials subjected her to deliberately cruel treatment including forcibly separating her from her father, withholding information from each person of the other's whereabouts, refusing to reunite Plaintiff with her father after he was returned to ICE custody, and permitting minimal communication between the two. Compl. ¶¶ 67, 72, 76, 78-80, 89. There is no plausible argument, especially at the motion to dismiss stage, that such abuse could have been the result of considered judgments grounded in policy considerations contemplated by Congress or federal law generally.

*Ruiz ex rel. E.R. v. United States*, No. 13-CV-1241 KAM SMG, 2014 WL 4662241 (E.D.N.Y. Sept. 18, 2014), is instructive. There, a child removed by CBP brought FTCA claims based on, among other allegations, CBP's "failure to contact [her] parents for fourteen hours" and its "refusal to send [her] on the next flight to JFK to reunite with her parents." *Id*. at *6. The court held that CBP's conduct fell outside the DFE because it could not "discern how [such conduct] could constitute a considered judgment grounded in social, economic, or political policies." *Id.* at *8.

Also instructive is *Usoyan*, 6 F.4th at 45, where the court held that the Republic of Turkey was not entitled to immunity under the discretionary function exception of the Foreign Sovereign Immunity Act ("FSIA"), which is modeled after the DFE in the FTCA. *See id*. at 38 (applying FTCA case law to interpret the FSIA). There, the President of Turkey's security detail attacked a group of protestors during a diplomatic visit. The court concluded that although the security detail had discretionary authority to use force to protect its president, *id*. at 38-43, the particular attack was not the type of conduct grounded in policy considerations, *id*. at 45. It concluded that "[t]he nature of the challenged conduct was not plausibly related to protecting President Erdogan," *id*. at 47, and that "blatantly careless or malicious conduct cannot be recast in the language of cost-benefit analysis," *id*. at 45. The same is true here.

Defendant claims that the decision *to prosecute and detain* under the immigration laws is subject to policy analysis and so "all . . . subsequent events are protected by the discretionary function exception" as well. Mot. 23. But courts have rejected attempts to bootstrap non-policy judgments to the general authority to prosecute and detain. "Discrete injury-causing actions can, in certain cases, be sufficiently separable from protected discretionary decisions to make the discretionary function exception inapplicable." *Usoyan*, 6 F.4th at 46 (cleaned up); *see Reynolds v. United States*, 549 F.3d 1108, 1113 (7th Cir. 2008) ("[F]ederal investigator's decision to lie under oath is separable from the discretionary decision to prosecute."); *Mirmehdi v. United States*, 689 F.3d 975, 984 n.8 (9th Cir. 2012) (general discretion to detain "does not immunize from judicial review the conduct of the officers who made the arrest at an operational level").

Plaintiff's prolonged, forcible separation and inhumane treatment cannot be treated as part of routine immigration enforcement, and certainly not at the motion to dismiss stage.[6]

Finally, Defendant makes the unsupportable assertion that separating Plaintiff from her father involved policy considerations about the "best interest of the child." Mot. 24. It does not explain how separating a two-year-old toddler from her father, where she understood only an indigenous language and where there was no indication that her father was an unfit guardian, could possibly involve such considerations. Nor can it simply assert that on a motion to dismiss, contrary to the Complaint's allegations. Defendant's conduct therefore falls outside the DFE.

## II.  The Due Care Exception Does Not Apply in This Case

Defendant acknowledges that *Welch v. United States*, 409 F.3d 646 (4th Cir. 2005), provides the proper test for the due care exception, but it misapplies that test. Mot. 25. Under *Welch*, the exception applies where (1) a statute or regulation "specifically prescribes a course of action" and (2) Defendant "exercised due care in the execution of this . . . prescribed duty." 409 F.3d at 652. Defendant's conduct meets neither prong. No legal mandate required Defendant to separate Plaintiff, and even if one did, Defendant did not exercise due care in doing so.

### A.  No Statute or Regulation Mandated Plaintiff's Ongoing Separation

No statute or regulation authorized, let alone mandated, Plaintiff's prolonged separation from her father, as courts addressing nearly identical claims have concluded. *See C.M.*, 2020 WL 1698191, at *3 ("The United States cites no statute or regulation mandating the separation of

---

[6] *Blanco Ayala v. United States*, 982 F.3d 209 (4th Cir. 2020), is not to the contrary. There, the Fourth Circuit held that the DFE applied to the erroneous *detention and removal* of a U.S. citizen. *Id*. at 215. Here, Plaintiff does not challenge her father's detention or removal; she challenges her prolonged separation and resulting treatment. And in *Zumwalt v. United States*, 928 F.2d 951, 955 (10th Cir. 1991), the court applied the DFE to the Park Service's decision not to put up warning signs at a particular location in a national park as part of a broader policy of maintaining trails in their wilderness state. That is far afield from the factual scenario here.

Plaintiffs upon their entry into the country."); *A.P.F.*, 492 F.Supp.3d at 995-96 (similar); *Nunez Euceda*, 2021 WL 4895748, at *3 (similar). Before Defendant's family separation practice began in 2017, immigration officials administered the same statutes and regulations without routinely separating families. *See Jacinto-Castanon*, 319 F. Supp. 3d at 501-02. And in 2018, following widespread criticism over Defendant's practice, President Trump signed an Executive Order requiring immigrant parents and their children who were apprehended at the border to remain together during the pendency of their criminal or immigration proceedings. *See* Exec. Order No. 13,841, 83 Fed. Reg. 29435 (June 25, 2018). That order did not purport to override a statutory or regulatory duty. Indeed, Defendant has conceded that it has ended the "*prior* practice of separating children from their families." Mot. 1 (emphasis added). Prolonged separation of Plaintiff from her father thus could not have been mandated by any statute or regulation.

Defendant argues that the due care exception applies because Defendant was "authorized . . . to prosecute Plaintiff's father." Mot. 25. To start, Defendant misstates the relevant test. The due care exception applies "if a specific action is mandated" by statute or regulation, not when it is merely authorized. *Welch*, 409 F.3d at 652. And no statute mandates prolonged forcible family separation with little to no communication between parent and child. Among other things, Defendant nowhere even attempts to explain why this little child was kept apart from her father even after he was released from U.S. Marshals custody.

Defendant next points to the Trafficking Victims Protection Reauthorization Act ("TVPRA") as purportedly mandating family separation, but the statute does no such thing. The TVPRA provides that "[e]xcept in the case of exceptional circumstances, any department or agency . . . shall transfer the custody of [a] child to [ORR] not later than 72 hours after determining that such child is an unaccompanied alien child." 8 U.S.C. § 1232(b)(3). The statute

applies to an "unaccompanied" child, and was intended to focus on children who are genuinely unaccompanied when they arrive, not on those *rendered* unaccompanied by the government. Defendant cannot invoke this statute by forcibly taking a child away from her parent and then simply deeming the child unaccompanied, and certainly nothing in the TVPRA required them to commit such a cruel act. Defendant's position twists the TVPRA—a statute designed to *protect* immigrant children from mistreatment and abuse—beyond recognition. And even assuming *arguendo* the initial separation was lawful during the father's short period of criminal custody, nothing in the TVPRA precluded Defendant from immediately reunifying her with her father as soon as he left criminal custody. *See* Order at 2-3, *Ms. L. v. ICE*, 3:18-cv-00428-DMS-MDD (S.D. Cal. Jul. 10, 2018) (ORR's "onerous" vetting procedures were not required prior to reuniting separated parent and child, and "streamlined" procedures were compatible with TVPRA). Courts have thus overwhelmingly rejected the government's position, explaining that "true 'unaccompanied alien children'" are those "minor children who were apprehended at the border *without their parents*," in contrast to "migrant children detained with their parents at the border and who were thereafter separated from their parents." *Ms. L.*, 310 F. Supp. 3d at 1139 (emphasis added); *see also C.M.*, 2020 WL 1698191, at *3; *A.P.F.*, 492 F.Supp.3d at 995 n.3; *Jacinto-Castanon*, 319 F. Supp. 3d at 495 n.2.[7]

---

[7] Defendant's sole authority for the contrary position is an out-of-context quote from *United States v. Vasquez-Hernandez*, 924 F.3d 164 (5th Cir. 2019). Mot. 26. The court there simply repeated "*the government's contention* that once the parents were arrested and detained in adult facilities, their children became 'unaccompanied' for purposes of § 1232(b)(3)." *Id*. at 168 (emphasis added). The appellant did not challenge that assertion. And as explained above, even if Plaintiff became "unaccompanied" while her father was in criminal custody, nothing in the TVPRA barred Defendant from reunifying her with her father after he served his sentence.

### B. Defendant Did Not Exercise Due Care

Even if a statute or regulation arguably mandated Plaintiff's forcible and prolonged separation, Defendant did not exercise due care. Due care requires "at least some minimal concern for the rights of others." *Myers & Myers*, 527 F.2d at 1262. When assessing due care, courts apply a "reasonableness" standard. *Hydrogen Tech. Corp.* v. *United States*, 831 F.2d 1155, 1161 (1st Cir. 1987).

It is inconceivable that the forcible taking of a two-year-old girl from her father, without warning and when she could not communicate with anyone else, could meet any standard of reasonableness. Defendant has acknowledged that the family separation practice was a "human tragedy" which may have created a need for "trauma and mental health services" for separated families. Exec. Order No. 14,011, 86 Fed. Reg. 8273, 8273-74 (Feb. 2, 2021). Yet, it now argues, on a motion to dismiss, that it exercised due care in separating Plaintiff from her father. Defendant reiterates the contention that it complied with the relevant statutes in deeming Plaintiff "unaccompanied." Mot. 26. But it defies logic to suggest that a decision calculated to inflict trauma on a child was carried out consistent with a statute designed to protect children. Plaintiff's allegations fall well outside the due care exception.

### III. Private Person Analogs Exist for Plaintiff's Claims

The United States is liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. "Recognizing that the United States is seldom situated identically to private parties, however, the 'like circumstances' inquiry requires only that the United States be analogized to a similarly situated private party." *Nationwide Mut. Ins. Co. v. United States*, 3 F.3d 1392, 1396 (10th Cir. 1993). Here, private person analogs exist for Defendant's conduct. Plaintiff agrees that Texas choice of law principles apply and that New

Mexico substantive law applies to Plaintiff's IIED claim. Mot. 9-11. But contrary to Defendant's position, New Mexico law should also apply to Plaintiff's negligence claim. Also, Defendant's argument that no private person analog exists for uniquely governmental functions is mistaken.

### A.  A Private Person Analog Exists for Plaintiff's IIED Claim

Defendant argues that there is no private person analog for Plaintiff's IIED claim under New Mexico law because the alleged misconduct was legally permitted and therefore privileged. Mot. 12. But as explained, Plaintiff's separation was unconstitutional and violated binding federal law. The proper analog is thus not, as Defendant claims, "a private individual with legal custody of a child taking the child away from a parent who lacks the ability to retain physical custody." *Id*. Nor is Plaintiff's claim analogous to that of a landlord evicting a defaulting tenant. *Id*. (citing *Restatement (Second) of Torts* § 46 cmt. g). Rather, the appropriate private analog is an individual who takes physical custody of a child away from a parent without legal justification. Those are the allegations at issue here.

Under New Mexico law, such tortious conduct would support an actionable IIED claim. *See Hakkila v. Hakkila*, 112 N.M. 172 (1991) (recognizing "child snatching" would likely be sufficiently outrageous to support an IIED claim).[8] Indeed, courts addressing the same arguments in other family separation cases have recognized private analogs for IIED claims based on nearly identical facts under state laws which, like New Mexico's, also recognize a privilege defense. *C.M.*, 2020 WL 1698191, at *2 (denying motion to dismiss and recognizing private person analog for IIED FTCA claim under Arizona law where "separation of families was motivated by malice"); *A.P.F.*, 492 F.Supp.3d at 994-95 (similar); *see Ballesteros v. United Auto. Ins. Co*., No.

---

[8] Plaintiff's IIED claim would still be actionable if the court applied Texas law. *In re S.K.H*., 324 S.W.3d 156, 160 (Tex. App. 2010) (upholding judgment for IIED where grandparents took child from mother and concealed the child's whereabouts).

2 CA-CV 2009-0114, 2010 WL 93117, at *2 (Ariz. Ct. App. Jan. 11, 2010) (recognizing privilege defense for IIED claims).

The only case Defendant cites based on New Mexico law, *Galicia v. United States*, No. CV 13-0105 MCA/LAM, 2015 WL 12696086, at *2 (D.N.M. Feb. 24, 2015), is not to the contrary. There, the court rejected an IIED claim challenging a noncitizen's traffic stop arrest and subsequent removal from the country, conduct that Plaintiff does not challenge here. *Id*. The court concluded that the government's conduct was authorized by law and reasonable. *Id*. *Galicia* did not involve allegations of unlawful family separation. *See Jacinto-Castanon*, 319 F. Supp. 3d at 501; *Ms. L.*, 302 F. Supp. 3d at 1167.

### B.  A Private Person Analog Exists for Plaintiff's Negligence Claim

Defendant argues that Texas law applies to Plaintiff's negligence claim and that there is no private analog under Texas law. But New Mexico law applies, which has a private analog.[9] Assuming, as Defendant argues, that Texas's "most significant relationship" test applies to determine which substantive law applies, that test includes consideration of "where the injury occurred, where the conduct causing the injury occurred, where the parties reside, and where the parties' relationship is centered." *McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 702 (5th Cir. 2014). In personal injury cases, there is a "presumption in favor of applying the law of the place of the injury." *Enter. Prod. Partners, L.P. v. Mitchell*, 340 S.W.3d 476, 480 (Tex. App. 2011); *see Stevenson v. Ford Motor Co.*, 608 S.W.3d 109, 119 (Tex. App. 2020).

---

[9] Plaintiff's negligence claim would also be actionable if the court applied Texas law. *See Lopez-Flores v. Ibarra*, No. 1:17-CV-00105, 2018 WL 6577955, at *3 (S.D. Tex. Mar. 12, 2018) (finding private person analog under Texas law for negligence resulting in wrongful detention and deportation); *Applebaum v. Nemon*, 678 S.W.2d 533, 536 (Tex. App. 1984) (recognizing duties of schools and day care providers to render aid to minors under their care).

These factors weigh in favor of applying New Mexico law to Plaintiff's negligence claim. Plaintiff's forcible separation—the heart of Plaintiff's allegations—occurred in New Mexico. Compl. ¶ 72. And although Plaintiff's trauma was compounded by her subsequent mistreatment in other states, the trauma resulting from the separation occurred in New Mexico. Finally, the relationship between the Plaintiff and Defendant arose in New Mexico, where Plaintiff was apprehended. *Id*. ¶ 65. New Mexico thus has the "most significant relationship" to Plaintiff's negligence claim. *See Coffey v. United States*, 870 F. Supp. 2d 1202, 1229 (D.N.M. 2012) (holding under "most significant relationship" test that law of the state where plaintiff's injury and at least part of the conduct causing the injury occurred applied). Indeed, Defendant acknowledges that New Mexico law should apply to Plaintiff's IIED claim, Mot. 11, and her negligence claim includes similar allegations. Compl. ¶ 7. New Mexico law thus applies to her negligence claim as well. It is well established that a plaintiff is the master of her complaint.

Defendant's argument that the test favors applying Texas substantive law to Plaintiff's negligence claim mischaracterizes the Complaint's allegations. Defendant asserts that Plaintiff's only negligence allegation is the "negligent failure to unite S.E.B.M. with her grandmother in a timely manner." Mot. 13. While that was plainly negligent, Defendant fails to acknowledge the Complaint's additional negligence allegations: "The egregious deprivations of basic human rights that Plaintiff experienced while in U.S. custody, the forced separation from her father, her subsequent detention, and the failure to reunify her with her family all constitute *negligence* and intentional infliction of emotional distress." Compl. ¶ 7 (emphasis added). Plaintiff further claims that "Federal officers failed to use due care to minimize the trauma that was caused to" her. *Id*. ¶ 75; *see also id*. ¶ 53 ("[T]he U.S. government failed to exercise due care and failed to take reasonable measures to minimize the predictable psychological harms that resulted from its

policy to separate parents and children."). Plaintiff's negligence allegations thus go beyond her delayed reunification to include her prolonged separation and resulting mistreatment. New Mexico has the most significant relationship to both Plaintiff's negligence and IIED claims, and the Court need not apply two different sets of state laws.

Under New Mexico law, private analogs to Defendant's negligent conduct plainly exist. When CBP apprehended Plaintiff and placed her in detention, it assumed a duty of care much as a private facility does when it assumes care of a person. In *Coffey*, the court found private analogs under New Mexico law for claims that the federal government negligently failed to transfer medical information about a detainee and negligently placed the detainee in an unsafe facility. 870 F.Supp.2d at 1235-40, 1248-51. The court analogized the government's conduct to a "private school not having procedures in place to identify a young child's potential health problems," *id*. at 1236, and to "a parent sending his or her child to a dangerous place or placing the child in a dangerous situation," *id*. at 1248; *see Tilga v. United States*, No. CV 14-256 JAP/RHS, 2014 WL 12783121, at *8 (D.N.M. Dec. 5, 2014) (concluding plaintiff adequately stated FTCA claim for relief where he alleged "negligence in failing to provide safe living conditions for federal inmates" in facility in New Mexico). The same is true here, where Plaintiff alleges that her forced separation and mistreatment constitute negligence.

### C.  No "Governmental Action" Exception Exists

Finally, Defendant argues that there cannot be a private person analog for functions only the government can engage in and that enforcement of federal immigration laws is one such uniquely governmental function. Mot. 14. This argument has been repeatedly rejected by the Supreme Court as well as by courts ruling on motions to dismiss in family separation cases.

23

The Supreme Court has long rejected the government's argument that the FTCA excludes liability for the performance of "uniquely governmental functions" that private persons do not perform. *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955). The FTCA makes the United States liable "to the same extent as a private individual under *like circumstances*." 28 U.S.C. § 2674 (emphasis added). It "do[es] not restrict a court's inquiry to the same circumstances, but require[s] it to look further afield." *United States v. Olson*, 546 U.S. 43, 46 (2005). For example, in *Indian Towing* the Court found a private analog for a claim against the U.S. Coast Guard for negligent maintenance of a lighthouse even though the Coast Guard had exclusive responsibility for operation of coastal lighthouses. 350 U.S. at 62. And in *Olson*, the Court found that claims against federal mine inspectors likely had a private analog despite recognizing mine inspections were a "uniquely governmental function." 546 U.S. at 47.

Likewise, courts have found private analogs for tortious conduct committed in the course of immigration enforcement. *See Liranzo v. United States*, 690 F.3d 78, 94-95 (2d Cir. 2012) (finding citizen's arrest was private analog to immigration detention); *Xue Lu v. Powell*, 621 F.3d 944, 949-50 (9th Cir. 2010) (finding private employer liability was analogous to asylum officer conditioning grant of asylum on sexual favors and money); *Mayorov v. United States*, 84 F. Supp. 3d 678, 698 (N.D. Ill. 2015) (finding private company's failure to investigate analogous to ICE's failure to investigate plaintiff's citizenship claim).

Here, as explained, private analogs for Plaintiff's IIED and negligence claims plainly exist, as several courts addressing nearly identical facts have concluded. *See C.M.*, 2020 WL 1698191, at *4; *A.P.F.*, 492 F.Supp.3d at 995-96; *Nunez Euceda*, 2021 WL 4895748, at *4.

## <u>CONCLUSION</u>

For the foregoing reasons, the court should deny Defendant's motion to dismiss.

Respectfully submitted: March 8, 2022

/s/ María Martínez Sánchez
María Martínez Sánchez
Zoila Alvarez Hernandez
Leon Howard
ACLU OF NEW MEXICO
P.O. Box 566
Albuquerque, NM 87103
(505) 266-5915
msanchez@aclu-nm.org
zalvarez@aclu-nm.org
lhoward@aclu-nm.org

/s/ Ian Ross
Ian M. Ross, Fla. Bar No. 091214
Michael Nadler, Fla. Bar No. 051264
Erica L. Perdomo, Fla. Bar No. 105466
STUMPHAUZER FOSLID SLOMAN ROSS
    & KOLAYA, PLLC
Two South Biscayne Blvd., Suite 1600
Miami, FL 33131
(305) 614-1400
iross@sfslaw.com
mnadler@sfslaw.com
eperdomo@sfslaw.com

/s/ Lisa Lehner
Lisa Lehner, Fla. Bar 382191
Jennifer Coberly, Fla. Bar No. 930466
AMERICANS FOR IMMIGRANT JUSTICE
6355 NW 36 Street, Suite 2201
Miami, FL 33166
Phone: (305) 573-1106 Ext. 1995
Fax: (305) 576-6273
llehner@aijustice.org
jcoberly@aijustice.org

*Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 8th day of March, 2022, I filed the foregoing pleading electronically through the CM/ECF system which caused all parties or counsel of record to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

<u>*/s/ María Martínez Sánchez*</u>
María Martínez Sánchez