## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

S.E.B.M., *a minor, by and through her next friend*,
MARIA MENDEZ FELIPE,

     Plaintiff,

v.                                               No. 1:21-cv-00095-JHR-LF

THE UNITED STATES OF AMERICA,

     Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant United States of America's ("the government") Motion to Dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) ("the Motion"). [Doc. 16]. Briefing is complete and Plaintiff S.E.B.M., by and through her next friend, Maria Mendez Felipe ("S.E.B.M.'s grandmother"), has also filed supplemental briefing with leave of Court. *See* Docs. 41, 45, 49, 59–60. Having considered the briefing and the relevant law, the Court grants the Motion.

### I.    Introduction

This is a case stemming from the separation of a young child from her father after they illegally entered the United States and her father was prosecuted and deported. The young child sued the government under the Federal Tort Claims Act ("FTCA"), alleging that her separation from her father and the government's treatment of her afterwards constituted an intentional infliction of emotional distress, or at least negligence, under New Mexico law. The government does not deny that it separated the child from her father and that they were never reunited. Rather, the government argues that the child's tort claims are not analogous to valid state law claims; that its actions, including the separation, were merely side effects of the government's

discretionary decision to prosecute the child's father; and that many of its actions were required by federal law and were taken with due care.  If the government is correct, the Court lacks subject matter jurisdiction under the FTCA.  The government thus moves for this Court to dismiss the case.

The Court grants the government's motion.  There is little doubt S.E.B.M. was harmed by the government's actions, but the FTCA does not give everyone who is harmed by the government a right to sue.  S.E.B.M.'s intentional infliction of emotional distress and negligence claims, even if brought against a private person under the same circumstances, would not succeed under state law.  And although S.E.B.M. argues that she is suing for her separation, not her father's prosecution, the direct link between those events makes it impossible to sue for one and ignore the other.  The government had discretion to prosecute S.E.B.M.'s father, that prosecution did not violate any other federal law, and the government's actions after S.E.B.M.'s father was charged were a combination of mandatory actions taken with due care and discretionary actions for which S.E.B.M. cannot sue.  This Court thus lacks jurisdiction to hear her claims and must dismiss this case.

## II.    Factual Background

S.E.B.M. is a child from San Miguel Acatan, Huehuetenango, Guatemala.  [Doc. 1 ¶ 63]. In July 2017, while her mother remained in Guatemala, S.E.B.M. and her father crossed the border from Mexico into the United States at or near Santa Teresa, New Mexico.  *Id.* at ¶¶ 5, 65. S.E.B.M. was two years old at the time and spoke only Akateko, an indigenous Guatemalan language.  *Id.* at ¶ 63.  S.E.B.M. and her father turned themselves in to United States Customs and Border Protection ("CBP") officials who then transported them to the Santa Teresa CBP station.  *Id.* at ¶ 65.

S.E.B.M. and her father spent one night together at the Santa Teresa CBP station. *Id.* at ¶ 68. While there, S.E.B.M.'s father gave CBP officials contact information for his mother (S.E.B.M.'s grandmother), who lived in Florida. *Id.* at ¶ 69. CBP officials permitted S.E.B.M.'s father to call his mother to tell her that he would be transferred to a jail. *Id.* at ¶ 71.

S.E.B.M. was separated from her father in early August 2017 and has not seen him since. *Id.* at ¶ 72. The separation was distressing and caused her to cry inconsolably. *Id.* at ¶ 73. S.E.B.M. asserts that what happened to her was part of the Trump administration's "Pilot Program for Family Separation" and that this program resulted in the forced separation of nearly four-thousand children from their parents or guardians after they crossed the southwestern United States border. *Id.* at ¶¶ 1, 3, 19. She further contends that the purpose of the Pilot Program was to "use the trauma resulting from family separations, and the consequent media reporting about that trauma, to deter future asylum seekers." *Id.* at ¶ 2.

S.E.B.M.'s father was charged with improper entry, a misdemeanor immigration offense, transferred to the custody of the United States Marshals Service, and transported to jail. *Id.* at ¶ 77; *see also* 8 U.S.C. § 1325(a) (defining "improper entry" offenses). S.E.B.M.'s father pled guilty, was sentenced to time served, and was transported to the El Paso Service Processing Center in mid-August to be deported. [Doc. 1 ¶ 78]. He was ultimately deported to Guatemala in late November 2017. *Id.*

Meanwhile, S.E.B.M. was transferred to the Clint CBP station in Texas and placed in the care of the Office of Refugee Resettlement ("ORR") shortly after she was taken from her father. *Id.* at ¶ 85. Due to her age and the language barrier, S.E.B.M. could not provide contact information or details about her planned living arrangements in the United States. *Id.* at ¶ 86. At some point, ORR placed S.E.B.M. in a foster home through a local agency in Brownsville,

Texas.  *Id.* at ¶¶ 85–87.  S.E.B.M.'s caretakers took her to see an ORR case manager, visit with an ORR counselor, and make calls to her parents at the office of the foster care program.  *Id.* at ¶ 87.  On September 29, 2017, S.E.B.M.'s case manager began facilitating phone calls between S.E.B.M. and her father.  *Id.* at ¶ 89.  However, because of the conditions of his immigration detention, calls were allegedly limited to five minutes each.  *Id.*

S.E.B.M.'s mother died in mid-October 2017.  *Id.* at ¶ 90.  S.E.B.M.'s counselor told S.E.B.M., but S.E.B.M. struggled to process the information because she was so young.  *Id.*  In November 2017, S.E.B.M.'s case manager indicated that S.E.B.M.'s family had chosen her grandmother to be her immigration sponsor and that the case manager was working on placing S.E.B.M. in her care.  *Id.* at ¶ 92.  This was accomplished on January 8, 2018, when S.E.B.M. was released into her grandmother's custody in Florida where she still lives today.  *Id.* at ¶¶94–95.

S.E.B.M. alleges that her ordeal in government custody caused her severe mental and emotional harm.  *Id.* at ¶ 96.  According to her grandmother, S.E.B.M. cried often, did not sleep well, and barely ate for months after she was discharged.  *Id.* at ¶ 99.  She also frightened easily and was afraid to go outside.  *Id.* at ¶ 100.  She appeared especially distressed by the absence of relatives, clinging to her grandmother everywhere she went and following after a male relative while crying every time he left home.  *Id.*  S.E.B.M. alleges that her mental and emotional harm continues today.  *Id.* at ¶ 101.

### III.   Procedural History

S.E.B.M. sued the government on February 5, 2021, alleging two claims under the FTCA:  intentional infliction of emotional distress (Count I) and negligence (Count II).  *See id.* at

¶¶ 102–12.  Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73(b), the parties consented to my entering final judgment in this case.  [*See* Docs. 19–21].

On May 3, 2021, the government filed the present Motion to Dismiss.  [Doc. 16].  After unsuccessful settlement discussions, S.E.B.M. responded to the Motion on March 8, 2022.  [Docs. 33, 41].  The government replied on March 22, 2022, and S.E.B.M. filed a surreply on March 31, 2022.  [*See* Docs. 45, 49].  S.E.B.M. also filed a Notice of Supplemental Authority on September 9, 2022, notifying the Court of United States District Judge Robert C. Brack's ruling on a similar motion to dismiss in another family separation case filed in this district.  [*See* Doc. 59].  The government responded to the notice on September 26, 2022.  [Doc. 60].[1]

## IV.     Applicable Legal Standards

The government moves to dismiss S.E.B.M.'s claims for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  [*See* Doc. 16].  The United States contends that it has not waived its sovereign immunity for S.E.B.M.'s FTCA claims.  *Id.* at 2.

### A.  The FTCA

"Sovereign immunity protects the United States and its agencies from being sued without their consent."  *Poche v. Joubran*, 644 F.3d 1105, 1108 (10th Cir. 2011) (citing *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994)).  The FTCA provides a limited waiver of sovereign immunity allowing certain state-law tort claims against the government.  *Brownback v. King*, 141 S. Ct. 740, 745 (2021); *Ball v. United States*, 967 F.3d 1072, 1075 (10th Cir. 2020).  Within that

---

[1] The Court reviewed Judge Brack's memorandum opinion in *A.E.S.E. v. United States*, 1:21-cv-00569-RB-GBW, 2022 WL 4289930 (D.N.M. Sept. 16, 2022), in which the Court denied in part the government's motion to dismiss, and finds that case distinguishable on its facts.  A.E.S.E.'s tort claims largely depend on allegations of squalid living conditions, medical neglect, sexual abuse, and threats by government officials.  *See A.E.S.E.*, 2022 WL 4289930 at *2–5.  S.E.B.M. does not allege similar facts.  [*See generally* Doc. 1].  The decision to grant the government's Motion in this case is thus distinguishable.

waiver, the United States can be held liable only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Ball*, 967 F.3d at 1075 (citing 28 U.S.C. § 1346(b)(1)). FTCA plaintiffs must prove that sovereign immunity has been waived. *See James v. United States*, 970 F.2d 750, 753 (10th Cir. 1992). Proof of waiver may not be determinative, however, because the FTCA also has several exceptions to its general waiver of sovereign immunity. *Ball*, 967 F.3d at 1075. "When an exception applies, sovereign immunity remains, and federal courts lack jurisdiction." *Garling v. U.S. Env't Prot. Agency*, 849 F.3d 1289, 1294 (10th Cir. 2017) (citations omitted).

Here, the government argues that the Court lacks jurisdiction over S.E.B.M.'s FTCA claims generally because they have no private person analogs and additionally because the actions complained of fall within the discretionary function and due care exceptions. [Doc. 16 p. 9]. The Court discusses the applicable law of each below.

### B. Rule 12(b)(1) Motions

A court must dismiss a case when it lacks jurisdiction over the subject matter. *Gonzagowski v. United States*, 495 F. Supp. 3d 1048, 1085 (D.N.M. 2020). Parties may raise jurisdictional issues by motion under Rule 12(b)(1). *Id.* at 1085. "A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims." *Id.* (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998)).

Subject matter jurisdiction challenges can be facial or factual. *Ratheal v. United States*, No. 20-4099, 2021 WL 3619902, at *3 (10th Cir. Aug. 16, 2021), cert. denied, 142 S. Ct. 772 (2022), reh'g denied, 42 S. Ct. 1195 (2022) (citing *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995)). The two types call for different analytical approaches. "A facial attack

'questions the sufficiency of the complaint,' and when 'reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true.'" *Id.* (quoting *Holt*, 46 F.3d at 1002). "A factual attack goes beyond allegations in the complaint and challenges the facts on which subject matter jurisdiction depends." *Id.* (citing *Holt*, 46 F.3d at 1003). "When reviewing a factual attack, a court 'may not presume the truthfulness of the complaint's factual allegations,' and may consider affidavits and other documents to resolve disputed jurisdictional facts under Rule 12(b)(1) without converting the motion to a summary judgment motion." *Id.* (quoting *Holt*, 46 F.3d at 1003).

If the Court were required to resolve an aspect of S.E.B.M.'s substantive claims to assess the applicability of the discretionary function exception, the factual analysis would convert the motion to dismiss to one for summary judgment. *See id.* Here, the Court may "answer[ ] the jurisdictional question as a matter of law, without resolving any factual disputes or substantive aspects of [S.E.B.M.'s] claims." *See id.* Accordingly, the Court will consider the allegations in the complaint to be true and will resolve the issue as a motion to dismiss. *See id.*; *see also Harter v. United States*, 344 F. Supp. 3d 1269, 1275 (D. Kan. 2018).

## V.    Analysis

The government argues that there are three reasons why this Court lacks subject matter jurisdiction over S.E.B.M.'s case. First, it argues that S.E.B.M.'s complaint does not satisfy the FTCA's requirement that "the United States, if a private person, would be liable to [S.E.B.M.] in accordance with the law of the place where the act or omission occurred." [Doc. 16, pp. 9–15]; 28 U.S.C. § 1346(b). Second, the government argues that its actions were policy-driven choices within its discretion and protected from liability by the FTCA's discretionary function exception. [Doc. 16, pp. 15–24]; 28 U.S.C § 2680(a). Third, the government asserts that its actions were

performed with due care in execution of a statute or regulation and thus were protected by the FTCA's due care exception.  [Doc. 16, pp. 25–27].  S.E.B.M. disagrees, asserting the government would be liable as a private person under New Mexico law and that the government violated its internal guidelines, a binding settlement agreement, federal regulations, federal statutes, and the United States Constitution, thus precluding protection under the exceptions to FTCA liability.  [*See* Doc. 41, pp. 5–24].  The Court addresses each issue in turn below.

### A.  State Law Analog

Determining whether S.E.B.M.'s claims fall within the FTCA's general waiver of sovereign immunity requires the Court to answer three questions.  First, because the facts of this case span two States, which State's choice-of-law principles should be applied?  Second, applying the appropriate choice-of-law rule, which State's substantive tort law applies?  Third, does S.E.B.M.'s complaint state claims under the appropriate State's tort law?  The Court holds that Texas's choice-of-law principles apply; that those principles call for New Mexico's substantive tort law; and that S.E.B.M. does not state claims under New Mexico law.

#### i.  Choice of Choice-of-Law

##### a.  Rules

The FTCA requires courts to apply the "whole law" of the State where relevant acts or omissions occurred.  *Richards v. United States*, 369 U.S. 1, 11 (1962).  Courts therefore must apply that State's choice-of-law principles to determine what State's substantive tort law governs.  *Ellis v. Liberty Life Assurance Co. of Boston*, 958 F.3d 1271, 1283–84 (10th Cir. 2020) (interpreting *Richards*).  Neither the text of the FTCA nor *Richards*, however, define "the place where the act or omission occurred" when plaintiffs allege acts and omissions in multiple states. *See* 20 U.S.C. § 1346(b)(1); *Richards*, 369 U.S. at 10–11.  In a case like this, the Court's first

task is to clarify which State's "whole law" to apply.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 758–59 (2004) (Ginsburg, J., concurring in part).

The best rule seems to be applying the whole law of the State where the last significant act or omission occurred.[2]  In *Simon v. United States*, the Third Circuit adopted this rule primarily because it is clear and "clarity is the most important virtue in crafting a rule by which we choose a jurisdiction" whose choice-of-law principles will apply.  341 F.3d 193, 204 (3d Cir. 2003).  This view seems accurate.  A clear rule makes the ultimate choice of law more predictable and limits the discretion of judges to choose what law they wish to apply to cases before them.  The FTCA's language, stating only that "the law of the place where the act or omission occurred" should be applied, suggests judges are not supposed to have such great discretion.  *See* 28 U.S.C. § 1346(b)(1).  The test is also not as arbitrary as other bright lines, such as applying the whole law of the place where "last contact" occurred, and it avoids the mostly conjectural analysis involved in determining the place of the "most significant act."  *See Simon*, 341 F.3d at 204.  Finally, this test has been embraced by Judge Robinson in the District of Kansas, so adopting it here promotes a uniform interpretation of the FTCA in the Tenth Circuit.  *See Draughon v. United States*, 103 F. Supp. 3d 1266, 1281 (D. Kan. 2015).  The Court will thus apply the choice-of-law principles of the State where the last significant act or omission alleged by S.E.B.M. occurred.

### b.  Application

Texas is the place of the last significant act or omission alleged by S.E.B.M.  She alleges, and the government does not deny, that she was placed in foster care by ORR in Brownsville,

---

[2] At least five other approaches have been proposed in federal courts.  *See Gould Elecs. Inc. v. United States*, 220 F.3d 169, 181–83 (3d Cir. 2000) (describing five different approaches to choice-of-law questions under 28 U.S.C. § 1346(b)(1)).

Texas.  [Doc. 1, ¶ 85].  Brownsville was the last location where S.E.B.M. alleges she was

harmed by the government before she was placed in the care of her grandmother.  *Id.* at ¶ 91.

Because a significant part of S.E.B.M.'s claim is based on her continued separation from family

while in Texas, that State is the place of the last significant act or omission and the Court will

apply Texas's choice-of-law principles to determine what substantive tort law applies.

### ii.   Applying Texas Choice-of-Law Principles

#### a.   Rules

Texas decides choice-of-law disputes by applying the "most significant relationship" test

set forth in the Restatement (Second) of Conflict of Laws ("*Restatement*").  *Torrington Co. v.

Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000) (citing *Restatement* §§ 6, 145).  It is a multi-factor

balancing test in which courts consider factors relevant to lawsuits generally and some factors

particular to the type of suit before them to determine which jurisdiction has the most significant

relationship to a claim and the parties.  *See Restatement* § 6, cmt. c.  Section 6 lists the general

factors:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those
> states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

*Restatement* § 6(2).  Section 145 lists additional factors especially relevant to tort cases:

> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicil, residence, nationality, place of incorporation and place of business
> of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.

*Restatement* § 145(2).  Finally, in personal injury cases, there is a presumption that "the [substantive tort] law of the state where the injury occurred determines the rights and liabilities of the parties" which may be rebutted if another State is found to have a more significant relationship based on the factors listed above.  *See Restatement* § 146; *Enter. Prods. Partners v. Mitchell*, 340 S.W.3d 476, 480 (Tex. App.—Houston [1st Dist.] 2011, pet. abated).[3]

### b.  Application

#### 1.  Intentional Infliction of Emotional Distress

Based on the facts alleged, New Mexico is the State with the most significant relationship to S.E.B.M.'s emotional distress claim.

*Restatement* sections 145 and 146 mostly favor New Mexico law.  S.E.B.M. chiefly alleges that she was harmed by the government's "forceful separation" of her from her father and that this act was "extreme and outrageous."  [*See* Doc. 1, ¶ 103].  This suggests the relevant "injury" for this claim occurred, or at least began, upon separation while in New Mexico, so the § 146 presumption favors New Mexico law.  *See Restatement* § 146.  The first two § 145 factors support this presumption.  Factor (a), "the place where the injury occurred," is repetitive of § 146, and factor (b), "the place where the conduct causing the injury occurred," also favors New Mexico because the alleged injury (emotional distress) was caused by conduct (physical separation) in the same location as the injury.  [Doc. 1 ¶¶ 63–76]; *see Restatement* § 145 cmt. e ("When the injury occurred in a single, clearly ascertainable state and when the conduct which caused the injury also occurred there, that state will usually be the state of the applicable law").

---

[3] The Supreme Court of Texas has not applied the § 146 presumption before, but six of Texas's fourteen intermediate courts of appeals have.  *See Ford Motor Co. v. Aguiniga*, 9 S.W.3d 252, 260 (Tex. App.—San Antonio 1999, pet. denied); *Perkins v. Dynasty Grp. Auto*, 2003 WL 22810452 (Tex. App.—El Paso 2003, pet. denied); *Enter. Prods. Partners*, 340 S.W.3d at 480; *Liberty Mut. Ins. Co. v. Transit Mix Concrete & Materials Co.*, 2013 WL 3329026 at *5 (Tex. App.—Texarkana 2013, pet. denied); *Toyota Motor Co. v. Cook*, 581 S.W.3d 278, 285 (Tex. App.—Beaumont 2019, no pet.); *Stevenson v. Ford Motor Co.*, 608 S.W.3d 109, 118–19 (Tex. App.—Dallas 2020, pet. denied).

The other two § 145 factors carry little to no weight.  Factor (c) is unhelpful because it considers domicile and nationality, but neither the government nor S.E.B.M. can claim such status in New Mexico or Texas.[4]  Factor (d) is the only one that favors Texas law because S.E.B.M.'s relationship with the government mostly played out while she was in ORR detention in Texas, making that State a strong contender for the "center" of the parties' relationship.  [*See* Doc. 1 ¶¶ 85–93].  Overall, however, because S.E.B.M.'s complaint focuses on her separation, it is difficult to see how the geographic center of the parties' relationship could overcome the relevance of the State where S.E.B.M. alleges she was injured.  Finally, neither party argues that any of the § 6 factors overwhelm the § 146 presumption or the § 145 factors, and the Court does not see any reason they would.  New Mexico tort law thus controls.

### 2.  Negligence

S.E.B.M.'s allegations also suggest that New Mexico has the most significant relationship with her negligence claim, so New Mexico law applies to it as well.  S.E.B.M. says the same facts which support her intentional tort claim also support her negligence claim. [Doc. 1 ¶¶ 102, 108].  She then recites the elements of common law negligence without referencing any specific allegations to distinguish her negligence-based injury from her intentional-tort-based injury.  *Id.* at ¶¶ 109–12.  This suggests that S.E.B.M. is simply pleading negligence in the alternative; that, even if she cannot show the government's conduct was intentional, extreme, and outrageous, she can at least prove that the same conduct breached a more general duty of care regardless of relevant federal employees' mental states.[5]  Because

---

[4] Further, neither party requests Guatemalan law.

[5] The government argues that "the only negligent conduct that Plaintiff specifically alleges is the negligent failure to unite S.E.B.M. with her grandmother in a timely manner." [Doc. 16, p. 13] (quotation marks omitted).  This is not entirely accurate.  S.E.B.M. intersperses her complaint with assertions that federal officers acted negligently or without due care, suggesting that she believes the government was negligent throughout the relevant events.  [*See* Doc. 1 ¶¶ 53, 62, 75].  The Court thus does not read S.E.B.M.'s complaint as narrowly alleging a single negligent act in Texas, but as alleging that all the allegedly intentional tortious acts were also negligent.

S.E.B.M.'s pleadings suggest there is little to no difference between her negligence- and intentional-tort-based injuries, the significant-relationship analysis above applies equally to S.E.B.M.'s negligence claim.  Her alleged injury is the emotional distress she suffered upon separation in New Mexico, so the § 146 presumption favors New Mexico law; the location where the original injurious conduct happened was New Mexico, strengthening that presumption; and the relevant relationship was likely centered in Texas, but that factor carries little weight.  The Court thus applies New Mexico tort law to S.E.B.M.'s negligence claim.

### iii.   Intentional Infliction of Emotional Distress in New Mexico

#### a.  Rules

New Mexico plaintiffs suing for intentional infliction of emotional distress must show: (1) the defendant acted extremely and outrageously; (2) the defendant's conduct was intentional or in reckless disregard of the plaintiff; (3) the plaintiff suffered extreme and severe mental distress; and (4) the defendant's conduct caused plaintiff's mental distress.  *Baldonado v. El Paso Natural Gas Co.*, 2008-NMSC-005 ¶ 27, 176 P.3d 277, 283 (N.M. 2008).  New Mexico courts have recognized that certain conduct affecting family relations, especially children, can be so extreme and outrageous that plaintiffs are allowed to sue for emotional damage caused by that conduct.  *See Hakkila v. Hakkila*, 1991-NMCA-029 ¶ 23, 812 P.2d 1320, 1326 (N.M. Ct. App. 1991) (referencing "child snatching" as grounds for an intentional infliction of emotional distress claim).  But they have also recognized that some outrageous conduct is "privileged," meaning that defendants may engage in it as a matter of right without incurring liability.  *See Baldonado*, 2008-NMSC-005 ¶ 34, 176 P.3d at 285; *Hakkila*, 1991-NMCA-029 ¶ 26, 812 P.2d at 1327 (holding that a husband was not liable to wife for withholding marital relations because "[h]e was privileged to refrain from intercourse").  The prime example of privileged conduct is

conduct the defendant has a legal right to perform.  *See* Restatement (Second) of Torts § 46 cmt.

g; *Baldonado*, 2008-NMSC-005 ¶ 34, 176 P.3d at 285 (quoting comment g).

### b.  Application

S.E.B.M. cannot hold the government liable for intentional infliction of emotional

distress because a private person in the same circumstances would have been privileged to act as

the government did.  The federal government generally has discretion to prosecute any person in

the United States whom it has probable cause to believe has violated federal criminal law.

*United States v. Armstrong*, 517 U.S. 456, 464 (1996).  The government's prosecutorial

discretion is akin to a private landowner's right to evict tenants who are behind on rent; landlords

are not required to evict but have the privilege even though it likely harms tenants.  *See* N.M.

Stat. Ann. §§ 47-8-33, 47-8-40 (detailing when and how property owners may evict leasehold

tenants).  Indeed, the decision to evict a parent may mean they lose custody of a child, but New

Mexico courts would likely hold that the decision to evict is no less privileged.  *See Alfieri v.

Alfieri*, 1987-NMCA-003 ¶ 26, 733 P.2d 4, 10 (N.M. Ct. App. 1987) (holding that child custody

may be modified upon evidence establishing a substantial change in circumstances which

materially affect the best interests and welfare of the child).

The government's alleged actions in this case were protected by its privilege to prosecute.

By her own explanation of events, S.E.B.M.'s separation from her father was a direct result of

the government's decision to prosecute him.  [*See* Doc. 1 ¶¶ 21, 29, 77].  After he was arrested

S.E.B.M. became an unaccompanied alien child because her father could not provide her care

and physical custody while in detention.  6 U.S.C. § 279(g)(2).  The government was thus

required by the Trafficking Victims Protection Reauthorization Act ("TVPRA") to shelter

S.E.B.M. in an ORR facility, or with a contracted foster care agency, while her father was

14

detained and awaiting deportation.  8 U.S.C. §§ 1232(b)(3), (g); *see below* at 28–29 (finding that S.E.B.M. was a UAC).  Because S.E.B.M.'s separation from her father was the immediate consequence of the government's decision to prosecute, the same privilege that would protect the government from an emotional distress claim by S.E.B.M.'s father must also protect it from liability to S.E.B.M.

S.E.B.M. is correct that, were the government's conduct contrary to federal law, the government would not be protected by New Mexico's privilege rule.  Extending the eviction analogy, landlords may usually have a right to evict non-paying tenants, but that right can be superseded by other state law.  *Cf. Smart Coffee, Inc. v. Sprauer*, 140 N.Y.S.3d 376, 384 (N.Y. Civ. Ct. 2021) (finding that eviction by lockout was illegal under governor's temporary eviction moratorium).  But the government's conduct did not violate federal law, so S.E.B.M. cannot win on this argument.  *See below* at 26–28 (finding the government did not violate federal law).  The Court thus finds that S.E.B.M.'s intentional infliction of emotional distress claim has no state law analog.

### iv.   Negligence in New Mexico

#### a.  Rules

Under New Mexico common law, negligence plaintiffs must show:  (1) defendant owed a legal duty to plaintiff; (2) defendant breached that duty; (3) plaintiff was injured; and (4) defendant's breach caused the injury.  *Zamora v. St. Vincent's Hosp.*, 2014-NMSC-035 ¶ 22, 335 P.3d 1243, 1249 (N.M. 2014).  Plaintiffs who do not show that defendants owed them a legal duty cannot prevail because it is a threshold to liability.  *Morris v. Giant Four Corners, Inc.*, 2021-NMSC-028 ¶ 13, 498 P.3d 238, 243 (N.M. 2021).[6]  Additionally, plaintiffs alleging that

---

[6] New Mexico courts can recognize new common law duties and expand existing ones.  *See Herrera v. Quality Pontiac*, 2003-NMSC-018 ¶ 9, 73 P.3d 181, 187 (N.M. 2003) (discussing when courts will find legal duties in new

another's negligence caused purely emotional or psychological damage may only recover if they were a bystander witness to a sudden, traumatic event which caused serious injury or death to a family member. *Fernandez v. Walgreen Hastings Co.*, 1998-NMSC-039 ¶ 6, 968 P.2d 774, 777 (N.M. 1998).

### b. Application

S.E.B.M.'s second claim fails because a private person in the same circumstances would not be liable in negligence. First, S.E.B.M. does not clearly plead an analogous duty.[7] Her complaint states only that "federal officers . . . owed a duty to Plaintiff to act with ordinary care and prudence" without specifying what actions that duty forbade or called for. [Doc. 1 ¶ 109]. She cites *Coffey v. United States*, 870 F. Supp. 2d 1202 (D.N.M. 2012) and *Tilga v. United States*, 14-cv-00256, 2014 WL 12783121 (D.N.M. Dec. 5, 2014) for the proposition that an analogous duty exists, but both cases are inapposite. [Doc. 41, p. 23]. In *Coffey*, this Court recognized, in the context of an FTCA claim governed by New Mexico law, duties to screen for an inmate's medical conditions or otherwise ensure his conditions would be discovered during and after transferring him between facilities. *Coffey*, 870 F. Supp. 2d at 1239. But S.E.B.M. does not argue that the government failed to attend to her physical health or provide appropriate medical care. Her alleged injuries stem entirely from her separation from her father, which is hardly analogous to the physical injury (death) and duty involved in *Coffey*. *See id.* at 1210–11. *Tilga* is also inapplicable because the government's alleged negligence there was a failure "to provide safe living conditions for federal inmates . . . and supervise conditions [in prison]." 2014

---

situations). S.E.B.M. does not argue that New Mexico courts would recognize a new duty here, so the Court only considers whether she has shown an analogous duty already exists in New Mexico.
[7] S.E.B.M. also fails to carry her burden on this element under Texas negligence law. Plaintiffs in Texas must show: (1) defendant owed a legal duty to plaintiff; (2) defendant breached that duty; and (3) the breach proximately caused plaintiff's injury. *Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 144 (Tex. 2022). Like in New Mexico, existence of a duty is a threshold to liability. *Id.* at 145. S.E.B.M. relies on inapplicable Texas cases and does not argue that Texas courts would expand its common law duties to incorporate her claim. [*See* Doc 41, p. 21 n.9].

WL 12783121 at *8.  Again, S.E.B.M.'s complaint does not allege that she was physically unsafe, only that she was physically separate from family.  Although there is no doubt that extended physical separation from a parent or relative at that age is psychologically harmful, S.E.B.M. does not show the Court any analogous legal duty to prevent it and fails to explain why New Mexico courts would recognize one.

Second, even if a duty exists, New Mexico law bars recovery in negligence for purely emotional harm.  S.E.B.M. alleges only "mental and emotional harm" and does not allege she was a bystander witness to anyone's injury or death.  [Doc. 1 ¶¶ 96–101].  The New Mexico Supreme Court has been clear:  "[Negligent infliction of emotional distress] is an extremely narrow tort that compensates a bystander who has suffered severe emotional shock as a result of witnessing a sudden, traumatic event that causes serious injury or death to a family member." *Fernandez*, 1998-NMSC-039 ¶ 6, 968 P.2d at 777.  S.E.B.M. does not cite, and the Court cannot find, any law which suggest New Mexico has adopted, nor would adopt, an exception to this rule.  S.E.B.M.'s negligence claim thus has no state law analog.

### B.  Due Care and Discretionary Function Exceptions

To apply the due care and discretionary function exceptions, the Court must first outline the tests for each exception, then address the relevant federal law which may have prescribed federal employee conduct or called for federal employees to exercise discretion in their treatment of S.E.B.M.  The Court must then consider whether the government's conduct fell within either exception.

i.    **Rules**

a.   **The Due Care Exception**

FTCA claims will not lie when they are "based upon an act or omission of an employee

of the Government, exercising due care, in the execution of a statute or regulation, whether or

not such statute or regulation be valid."  28 U.S.C. § 2680(a).  Under the exception's validity

clause, sovereign immunity is not waived even for unconstitutional conduct if that conduct was

prescribed by an applicable federal statute or regulation.  *Powell v. United States*, 233 F.3d 851,

854–55 (10th Cir. 1956).  The Court uses a two-step analysis to determine if the exception

applies.  *See Welch v. United States*, 409 F.3d 646, 652 (4th Cir. 2005); *see also Crumpton v.*

*Stone*, 59 F.3d 1400, 1403 (D.C. Cir. 1995).[8]  First, the Court determines if a federal statute,

regulation, or policy specifically prescribes a course of action for the employee.  *Welch*, 409 F.3d

at 652.  If specific action is not prescribed, the Court applies the discretionary function analysis.

*See below*.  But if specific action is prescribed, the Court then determines whether the relevant

officers exercised due care in executing the prescribed action.  *Welch*, 409 F.3d at 652.  If due

care was exercised, sovereign immunity is not waived and the Court lacks jurisdiction.  *Id.* at

652.

b.   **Discretionary Functions under *Berkovitz***

FTCA claims will not lie when they are "based upon the exercise or performance or the

failure to exercise or perform a discretionary function or duty on the part of a federal agency or

an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C.

---

[8] Neither party cites, and the Court cannot find, on-point Tenth Circuit precedent for the due care analysis.  *Welch* and *Crumpton*, however, are well-reasoned decisions interpreting the due care exception based on the text of the FTCA and Supreme Court precedent.  The *Welch* analysis has also been applied by this Court elsewhere.  *See A.E.S.E.*, 2022 WL 4289930 at *13 (applying the *Welch* analysis for the due care exception).  The Court thus applies the test set forth in those cases.

§ 2680(a).  The discretionary function exception is based on "Congress' desire to prevent the judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988) (internal quotation marks omitted).  The exception protects only governmental actions and decisions based on considerations of public policy.  *Id.* at 537.

*Berkovitz* provides a two-pronged test to determine whether the discretionary function exception applies.  *See Ball v. United States*, 967 F.3d 1072, 1076 (10th Cir. 2020).  First, the Court must determine whether the challenged conduct was a matter of choice for the acting employee.  *Berkovitz*, 486 U.S. at 536.  "This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice." *Id.* at 536.  If "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," there is no discretion in the employee's conduct to protect.  *Id.* at 536. By corollary, federal employees lack discretion to violate statutory, regulatory, and policy-based prescriptions on their conduct.  *Elder v. United States*, 312 F.3d 1172, 1177 (10th Cir. 2002).

*Berkovitz* does not state whether federal employees have discretion to violate constitutional prescriptions (*See Berkovitz*, 486 U.S. at 536–37 (discussing statutes, regulations, and policies, but not the Constitution)) and federal courts are divided on the matter.  *See Martinez v. United States*, 822 F. App'x 671, 676 n.3 (10th Cir. 2020) (unpublished) (collecting cases).  The more well-reasoned position seems to be the approach taken by most circuits – that federal employees lack such discretion.  *See Martinez*, 822 F. App'x at 676 n.3.  Federal policies and regulations flow from statutes, and only statutes permitted by the Constitution are enforceable.  It would make little sense to hold that constitutional prescriptions do not bind the discretion of federal officers.  This, of course, does not make the FTCA a constitutional tort

statute.  Plaintiffs may only recover in tort as they would under state tort law; it is not enough to state only a constitutional claim.  *See* 28 U.S.C. § 1346(b)(1).  The Court thus considers, as part of the first prong of *Berkovitz*, whether the government's alleged conduct violated policy, regulatory, statutory, and constitutional prescriptions.[9]

If the employee had discretion, the Court proceeds to step two and asks whether the employee's judgment was the kind that the discretionary function was designed to shield.  *Ball*, 967 F.3d at 1076.  Discretionary decisions are protected when they are "grounded in the social, economic, or political goals of the [governing] statute and regulations[.]"  *United States v. Gaubert*, 499 U.S. 315, 323 (1991).

### c.   Relevant Federal Law

Both exceptions to FTCA jurisdiction require the Court to determine whether applicable policies, regulations, or statutes prescribed conduct for federal employees, so the Court addresses relevant provisions of each below.  The Court also addresses relevant constitutional rules to complete its analysis on the discretionary function exception.

### 1.   Trafficking Victims Protection Reauthorization Act

The TVPRA places responsibility for all unaccompanied alien children ("UACs") in the Secretary of Health and Human Services.  8 U.S.C. § 1232(b)(1).  The statute defines a UAC as a child who has no lawful immigration status in the United States; is less than eighteen years old; and either has no parent or legal guardian in the United States or who has no parent or legal guardian in the United States available to provide care and physical custody.  6 U.S.C. § 279(g)(2); *see also* 8 U.S.C. § 1232(g) (adopting the definition of UAC in Title 6).  Unless

---

[9] The government argues that, if federal employees lack discretion to violate the Constitution, their discretion is limited only by clearly established constitutional prescriptions.  [Doc. 45, pp. 6–9].  S.E.B.M. disagrees.  [Doc. 49, pp. 1–2].  The Court takes no position on this issue because, as discussed below, the government's conduct did not violate any Constitutional prescriptions, clearly established or not.

there are "exceptional circumstances," federal agencies with custody of a child must transfer custody of that child to the Secretary within seventy-two hours of determining the child is a UAC.  8 U.S.C. § 1232(b)(3).  The Secretary must then promptly place the child in the least restrictive setting that is in her best interest.  *Id.* at § 1232(c)(2)(A).  If a suitable family member is not available, this may include placement in a contracted unaccompanied refugee minor program.  *Id.* at § 1232(c)(2)(A); *see also id.* at § 1522(d)(2)(A) (authorizing the Secretary of Education to contract with public and private nonprofit agencies for the provision of child welfare services, "including foster care maintenance payments and services and health care" for refugee children).

### 2.  Federal Regulations

Federal regulations elaborate on the government's obligations to alien juveniles. Generally, people under the age of eighteen "for whom bond has been posted, for whom parole has been authorized, or who have been ordered released on recognizance" should be released. *See* 8 C.F.R. § 1236.3(b).  Release preference is given to parents, then legal guardians, and then other adult relatives, each of whom must not themselves be in immigration detention.  *Id.* at § 1236.3(b)(1).  The regulations permit some flexibility when the juvenile's parent or legal guardian is in immigration detention:

> (2) If [parents, legal guardians, and other adult relatives] cannot be located to accept custody of a juvenile, and the juvenile has identified a parent, legal guardian, or adult relative in Service detention, simultaneous release of the juvenile and the parent, legal guardian, or adult relative shall be evaluated on a discretionary case-by-case basis.
> (3) In cases where the parent or legal guardian is in Service detention or outside the United States, the juvenile may be released to such person as is designated by the parent or legal guardian in a sworn affidavit, executed before an immigration officer or consular officer, as capable and willing to care for the juvenile's well-being. Such person must execute an agreement to care for the juvenile and to ensure the juvenile's presence at all future proceedings before the Service or an immigration judge.

*Id.* at §§ 1236.3(b)(2)–(3).

### 3.  Transport, Escort, Detention, and Search Standards

CBP has an internal policy governing its interaction with detainees in its custody, titled

the "National Standards on Transport, Escort, Detention, and Search" ("TEDS").[10]  Its "General

Standards" address the overall treatment of juveniles, permitted duration of detention, and

maintenance of family unity:

> **Treatment of Juveniles:**  Officers/Agents will consider the best interest of the
> juvenile at all decision points beginning at the first encounter and continuing
> through processing, detention, transfer, or repatriation.  Officers/Agents should
> recognize that juveniles experience situations differently than adults[.] . . .
> **Duration of Detention:**  Every effort must be made to promptly transfer, transport,
> process, release, or repatriate detainees as appropriate according to each operational
> office's policies and procedures, and as operationally feasible.
> **Family Unity:**  CBP will maintain family unity to the greatest extent operationally
> feasible, absent a legal requirement or an articulable safety or security concern that
> requires separation.

TEDS 1.6, 1.8, 1.9.  The policy also has specific provisions governing the treatment of detained

juveniles, detained family units which include juveniles, and UACs:

> ***Juvenile/Adult Segregation:***  Detainees under the age of 18 years will not be held
> with adult detainees, unless the adult is an immediate relative or legal guardian
> responsible for the care and custody of the juvenile, and no other adult detainees
> are present in the area.  Exceptions may be made on a case-by-case basis, based on
> family unity.
> ***Family Units:***  Generally, family units with juveniles should not be separated.
> When it is necessary to separate juveniles from the parent(s) and/or legal
> guardian(s), officers/agents must follow their operation office's policies and
> procedures and appropriate legal requirements.  In circumstances where family
> units must be separated due to different immigration dispositions, such separation
> must be documented in the appropriate electronic system(s) of record.
> . . .
> ***Detention – UAC and Juveniles:***  UAC must be held separately from adult
> detainees . . .
> ***Transfer to the Department of Health and Human Services, Office of Refugee
> Resettlement (ORR):***  Every effort must be made to transfer UAC from CBP to

---

[10] A copy of the policy can be found on the CBP website at https://www.cbp.gov/document/directives/cbp-national-standards-transport-escort-detention-and-search (accessed March 2, 2023).

ORR custody as soon as possible, but no later than 72 hours after determining that a child is a UAC.  Requested placement notifications for the UAC must be conducted and logged in the appropriate electronic system(s) of record.  The reasons for any detention longer than 72 hours must be logged in the appropriate electronic system(s) of record.

*Id.* at 4.3, 5.6.

### 4.  The *Flores* Agreement

The government is also bound by a consent decree in the *Flores* class action litigation in the Central District of California (the "*Flores* Agreement").[11]  *See Flores v. Lynch*, 828 F.3d 898, 902–03 (9th Cir. 2016) (describing the settlement).  Because the *Flores* class action concerned only the treatment of minors, the Agreement confers no rights on adults even though it prefers releasing children to their parents.  *See Flores* Agreement ¶ 10; *Flores*, 828 F.3d at 908.

Three provisions of the *Flores* Agreement are relevant to S.E.B.M.'s case.  First, the Agreement states that minors in its custody will be provided "contact with family members who were arrested with the minor."  *Flores* Agreement ¶ 12.A.  The second and third provisions are features of the Agreement's preference for release of minors.  The second relevant provision states:

Where the [government] determines that the detention of the minor is not required to secure his or her timely appearance before the [government] or the immigration court, or to ensure the minor's safety or that of others, the [government] shall release a minor from its custody without unnecessary delay, in the following order of preference, to:
A. a parent;
B. a legal guardian;
C. an adult relative (brother, sister, aunt, uncle, or grandparent);
D. an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer, or (ii) such other document(s) that establish(es) to the satisfaction of the [government], in its discretion, the affiant's paternity or guardianship;

---

[11] A scanned copy of the *Flores* Agreement can be found on the American Civil Liberties Union's website at https://www.aclu.org/sites/default/files/assets/flores_settlement_final_plus_extension_of_settlement011797.pdf (accessed March 6, 2023).

> E. a licensed program willing to accept legal custody; or
> F. an adult individual or entity seeking custody, in the discretion of the [government] when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

*Flores* Agreement ¶ 14. Finally, the Agreement also provides that "[u]pon taking a minor into custody, the [government], or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification[.]"

### 5. United States Constitution

S.E.B.M. argues that the government's conduct in this case was unconstitutional and thus cannot be protected by the discretionary function exception. The Court thus must consider relevant constitutional protections related to family unity and the federal government's discretion to prosecute individuals under Article II.

The Due Process clause of the Fifth Amendment to the United States Constitution guarantees, among other things, a substantive right to family integrity and association.[12] *Quillon v. Walcott*, 434 U.S. 246, 255 (1978); *Doe v. Woodard*, 912 F.3d 1278, 1300–01 (10th Cir. 2019). Its outer bounds are unclear, but the right protects at least the relationship between parent and child. *See Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("the custody, care and nurture of the child [must] reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder"). Generally, the government's forced separation of parent from child, even briefly, is a "serious impingement" on the right. *P.J. ex rel Jensen v. Wagner*, 603 F.3d 1181, 1199 (10th Cir. 2010). That said, the Tenth Circuit has held that separation of a parent from child incidental to the parent's deportation

---

[12] All persons in the United States, including aliens, are guaranteed the rights enshrined by the Fifth Amendment. *Matthews v. Diaz*, 426 U.S. 67, 77 (1976).

does not violate either's constitutional rights, so the right is not absolute.  *See Delgado v. Immigr. and Naturalization Serv.*, 637 F.2d 762, 763 (10th Cir. 1980).

Indeed, alleged parent-child separation is never enough, on its own, to allege a constitutional violation.  When a plaintiff alleges the executive branch interfered with their due process right to familial association or integrity, she must allege facts which show she was deprived of her rights "in a manner so arbitrary it shocks the judicial conscience."  *See Halley v. Huckaby*, 902 F.3d 1136, 1153–54 (10th Cir. 2018).  Government behavior shocks the conscience when:  (1) the officials involved intended to deprive plaintiff of a protected relationship with a family member; and (2) the officials' intrusion into the relationship was not warranted by countervailing government interests (usually in the child's welfare).  *Halley*, 902 F.3d at 1154.

Meanwhile, the government, acting through federal prosecutors, has wide latitude to enforce federal criminal law under Article II, § 3 of the Constitution.  *See Armstrong*, 517 U.S. at 464.  Prosecutors thus enjoy the "presumption of regularity," under which courts presume that prosecutorial decisions supported by probable cause are proper unless clear evidence to the contrary is presented.  *Id.*  Although this standard is typically used to determine whether federal prosecutors unfairly discriminated against a class of criminal defendants, as in *Armstrong*, it is nonetheless relevant in cases where the plaintiff's claim is closely associated with a decision to prosecute.

    **ii.    Application**

S.E.B.M. alleges four acts and omissions by the government harmed her:  (1) her physical separation from her father [Doc. 1 ¶¶ 5, 72]; (2) her limited contact with her father while in government custody (*id.* at ¶ 89); (3) her placement in ORR custody (*id.* at ¶¶ 85–95); and (4)

being made to wait 160 days before she was placed in her grandmother's care.[13] *Id.* at ¶¶ 62, 94. The Court finds that these alleged acts or omissions were a combination of actions both prescribed by federal law and conducted with due care as well as discretionary acts or omissions covered by the discretionary function exception.

### a. S.E.B.M.'s Separation

S.E.B.M.'s physical separation from her father consisted of two actions by government officials.  First, they charged, prosecuted, and jailed S.E.B.M.'s father for improper entry, rendering him unable to care for S.E.B.M.; second, they physically removed S.E.B.M. from her father's custody and kept them separated thereafter.  The first was a discretionary act protected by the discretionary function exception and the second was mandated by controlling law and protected by the due care exception.

*Discretionary Function:*  The government's prosecution of S.E.B.M.'s father satisfies both prongs of the *Berkovitz* test.  The federal government, acting through the Attorney General and United States Attorneys, has discretion to choose what criminal cases to prosecute.  *See Armstrong*, 517 U.S. at 464.  This means, assuming its action did not violate the Constitution, the decision to prosecute S.E.B.M.'s father was discretionary under the first prong.  The decision to prosecute was also the kind of discretionary decision that the exception is supposed to protect. Prosecutorial discretion is grounded in social, political, and even economic goals because it is fundamental to how the executive branch pursues criminal legal policy.  As explained by Justice Powell, relevant factors in deciding whether to prosecute a case include "the strength of the case,

---

[13] The only discrete action S.E.B.M. alleges made up an element of either of her claims was the "forceful separation of parent and child[.]"  [*See* Doc. 1 ¶ 103].  Her broad statements referencing "the acts described in this Complaint" and "the acts alleged herein" give the Court little guidance on what other actions, if any, S.E.B.M. intends to litigate. [*See* Doc. 1 ¶¶ 104, 109].  Although the Court could consider solely the act of separating S.E.B.M. from her father, the Court instead considers the totality of the acts and omissions S.E.B.M. appears to reference for the sake of completeness.

the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan[.]" *Wayte v. United States*, 470 U.S. 598, 607 (1985).  Executive branch officers thus must consider the social effects of prosecuting a given case and how prosecutorial action fits with other policy goals.  The decision to prosecute is perhaps the prototypical discretionary function the exception is intended to protect from liability.  It therefore satisfies the second prong of *Berkovitz* as well.

 S.E.B.M. argues that she is not suing to hold the government liable for damages caused by prosecuting her father but instead for the act of separating them.  The two acts, however, are indivisible.  The act of charging, prosecuting, and jailing S.E.B.M.'s father made S.E.B.M. a UAC which in turn required her to be cared for elsewhere.  *See below* at 28–29 (finding that S.E.B.M. was a UAC).  The only discretionary action in that chain of events was the decision to prosecute.  Her arguments about the government's lack of discretion, then, only make sense within the context of prosecutorial discretion.

 S.E.B.M.'s argument that the government lacked discretion because its conduct was unconstitutional fails because it was not.  Assuming even that government officials intentionally deprived S.E.B.M. of her constitutionally protected relationship with her father, she fails at the second prong of the "shocks the conscience" test.  As discussed above, the government has an inherently strong interest in exercising prosecutorial discretion to further its policy goals.  *Wayte*, 470 U.S. at 607.  This interest is even greater in the arena of immigration law because immigration policy generally has significant effects on the nation as a whole and the executive branch has the special responsibility to enforce it.  *See Arizona v. United States*, 567 U.S. 387, 394–95 (2012).  Although S.E.B.M.'s right to associate with her father is constitutionally protected, it does not outweigh the government's interest in enforcing its immigration policy.

Neither party cites it, but the Tenth Circuit's decision in *Delgado* is nearly on-point here. In *Delgado*, a Mexican national was found deportable on the grounds that he improperly entered the United States. 637 F.2d at 762. While in the country unlawfully, he had four children, all of whom were United States citizens. *Id.* The Mexican national thus argued that his deportation would violate his children's Fifth and Fourteenth Amendment substantive rights to family integrity. *Id.* at 763. The Tenth Circuit rejected this argument, holding that "the incidental impact [of deportation] visited upon children of deportable, illegal aliens does not raise constitutional problems." *Id.* at 764. S.E.B.M.'s case is hardly distinguishable. Just like the children in *Delgado*, S.E.B.M.'s father was charged with improper entry and found deportable. [Doc. 1 ¶¶ 77–78]. As a result, S.E.B.M. could no longer maintain her close relationship with him because he was held in government custody and deported. *Id.* at ¶ 78. Although the *Delgado* court did not elaborate on whether the government's conduct "shocked the conscience," the holding is hard to ignore and leads to the same result under slightly different facts.

In sum, the government's prosecution of S.E.B.M.'s father, which immediately caused her to be separated from him, was a discretionary decision that violated no federal law cited by the parties and which was protected from liability by the discretionary function exception to the FTCA. Insofar as S.E.B.M.'s tort claims indirectly attack that decision, they fail.

*Due Care:* When S.E.B.M.'s father was prosecuted for improper entry, he could no longer care for S.E.B.M. because it was necessary to place him in criminal detention. With her father in jail and her mother in Guatemala, S.E.B.M. became a UAC. *See* 6 U.S.C. § 679(g). Government officials were thus required to place S.E.B.M. in the care of the Department of Health and Human Services within seventy-two hours. 8 U.S.C. § 1232(b)(3). S.E.B.M. alleges

that CBP officials did this, thus satisfying the first prong of the due care analysis. [*See* Doc. 1 ¶¶ 63–77].

S.E.B.M.'s argument that she was not a UAC, and thus was not required to be placed in the Department's custody, is unpersuasive. S.E.B.M. asserts that she was accompanied by her father when she first arrived in the United States, and thus was not an "unaccompanied alien child." [Doc. 41, pp. 17–18]. In her view, the TVPRA "was intended to focus on children who are genuinely unaccompanied when they arrive, not those *rendered* unaccompanied by the government." *Id.* at 18 (emphasis in original). She cites several out-of-circuit district court cases for support but ignores the plain text of the statute. Congress defined UACs without distinguishing children based on why they are unaccompanied. *See* 6 U.S.C. § 279(g). The term encompasses all children who have "no parent or legal guardian in the United States . . . available to provide care and physical custody" of them. *Id.* at § 279(g)(2)(C)(ii). Potential policy reasons exist to support that decision. Without amending the statute criminalizing improper entry, Congress cannot stop the executive from prosecuting migrants who bring their children. *See Armstrong*, 517 U.S. at 464. Distinguishing two classes of migrant children who cannot be cared for by their parents and having the TVPRA's child welfare protections apply only to one could be disastrous. Children who came alone could be placed in foster care while others are held indefinitely by the Department of Homeland Security. That situation would appear to many more inhumane than placing the children who came with their parents in foster care apart from them. Regardless of the underlying reason, the text is clear and it is not obviously nonsense, so the Court will not read a new meaning into it. S.E.B.M.'s status as a UAC after her father was charged and jailed thus required her to be physically separated from him.

S.E.B.M. does not carry her burden on the second prong of the due care analysis.  She alleges that "[f]ederal officers failed to use due care to minimize the trauma that was caused to S.E.B.M." upon separation from her father.  [Doc. 1 ¶ 75].  Under the circumstances, it is not clear what, if anything, federal officers could have done.  There is no doubt that the separation of a very young child from her only caretaker would be distressing, possibly traumatizing.  But the separation itself was mandated by statute and S.E.B.M. alleges no other facts to suggest that she was treated unreasonably by federal officers.  Because S.E.B.M. does not carry her burden to show that this Court has subject matter jurisdiction, the Court presumes the due care exception applies.

**b.  Limited Contact with S.E.B.M.'s Father**

The government's conduct in providing only short calls between S.E.B.M. and her father is protected by the due care exception.  The government was required to provide S.E.B.M. with "contact with family members who were arrested with [her]."  *Flores* Agreement ¶ 12.A.  The calls were provided in furtherance of that requirement, satisfying the first prong of the due care analysis.  The issue, then, is whether the government exercised reasonable care in providing the calls.

S.E.B.M.'s allegations suggest the government was reasonable under the circumstances.  She alleges that the calls only happened "when ORR and ICE permitted" because S.E.B.M.'s father was in immigration detention, were only five minutes long, often did not go through, and that S.E.B.M. was inconsolably upset during the calls.  [Doc. 1 ¶ 89].  These conditions were less than ideal, but it is not clear what the government could have done better.  The *Flores* Agreement provides no time parameters for how long or frequent calls between children and their family members should be.  This is likely because immigration detention involves unique

security concerns that makes it difficult for detainees to be available for regular calls and thus flexibility is necessary.  Further, it is unclear whether significantly longer calls would have reduced S.E.B.M.'s trauma and S.E.B.M. does not suggest how better results could have been achieved.  *See id.* at ¶¶ 85–89.  The Court thus finds that the government's conduct was reasonable and protected by the due care exception.

### c.  ORR Placement

S.E.B.M.'s placement in ORR custody was protected by the due care exception.  After she was placed in the care of the Department of Health and Human Services, the Department was required to place her in the least restrictive setting in her best interest.  8 U.S.C. § 1232(c)(2)(A).  S.E.B.M. could not have been placed with her grandmother right away because the Department had not yet determined whether she was "capable and willing to care for [S.E.B.M.'s] well-being," (8 C.F.R. § 1236.3(b)(3)), so its mandate to make a safe and secure placement left little choice but to place S.E.B.M. with a contracted foster care provider as permitted by 8 U.S.C. § 1232(c)(2)(A).  S.E.B.M.'s allegations suggest that the government exercised due care when it did so.  While in foster care, her caretakers brought her to a government-contracted facility to see a case manager and a counselor and to make calls to her parents.  [Doc. 1 ¶¶ 85–93].  She does not allege that her caretakers mistreated, abused, or neglected her, nor that the government did not provide adequate supervision.  *Id.* at ¶¶ 85–93.  Her allegations thus suggest that, even if she was distressed by her parents' absence and her new surroundings, ORR and its contracted partners followed the law and exercised due care all the while.

### d.  Delayed Placement with Grandmother

The government's decision to keep S.E.B.M. in ORR custody for 160 days before releasing her to her grandmother was protected by the due care exception.  The *Flores*

31

Agreement required the government to release S.E.B.M. to her grandmother, without unnecessary delay, after determining that S.E.B.M. did not need to be held by the government for her to appear timely before an agency or in immigration court.  *Flores* Agreement ¶ 14. S.E.B.M. states that she was kept in ORR custody for 160 days beginning in early August 2017. [Doc. 1 ¶ 85].  Her case manager indicated in late November that she was working on unifying S.E.B.M. with her grandmother.  *Id.* at ¶ 92.  Less than two months later, S.E.B.M. was placed in her grandmother's care.  *Id.* at ¶ 94.  The government thus satisfied its requirement to place S.E.B.M. with an adult relative.  S.E.B.M. does not allege facts to suggest that her delay was "unnecessary," and the allegations instead suggest that government officials were working with limited information from S.E.B.M. and her father to safely place S.E.B.M. in a home on the other side of the country.  S.E.B.M. further does not allege facts which suggest the government was unreasonable in how it pursued this directive.  The Court thus finds that the government's conduct was protected by the due care exception.

### VI.     Conclusion and Order

Even if federal officials never intended to inflict emotional trauma by separating a father from his daughter, prosecutorial decisions authorized by officers in the highest echelons of the federal government apparently caused that to happen in this case.  Many reasonable people may find those decisions reprehensible.  But what individuals find reprehensible cannot steer the Court's decision.  Statutes duly passed by Congress, regulations adopted by executive agencies according to proper procedure, case law binding on this Court and, of course, the Constitution ratified and adopted by the States – these control today's decision, and they compel this case to be dismissed.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss [Doc. 16] is

**GRANTED.**

Jerry H. Ritter
U.S. Magistrate Judge
Presiding by Consent