**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| S.E.B.M., a minor, by and through her next friend, MARIA MENDEZ FELIPE, <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> )   No. 21-cv-00095-JHR-LF <br> ) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSED
RULE 59 MOTION TO ALTER OR AMEND JUDGMENT**

**INTRODUCTION**

Plaintiff's case should be reopened for two core reasons. *First*, reopening is merited to enable Plaintiff to seek leave to amend her Complaint. If granted leave to file an Amended Complaint, Plaintiff will incorporate information based on new and previously unavailable evidence, which will further demonstrate the clear basis for the Court's subject matter jurisdiction in this case and support her claims for relief. *Second*, should the Court decline to reopen Plaintiff's case based on new and previously unavailable evidence, it still should reconsider its decision pursuant to Fed. R. Civ. P. 59(e) to correct clear error, as the Court misapprehended key elements of Plaintiff's claims and consequently did not consider issues vital to determining the Court's subject matter jurisdiction. Specifically, the Order did not address: (1) Plaintiff's argument that the separation of Plaintiff from her father was not the incidental byproduct of a lawful prosecution but the very reason for the prosecution; thus, because the prosecution was not done not for legitimate immigration or law enforcement reasons within the government's discretion, but for the very purpose of achieving the separation, the separation was unlawful; (2) the extent to which, even if the Court finds that her father's prosecution mandated Plaintiff's initial separation and detention,

the government lacked any legal justification for the prolonged nature of this separation, which contravened Plaintiff's constitutional rights; and (3) Defendant's unreasonable delays in both facilitating telephonic contact between Plaintiff and her father, and in commencing the process to release Plaintiff from government custody, both of which contravened federal law.

## ARGUMENT

### I.   LEGAL STANDARD

A party seeking to amend a pleading following the court's grant of a motion to dismiss must first move to reopen the case under Fed. R. Civ. P. 59(e) or 60(b).  *See Calderon v. Kansas Dep't Social & Rehab. Servs.,* 181 F.3d 1180, 1185 (10th Cir. 1999). Then, a party must file a motion under Fed. R. Civ. P. 15 for leave to amend pursuant to the standards set out in Fed. R. Civ. P. 7. C*alderon,* 181 F.3d at 1185.

A Rule 59(e) motion to alter or amend judgment, commonly referred to as a motion to reconsider, is appropriate where a party shows either "new evidence previously unavailable" or "the need to correct clear error or prevent manifest injustice."[1] *Monge v. RG Petro-Machinery (Grp.) Co. Ltd.*, 701 F.3d 598, 611 (10th Cir. 2012). The Tenth Circuit has defined clear error as "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Wright ex rel. Trust*

---

[1] The Tenth Circuit has not defined "manifest injustice" in the context of Rule 59(e), and unpublished district court decisions have provided differing definitions of the term. *See Petrie v. GoSmith, Inc*., 2019 WL 3215983 (D. Colo. July 17, 2019) at *4 (finding "that term is commonly defined as [a] direct, obvious, and observable error in a trial court") (citations and quotations omitted); *Tri-State Truck Ins., Ltd. v. First Nat'l Bank of Wamego*, No. 09-4158-SAC, 2011 WL 4691933, at *3 (D. Kan. Oct. 6, 2011) (quoting Manifest Injustice, Black's Law Dictionary 1048 (9th ed. 2009)); *Grynberg v. Ivanhoe Energy, Inc*., No. 08-cv-2528, 2010 WL 2802649, at *3 (D. Colo. July 15, 2010); *Navarette v. Corizon LLC*, 2020 WL 209317 (D.N.M. January 14, 2020) (noting that "other courts have defined manifest injustice as 'more than just a clear and certain prejudice to the moving party, but also a result that is fundamentally unfair in light of governing law'"); *Thymes v. Verizon Wireless, Inc*., No. 16-cv-0066 KG/WPL, 2016 U.S. Dist. LEXIS 140345, 2016 WL 9777487, at *2 (D.N.M. Sept. 28, 2016) (unpublished) (quoting *Smith v. Ly*nch, 115 F. Supp. 3d 5, 12 (D.D.C. 2015); and then citing *In re Green Goblin, Inc., Bankr.* No. 09-11239 ELF, 2012 WL 1971143, at *1 (Bankr. E.D. Pa. May 31, 2012) (unpublished)).

*Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1236 (10th Cir. 2001). Furthermore, it has found that "a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). A Rule 59(e) motion based on new evidence "may be based either on (1) evidence arising after the initial ruling (in which event the party's diligence in seeking the evidence is obviously not a consideration) or (2) evidence available but not discovered at the time of the initial ruling (in which event the moving party must show it diligently sought the evidence earlier)." *Bell v. Bd. of Cnty. Comm'rs of Jefferson Cnty.*, 451 F.3d 1097, 1102 (10th Cir. 2006).

## II.    THE COURT SHOULD REOPEN PLAINTIFF'S CASE SO THAT SHE CAN SEEK LEAVE TO AMEND HER COMPLAINT

### A. Newly Discovered Evidence Merits Reopening to Afford Plaintiff the Opportunity to Amend the Complaint

Several key documents have recently been made available to the Plaintiff that significantly impact the resolution of key points the Court addressed in its decision. Many of these documents were recently discovered by investigative reporters who reviewed heretofore non-public records. Prior to this point, Plaintiff consistently and diligently sought to obtain and review potential evidence that could prove relevant to Plaintiff's claims by reviewing government reports, keeping abreast of other recently filed family separation lawsuits and reviewing publicly available documents from these lawsuits, and reviewing press reports related to family separations. Plaintiff's efforts have been stymied by the fact that Defendant possesses large amounts of non-public information, which she believes would be relevant to her claim, but cannot access. Recently, Plaintiff learned of the release of a high volume of documents—many of which were previously non-public, possessed by the government, and obtained only through extensive litigation—which

had been obtained and published online by an investigative reporter on December 31, 2022.[2] Upon learning about the release of these documents, Plaintiff sought to timely review them to determine their potential relevance to her case. Given that the release included 71 documents, including one that totaled over 500 pages, Plaintiff required sufficient time to compare these documents with previously reviewed documents to assess whether the new documents contained previously unavailable and relevant information. Plaintiff completed this review on March 27, 2023, and at that time determined that numerous released documents are highly relevant to her case.

Examples of these new documents include:

- Emails showing that Matthew Albence, the head of ICE Enforcement and Removal Operations ("ERO"), expressed frustration with CBP that families were being reunited after parents' prosecution for illegal entry; Albence maintains that family reunification is "not the consequence we had in mind," and reunification "obviously undermines the entire effort," and states that families should only be reunified for purposes of removing the families and terms any other efforts by CBP to reunite parents with their child a "fiasco";

- Documentation showing that as of July of 2017, the Office of Refugee Resettlement ("ORR") was supposed to provide separated parents with a contact number and an explanation of how to contact their children in ORR care, as well as an internal government email from Department of Health and Human Services indicating that, as of November of 2017, ORR was still "exploring" ways to help locate children sought by their parents;

- Many documents that expressly establish that there was no uniform and coherent policy applied to the separation of families, even into 2018;

- Significant documentary evidence, including internal emails, showing that early on in 2017 the government, including ORR, knew that the separations would particularly impact hundreds of children termed "tender age," which refers to children ages 0-5, and knew that the separations would both seriously harm these children and that the government was unprepared to handle a large influx of very young children into its custody;

- Documentary evidence, including a government report from March of 2017, revealing that government officials were aware that the separation of children from parents could be

---

[2] Caitlin Dickerson, *The Family Separation Files*, The Atlantic (Dec. 31, 2022), https://www.theatlantic.com/politics/archive/2022/12/the-secret-history-of-family-separation-document-collection/672146/

considered a "human rights violation" and a practice that would be deemed "illegal, immoral or unethical" and thus could impact contractors and staff who would not want to be involved in this type of conduct;

- Customs and Border Protection ("CBP") documentation noting that there was a failure to properly document the separations and locations of children between the ages of 0-4;

- Documents indicating that there was no language assistance provided for families, such as Plaintiff's family, who spoke only indigenous languages, despite the existence of an on-call language line that could have been utilized; and

- A document containing a directive by government officials that all families were to be separated, even if this impacted those seeking asylum and imposed difficulties for young children, once separated, to assert an asylum claim on their own.

Thus, Plaintiff's diligent attempts to find new and previously unavailable evidence have resulted in her discovery of relevant evidence that the Court should consider. Furthermore, and separately, the Court's failure to consider the new evidence would result in manifest injustice—an injustice highlighted by the fact that none of the 18 other district courts to consider motions to dismiss in family separation cases have found that they lack subject matter jurisdiction over plaintiffs' claims.

### B. Plaintiff's Amended Complaint Would Demonstrate the Court's Subject Matter Jurisdiction over the Claim

Information disclosed in the new documents above is highly relevant to Plaintiff's case, and to analyzing whether the Court has subject matter jurisdiction under the FTCA. As such, reopening the case to allow Plaintiff to seek leave to file an amended complaint is appropriate.

This new evidence has direct implications for each element of the Court's subject matter jurisdiction analysis, and an amended complaint incorporating this evidence would demonstrate that the Court possesses clear subject matter jurisdiction. First, the evidence is highly relevant to the government's intent in separating Plaintiff from her father, which is a key factor in determining whether Plaintiff's intentional infliction of emotional distress ("IIED") claim would be cognizable under New Mexico law. As the document quoting ERO head Matthew Albence shows, government

decisionmakers actively sought to thwart reunification efforts and to ensure that prosecutions of parents would result in their separation from their children unless and until they were deported from the U.S. In other words, the separations were not an incidental byproduct of prosecutions done for lawful policy reasons, but rather were undertaken for the specific reason of achieving the separation. As Albence states in the recently discovered emails, reunifying families is "not the consequence we had in mind," and family reunification "obviously undermines the entire effort" and will make DHS "look completely ridiculous if we go through the effort of prosecuting" only to reunify families after parents' releases from criminal custody. This shows the government's malicious intent in prosecuting Plaintiff's father for the purpose of separating him from Plaintiff, which has clear ramifications on the private actor and discretionary function exception analyses.

District courts have consistently found that the government's malicious intent in effecting separations supports finding a private actor analog for plaintiffs' IIED claims, and, in such cases, have found the discretionary function exception inapplicable. *C.M. v. United States*, No. CV-19-05217-PHX-SRB, 2020 WL 1698191, at *2 (D. Ariz. Mar. 30, 2020) (denying motion to dismiss, finding the discretionary function exception inapplicable, and recognizing private person analog for IIED FTCA claim under Arizona law where "separation of families was motivated by malice"); *A.P.F. v. United States*, 492 F. Supp. 3d 989, 994-95 (D. Ariz. 2020); *A.I.I.L. v. Sessions*, No. CV-19-00481-TUC-JCH, 2022 WL 992543, at *7 (D. Ariz. Mar. 31, 2022) (denying motion to dismiss, finding the discretionary function exception inapplicable, and recognizing private person analog for IIED FTCA claim under Arizona law where "the FAC alleges that the government's enforcement of the family separation policy was motivated by malice"); *B.A.D.J. v. United States*, No. CV-21-00215-PHX-SMB, 2022 WL 11631016, at *4 (D. Ariz. Sept. 30, 2022); *F.R. v. United States*, No. CV-21-00339-PHX-DLR, 2022 WL 2905040 (D. Ariz. July 22, 2022); *D.A. et al. v.*

*United States*, No. 22-00295-FM, 2023 WL 2619167, at *17 (W.D. Tex. Mar. 23, 2023) (finding that Defendant's Zero Tolerance Policy motivating family separations "plausibly amounted to selective prosecution motivated by discriminatory animus against Latino immigrants"). Given the malicious intent motivating the prosecutions and separations, the Defendant clearly cannot avail itself of a privilege defense in the IIED claim.

As the Court has correctly noted, to the extent the Defendant violated federal law, it could not avail itself of New Mexico's privilege defense. Mem. Op. & Order on Def.'s Mot. to Dismiss 15, ECF No. 62. Documentary evidence referred to above highlights that government officials recognized the likely illegality of separating children from their parents—further demonstrating that the government could not avail itself of a privilege defense to Plaintiff's IIED claim. Further, they show the government's malicious intent in seeking to interfere with asylum seekers' ability to pursue their claims for protection—actions also in violation of both U.S. and international law.

These recently discovered documents also demonstrate the many ways in which the government acted with negligence, breaching the duty of care it assumed for Plaintiff when it detained her, by lacking adequate plans to allow her to contact her family, by linguistically isolating her due to her indigenous language and the failure to use interpreters, and by unnecessarily and illegally prolonging her detention and separation from her family. These actions show Defendant's clear failure to act with due care towards Plaintiff, and shows that, contrary to this Court's analysis, no statute or regulation mandated the separation of Plaintiff and her father and that the treatment of Plaintiff while she was in government custody was unreasonable.

Further, this new documentary evidence reveals that the government cannot claim that its actions towards Plaintiff were discretionary. First, government officials' actions towards Plaintiff were non-discretionary, as in failing to provide Plaintiff's father with a number and instructions

for how to contact her, they violated a clear ORR mandate. Second, these documents highlight the extent to which the government's cruel, illegal, and haphazard approach to Plaintiff was untethered to the social, economic, or political goals of governing statutes and regulations.

## III.   THE COURT SHOULD RECONSIDER ITS DISMISSAL OF PLAINTIFF'S COMPLAINT

In the alternative, even if the Court declines to reopen Plaintiff's case based on new and previously unavailable evidence, it should reconsider its decision dismissing Plaintiff's case for lack of subject matter jurisdiction. This decision contains clear error, as the Court misapprehended Plaintiff's arguments in key ways, which led it to fail to properly analyze the extent to which it possessed subject matter jurisdiction over Plaintiff's claims.

### A.   Plaintiff's Claims Are Cognizable under New Mexico Law

Plaintiff's claims for intentional infliction of emotional distress and negligence do not arise solely from the fact that the government separated her from her father, but rather from the malicious intent of government officials, which motivated this separation and, crucially, government acts throughout the course of Plaintiff's prolonged separation that were motivated by malice and that contravened federal law. Compl. ¶¶ 27-37, 67, 72, 76, 78-80, 89, 94, ECF No. 1; Pl.'s Resp. to Mot. To Dismiss 5-6, ECF No. 41. However, in assessing whether Plaintiff states claims for IIED and negligence under New Mexico law, the Court limited its analysis solely to the fact that Plaintiff was separated from her father. This limitation caused the Court to err in two important ways. First, the Court's IIED analysis erroneously looked only to whether Plaintiff's initial separation would be protected by a privilege defense, without considering the motive for this separation or the extent to which Plaintiff's IIED claim is based not just on the fact that Plaintiff was separated from her father, but also on the government's mistreatment of Plaintiff throughout her prolonged separation and detention. Second, the Court's analysis of Plaintiff's

negligence claim improperly miscasts the claim as one for negligent infliction of emotional distress, and consequently fails to consider whether she could hold the government liable for negligence.

> ### 1. The Court failed to weigh factual allegations that were essential to determining whether the government had a privilege defense to intentional infliction of emotional distress

The Court found that Plaintiff cannot hold the government liable for IIED as "the government's actions in this case were protected by its privilege to prosecute," and Plaintiff's separation from her father was the direct result of the government's decision to prosecute him. Mem. Op. & Order on Def.'s Mot. to Dismiss 14, ECF No. 62. In drawing this conclusion, the Court committed clear error by failing to take into account two crucial aspects of Plaintiff's IIED claim. *See Monge*, 701 F.3d at 611.

*First*, looking to Plaintiff's initial separation from her father, she alleges that malicious intent motivated the separation, and that her father's prosecution was part and parcel of a government practice of using pretextual prosecutions as a means to separate parents from their young children and thereby deter would-be asylum seekers from entering the U.S. Compl. ¶¶ 27-37, ECF No. 1; Pl.'s Resp. to Mot. To Dismiss 5-6, ECF No. 41. The Court, however, entirely failed to consider the extent to which, as a part of the government's family separation policy, Plaintiff's separation from her father and her father's prosecution were impermissibly motivated by the malicious desire to separate families, and a privilege defense is therefore unavailing.

In her Opposition to Defendant's Motion to Dismiss, Plaintiff drew the Court's attention to recent court decisions in family separation cases addressing the same arguments set forth by Defendant, which recognized private analogs for IIED claims under state laws (which, like New Mexico, also recognize a privilege defense), where the plaintiff alleged that government actors were motivated by malice. Pl.'s Resp. to Mot. To Dismiss 20-22, ECF No. 41; *C.M. v. United*

*States*, No. CV-19-05217-PHX-SRB, 2020 WL 1698191, at *2 (denying motion to dismiss and recognizing private person analog for IIED FTCA claim under Arizona law where "separation of families was motivated by malice"); *see A.P.F. v. United States*, 492 F. Supp. 3d 989, 994-95 (D. Ariz. 2020). Since then, the chorus of similar decisions finding viable IIED claims due to alleged malicious motive has only grown louder. *A.I.I.L. v. Sessions*, No. CV-19-00481-TUC-JCH, 2022 WL 992543, at *7; *B.A.D.J. v. United States*, No. CV-21-00215-PHX-SMB, 2022 WL 11631016, at *4; *F.R. v. United States*, 2022 WL 2905040; *D.A. et al. v. United States*, 2023 WL 2619167, at *17. In stark contrast, in this case the Court appears to exclude from its private analog analysis any consideration of the government's malicious motive.

*Second*, the Court likewise excludes from its private analog analysis consideration of the harms perpetrated by government actors during Plaintiff's detention and prolonged separation from her father. Plaintiff has alleged that the government ripped Plaintiff from the arms of her father, withheld from her father information about Plaintiff's whereabouts, failed to reunite Plaintiff with her father after his release from criminal custody, isolated Plaintiff—a two-year-old Aketeko speaker—from nearly all communication, and unreasonably delayed in releasing Plaintiff to the custody of her grandmother. Compl. ¶¶ 67, 72, 76, 78-80, 89, 94, ECF No. 1.

Yet the Court's only consideration of whether government conduct—beyond the decision to separate Plaintiff from her father—constituted IIED was to conclude that because the Defendant did not violate federal law detaining Plaintiff, its conduct was protected by New Mexico's privilege law. Mem. Op. & Order on Def.'s Mot. to Dismiss 15, ECF No. 62. This reasoning falls short on two counts. First, even if a privilege defense were to be found to shield the government from liability for the act of separating Plaintiff from her father, such privilege would not shield the government from liability for all acts perpetrated over the course of more than five months during

which Plaintiff was detained and separated from her family. Second, as discussed at Section 3.B., the government's treatment of Plaintiff did indeed violate federal law, including the TEDS Standards and the *Flores* Agreement.

Even if the privilege to prosecute were to shield the government from tort liability for the act of separating Plaintiff from her father (which, in this case, it does not, given the government's malicious intent motivating the prosecution and separation), the government committed acts during the course of Plaintiff's detention and separation from her family that cannot fall under this privilege. As the District Court of Arizona found in *E.S.M. v. U.S.*, even if the government has legal authority to incarcerate, it can still be penalized for committing torts during an otherwise-legal incarceration. No. CV-21-00029-TUC-JAS, 2022 WL 11729644, at *3 (D. Ariz. Oct. 20, 2022). This reasoning applies with equal force here. Using the Court's analogy of a landlord's right to evict, while a court could well find that a landlord's right to evict shields the landlord from legal liability for effecting an eviction of a parent that results in their loss of custody of their child, no court would find that this right to evict extends to permit the landlord to engage in whatever tortious and malicious actions he so chooses during and after making the choice to evict.

Here, the privilege to prosecute does not give the government carte blanche to effect the separation by tearing her from the arms of her panicked and confused father. And it likewise does not shield Defendant from liability for tortious acts it committed *after* the initial separation. These acts, as alleged, include denying Plaintiff's father information as to her location, denying Plaintiff access to the means to communicate with her father or any other family, refusing to release Plaintiff to her father after his release from criminal custody, and further unnecessarily prolonging Plaintiff's detention by failing to timely investigate and assign custody to Plaintiff's grandmother.

Furthermore, as Plaintiff shows in greater detail at Section 3.B., the tortious acts alleged during and after the initial separation violated federal mandates, including the TEDS Standards and the *Flores* Agreement. Thus, the Court clearly erred in finding no private actor analog because Defendant did not violate federal law. Mem. Op. & Order on Def.'s Mot. to Dismiss 15. Defendant violated the TEDS Standards by failing to reunite Plaintiff with her father after his release from criminal custody. Defendant violated the *Flores* Agreement by refusing for approximately two months to facilitate calls between Plaintiff and her father and by failing for approximately three months to begin the process of vetting Plaintiff's grandmother to be her custodian.

Notably, the New Mexico District Court in *A.E.S.E. v. U.S.* found a private actor analog for a plaintiff's IIED claim where the plaintiff "based the [IIED] claim on allegations that the government officials' conduct was violative of the *Flores* Agreement and TEDS Standards." *A.E.S.E. v. U.S.*, No. 21-cv-0569 RB-GBW, 2022 WL 4289930, at *14 (D.N.M. Sept. 16, 2022). As the Court has recognized, "were the government's conduct contrary to federal law, the government would not be protected by New Mexico's privilege rule." Mem. Op. & Order on Def.'s Mot. to Dismiss 15, ECF No. 62.[3] As Plaintiff alleges tortious conduct that is both distinct from the decisions to prosecute and separate *and* that is violative of federal mandates, the Court should

---

[3] The Court found *A.E.S.E. v. U.S.* distinguishable from Plaintiff's case because the plaintiff in *A.E.S.E.* made claims that "largely depend on allegations of squalid living conditions, medical neglect, sexual abuse, and threats by government officials." Mem. Op. & Order on Def.'s Mot. to Dismiss fn. 1. However, the Court's distinction ignores the extent to which, like *A.E.S.E.*, Plaintiff makes tort claims based on Defendant's actions—separate from the separation itself—during the course of Plaintiff's detention, which violated the *Flores* Agreement and the TEDS Standards, including a 2-month-long delay in permitting Plaintiff required calls with her father, and an impermissible three-month delay before commencing work to release Plaintiff to her grandmother.

reconsider the extent to which such conduct would support an IIED claim under New Mexico state law.[4]

### 2. The Court improperly narrowed Plaintiff's negligence claim and miscategorized it as a claim for negligent infliction of emotional distress

Plaintiff urges the Court to reconsider its assessment of Plaintiff's negligence claim, as the Court adopted an overly narrow view of this claim and improperly re-categorized it as a claim for negligent infliction of emotional distress. In so doing, the Court violated the fundamental principle that the plaintiff is the master of her Complaint, and, as such, her arguments should not be reshaped by the defendant or by the court. *See Caterpillar Inc. v. Williams*, 482 U.S. 386 (1987).

As an initial matter, the Court's premise that Plaintiff's "alleged injuries stem entirely from her separation from her father" does not accurately reflect Plaintiff's negligence claim. Mem. Op. & Order on Def.'s Mot. to Dismiss 16. Contrary to the Court's finding, Plaintiff alleges that the government assumed a duty of care upon detaining Plaintiff. Compl. ¶ 110, ECF No. 1; *Coffey v. United States*, 870 F. Supp. 2d 1202, 1235-40, 1248-51 (D.N.M. 2012). It breached this duty in concrete ways that did not inevitably flow from the government's decision to separate Plaintiff from her father. First, Plaintiff alleges that the government breached its duty of care in the manner

---

[4] Lastly, it should be noted that this Court stands alone among family separation cases, in finding that there is no private analog for Plaintiff's IIED claim. Every other district court that addressed this issue has found there to be a private actor analog for plaintiffs' IIED claims. *C.M. v. United States*, 2020 WL 1698191, at *2; *A.P.F. v. United States*, 492 F. Supp. 994-95; *A.E.S.E. v. U.S.*, 2022 WL 4289930, at *14; *A.I.I.L. v. Sessions*, 2022 WL 992543, at *7; *B.A.D.J. v. United States*, 2022 WL 11631016, at *4; *F.R. v. United States*, 2022 WL 2905040; *D.A. et al. v. United States*, 2023 WL 2619167, at *17; *Fuentes-Ortega v. United States*, No. CV-22-00449-PHX-DGC, 2022 WL 16924223 at *5 (D. Ariz. Nov. 14, 2022); *E.C.B. et al. v. United States*, No. 22-00915-PHX-CBD (D. Ariz. Nov. 08, 2022); *K.O. et al. v. United States*, No. 20-12015-TSH (D. Mass. Jan. 9, 2023); *A.F.P. v. United States*, No. 1:21-CV-00780-DAD-EPG, 2022 WL 2704570 at *10 (E.D. Cal. July 12, 2022); *D.J.C.V. v. United States*, 605 F. Supp. 3d 571, 600-601 (S.D.N.Y. 2022); *Nunez Euceda v. United States*, No. 2:20-CV-10793-VAP-GJSx, 2021 WL 4895748 at *1-2 (C.D. Cal. Apr. 27, 2021); *Wilbur P.G. v. United States*, No. 4:21-CV-04457-KAW, 2022 WL 3024319 at *1-2 (N.D. Cal. May 10, 2022).

by which it effected the initial separation. Compl. ¶¶ 67, 72-75, ECF No. 1. Additionally, and importantly, Plaintiff alleges that the government's conduct after the initial separation, continuing even after her father's release from criminal custody, unnecessarily and illegally prolonged her detention and separation from her family and caused her serious and extreme distress—the effects of which will likely endure and cause psychological issues through the course of her life. *Id.*

Plaintiff's injuries thus did not stem entirely—or solely—from the fact that she was separated from her father, but rather from the manner by which the government separated Plaintiff from her father and the government's conduct, including its mistreatment of Plaintiff, in the months after effecting the initial separation. This includes conduct violative of both the TEDS Standards and the *Flores* Agreement. *See* Section 3.B. Such conduct was not a necessary consequence of the government's decision to separate Plaintiff from her father, but rather a series of subsequent deliberate acts, which caused injuries to the Plaintiff distinct and apart from injury caused by the fact of her initial separation from her father.

Furthermore, the Court misapprehends Plaintiff's negligence claim by recasting it as a claim for negligent infliction of emotional distress. In finding that there is no state law analog for Plaintiff's negligence claim, the Court noted that New Mexico law bars recovery in negligence for purely emotional harm. Mem. Op. & Order on Def.'s Mot. to Dismiss 16, ECF No. 62. This, of course, is true for the narrow tort of negligent infliction of emotional distress. However, Plaintiff's negligence claim does not fall under this theory of liability, as she alleges that the government breached its duty of care to her not only by traumatically separating her from her father, but also by mistreating her while she was in government custody, prolonging her detention and separation from her family, unreasonably prolonging her time in government custody and failing to promptly release her to her grandmother. Compl. ¶ 61, 70, 92, ECF No. 1. As such, by improperly narrowing

14

and re-categorizing her negligence claim, the Court failed to assess the extent to which Plaintiff alleges a negligence claim that would be cognizable under New Mexico law.

### B. Defendant's Conduct Is Not Protected by the Discretionary Function Exception

In determining whether the discretionary function exception shields the government from liability for Plaintiff's claims, the Court erred in three fundamental ways. First, the Court improperly excluded the government's malicious intent in separating Plaintiff from her father from its consideration of the constitutionality of the initial separation. Second, the Court failed to consider whether the discretionary function exception applied to the separation once it became prolonged, particularly after Plaintiff's father was released from criminal custody. Lastly, the Court failed to consider the extent to which the government's mistreatment of Plaintiff violated its nondiscretionary duties. *See Monge*, 701 F.3d at 611.

The Court found that the government's initial separation of Plaintiff from her father satisfied the first prong of the *Berkowitz* test, as it did not violate the Constitution because it did not "shock the conscience," given the government's inherently strong interest in the exercise of prosecutorial discretion to further its policy goals. Mem. Op. & Order on Def.'s Mot. to Dismiss 28, ECF No. 62.

The Court deems the government's countervailing interest to be the legitimate exercise of prosecutorial discretion in deciding when to bring criminal charges.  But, as noted, this disregards that the actual purpose of the prosecutions was not to further a legitimate policy objective.  Rather, as alleged in the Complaint—and now further confirmed by the Albence emails—the actual purpose was to achieve the separations.  Compl. ¶¶ 18, 19, 25, 26, ECF No. 1. Thus, the Court, in finding that the separation was no more than an inevitable consequence of the government exercising its protected interest in prosecutorial discretion, improperly failed to assess how the

15

disruption of a protected parent-child relationship was in fact the intended outcome of the prosecution of Plaintiff's father. The Court's reliance on the Tenth Circuit's decision in *Delgado v. INS*, 637 F.2d 762 (10th Cir. 1980), is thus inapposite, as in *Delgado*, the children's separation from their father was an "incidental" consequence of their father's deportation. By contrast, here, Plaintiff alleges that her separation from her father was the purpose of her father's prosecution. Compl. ¶¶ 1, 48, ECF No. 1. Notably, in recent months, other courts considering family separations spurred by similar prosecutions have found that the intent of these separations rendered them unconstitutional. *See K.O. et al. v. United States*, No. 20-12015-TSH, 2023 WL 131411, at *16-17 (D. Mass. Jan. 9, 2023) (deeming parent-child separation to be a constitutional violation because it shocked the conscience and finding the discrete function exception to be inapplicable as "the only conceivable reason for separating these families was 'the in terrorem effect it may have on others'"); *D.A. et al. v. United States*, 2023 WL 2619167, at *17; *I.T. et al. v. United States*, No. 22-05333-DMR (N.D. Cal. Feb. 24, 2023) at *11; *Fuentes-Ortega at al. v. United States*, 2022 WL 16924223, at *2-3; *C.M. v. United States*, 2020 WL 1698191, at *4; *A.P.F. v. United States*, 492 F. Supp. 3d 989, 996-97; *A.I.I.L. v. Sessions*, 2022 WL 992543, at *3-4; *B.A.D.J. v. United States*, 2022 WL 11631016, at *2-3; *F.R. v. United States*, 2022 WL 2905040, at *5.

Furthermore, when considering the constitutionality of Plaintiff's separation from her father, the Court erred in failing to look beyond the initial separation to determine whether Plaintiff's prolonged separation from her father amounted to a distinct constitutional violation. Immigration officials forcibly separated Plaintiff from her father on or about August 1, 2017. Compl. ¶ 72, ECF No. 1. At this point, Plaintiff's father was transferred to criminal custody; he was charged with misdemeanor illegal entry, pled guilty, and was sentenced to time served. *Id.* at ¶¶ 77-78. After this, he was returned to immigration custody on or about August 10 or 11, 2017.

*Id.* Even if Plaintiff's initial separation from her father and Plaintiff's designation as an Unaccompanied Alien Child ("UAC") were to be viewed as a necessary consequence of the government's discretionary decision to prosecute her father, the necessity of this separation and accuracy of this designation ended after just 10 or 11 days, upon her father's release from criminal custody. Yet, as Plaintiff has alleged, the government made no effort to reunite Plaintiff with her father after this point.  Compl. at ¶¶ 77-84, ECF No. 1.

Here, the Court's analysis falls short, as the Court found only that upon Plaintiff's father's prosecution, "he could no longer care for S.E.B.M. because it was necessary to place him in criminal detention." Mem. Op. & Order on Def.'s Mot. to Dismiss 28, ECF No. 62. This was no longer the case upon Plaintiff's father's release from criminal custody. The Court failed to assess whether the discretionary function exception would shield the government from liability for continuing Plaintiff's separation from her father at this point. Proper application of the *Berkowitz* test would permit Plaintiff to proceed on these grounds. After Plaintiff's father's release from criminal custody, no legal authority mandated Plaintiff's continued separation from him. Indeed, the continued separation directly contravenes the TEDS Standards, which require CBP to "maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation," and demand that "Officers/Agents [] consider the best interest of the juvenile *at all decision points* beginning at the first encounter and *continuing through processing, detention, transfer, or repatriation."* TEDS 1.6, 1.9 (emphasis added).

This prolonged separation was also unconstitutional, as it violated the Fifth Amendment guarantee of a substantive right to family integrity and association. Although the Court found that the deprivation of this right effected by the initial separation did not shock the conscience, the

factors that the Court relied on no longer applied once Plaintiff's father was released from criminal custody on August 10 or 11, 2017. First, in light of the policy objective of the Family Separation Pilot Program that ensnared Plaintiff, the government clearly intended to deprive Plaintiff from her relationship with her father. Compl. at ¶¶ 1-5, ECF No. 1. In the time period following her father's prosecution and release from criminal custody, the government could no longer rely upon its interest in exercising prosecutorial discretion to justify the separation. Indeed, after Plaintiff's father was released from criminal custody, the government appears to lack <u>any</u> countervailing interest that could warrant its continued intrusion into Plaintiff's relationship with her father.

It bears noting that recently, another federal court found that the discretionary function exception is inapplicable to parent-child separations under similar facts as those here. *See D.A. et al. v. United States*, 2023 WL 2619167 at \*19 (finding the discretionary function exception did not shield the government from liability for plaintiffs' continued separation, as "Plaintiffs' long-term separation was arguably arbitrary since, following [the mother's] incarceration, she could have been reunited with her children in a family immigration detention center").[5] Given this Court's failure to weigh the government's failure to reunite Plaintiff with her father upon his release from criminal custody, Plaintiff urges the Court to reconsider whether the discretionary function exception shields the government from liability for the prolonged separation.

Lastly, the Court erred by failing to assess whether the discretionary function exception shields the government from liability for its approximately two-month delay in permitting Plaintiff any telephonic contact with her father and its approximately three-month delay in undertaking any

---

[5] Plaintiff previously drew the Court's attention to the case of *Ms. L,* in which the court likewise found that a mother's prolonged separation from her daughter alleged facts sufficient to "show the government conduct at issue "shocks the conscience" and violates Plaintiffs' constitutional right to family integrity." *Ms. L. v. ICE*, 3:18-cv-00428-DMS-MDD (S.D. Cal. Jul. 10, 2018); Pl.'s Resp. to Mot. To Dismiss 5-6, ECF No. 41.

significant efforts to release Plaintiff to her grandmother, who was her family's chosen custodian. Neither of these components of Plaintiff's allegations appear to have factored into the Court's analysis under the discretionary function exception.

Plaintiff was separated from her father on or about August 1, 2017. Compl. ¶ 72, ECF No. 1. The government did not permit any calls between Plaintiff and her father for approximately 59 days, until September 29, 2017. Compl. ¶ 89, ECF No. 1. While the *Flores* Agreement mandates that Plaintiff be provided contact with family members arrested with her, it does not specify how promptly such contact must be facilitated or how frequently such contact must occur. *Flores* Agreement ¶ 12. However, no reasonable reading of *Flores* would permit a wholesale refusal to allow *any* contact with a detained child's parents for two months. As such, officials lacked discretion to do so, as their conduct violated the *Flores* Agreement's requirements. Even if government officials had discretion regarding when to begin facilitating calls between Plaintiff and her father, no statutory social, economic or political goal properly undergirded their decision to refuse for two months to permit any telephonic contact between a detained two-year-old child and her father.[6] In light of this, the Court erred by failing to account for the two-month denial of any contact between Plaintiff and her father in its discretionary function exception analysis.

The Court's analysis likewise failed to account for how Government officials also unjustifiably delayed starting the process necessary to release Plaintiff into her grandmother's custody. Plaintiff and her father turned themselves in to CBP officials on approximately July 31, 2017. Compl. ¶ 65, ECF No. 1. Shortly after this, Plaintiff's father provided officials with the name

---

[6] When assessing a *one-month* delay in initiating calls between a minor and her father under *Berkowitz* prong two, the *AESE* court found that "the Court is hard-pressed to find how a policy grounded in the management of facilities justifies the refusal to allow Plaintiffs to communicate for a month," and thus held that the discrete function exception did not apply. *A.E.S.E. et al. v. Unites States*, 2022 WL 4289930, at *22.

and telephone number of Plaintiff's paternal grandmother, who lived in Florida, and requested that officials contact her. Compl. ¶ 61, 70, ECF No. 1. At this time, Plaintiff's father informed officials that he and Plaintiff planned to live with her and that she possessed identity documents for Plaintiff and the family. *Id*. Despite this, the government apparently took no steps to commence the process of determining whether Plaintiff should be released to her grandmother for approximately three months, contrary to its obligations under the *Flores* Agreement. As Plaintiff alleged, government officials did not document any efforts to release Plaintiff to her grandmother until November 1, 2017, approximately 92 days after she was separated from her father. *Id*. at ¶ 92.

The *Flores* Agreement required that Plaintiff be released to her grandmother without "unnecessary delay." *Flores* Agreement ¶ 14. The government has made no showing of any justification for its failure over approximately three months to undertake any steps to initiate or advance the vetting process to release Plaintiff to her grandmother. Officials' failure to act contravenes *Flores* and was unsupported by any valid social, economic, or political goals, rendering the discretionary function exception inapplicable. The Court erred in failing to so find.

Other courts that have recently considered similar—and, indeed, shorter—delays have found the discretionary function exception inapplicable. *See K.O. et al. v. United States,* No. 20-12015-TSH (D. Mass. Jan. 9, 2023) at *13 (finding that the government was not shielded from liability by the discretionary function exception, when there was a 31-day delay in releasing plaintiff to an available custodian and the government failed to take "any affirmative steps to reunite the children with their rightful custodian"); *D.J.V.C. v. United States,* No. 20-05747-PAE (S.D.N.Y. June 3, 2022) at *52 (finding that "the Government's actions in failing to reunite [the son] with [the father] for five days—until Judge Hellerstein ordered such reunification—do not fit with the DFE or the DCE"); *A.E.S.E. et al. v. Unites States*, No. 21-0569-RV-GBW (D.N.M. Sept.

16, 2022) (finding the DFE inapplicable where "[the daughter] was detained for over a month even though she had relatives advocating for custody with her mother's permission").

Here, the Court improperly failed to take into account the three-month delay, and instead considered only the time that elapsed between when the vetting of Plaintiff's grandmother commenced in November of 2017, and when Plaintiff was released into her grandmother's custody, a period of under two months, which the Court deemed reasonable. Mem. Op. & Order on Def.'s Mot. to Dismiss 31-32, ECF No. 62. This determination, though, is based on incomplete analysis, given that the delay was in fact far lengthier due to Defendant's three-month failure to take any actions to initiate the vetting process. As such, the Court should reconsider whether the discretionary function exception shielded Defendant from liability for this lengthy delay.

### C.  Defendant's Conduct Is Not Protected by the Due Care Exception

The Court's due care exception analysis represents a marked departure from other recent, similar cases. Here, the Court found that the due care exception shielded the government from liability in relation to: (1) Plaintiff's separation from her father; (2) the government's failure to permit Plaintiff to communicate with her father; and (3) the government's delay in releasing Plaintiff to her grandmother. However, this analysis fails to take into account crucial factual allegations of Plaintiff's Complaint.

#### 1.  No statute or regulation mandated Plaintiff's prolonged separation from her family

Contrary to this Court's analysis, no policy, statute or regulation, including the two statutes this Court points to, authorized, let alone mandated, Plaintiff's prolonged separation from her father, and as such the due care exception cannot apply to this prolonged separation.  As courts addressing nearly identical claims have concluded, *Welch* v. *United States,* 409 F.3d 646 (4th Cir. 2005) requires a statutory mandate for the government's conduct, not merely the authorization to

act. *See A.F.P.* v. *United States*, No. 21-00780-DAD-EPG, 2022 WL 2704570, at *15 (E.D. Cal. July 12, 2022) (finding that the government failed to cite to any statute or regulation mandating separation or detention of father in a different facility from his child); *Wilbur P.G. et. al. v. United States*, No. 21-04457-KAW, 2022 WL 3024319, at *5 (N.D. Cal. May 10, 2022) (holding that because family separations were conducted pursuant to executive policy and not statute of regulation, such actions are not shielded by the DCE); *A.I.I.L.* v. *United States*, 2022 WL 992543, at *5 (finding that neither TVPRA nor statutes allowing prosecution of immigration law violations expressly mandate family separation, so DCE was not applied); *see also A.P.F. et al. v. United States*, 492 F. Supp. 3d 989, 995-96 (D. Ariz. 2020); *E.C.B. et al. v. United States*, No. 22-00915-PHX-CBD, at *10 (D. Ariz. Nov. 08, 2022). Here, the government's actions were not statutorily authorized.  The two statutes relied on by the Court, 6 U.S.C. § 679(g) and 8 U.S.C. § 1232(b)(3), have been considered by other courts in similar cases, which have found that these statutes did not mandate family separation.  *See A.I.I.L.* 2022 WL 992543, at *8; *A.F.P.*, 492 F. Supp. 3d 989 (Defendant's assertion that Title 8 U.S.C. §1232(b)(3) required separation because government had to transfer to ORR rejected by court as mandating family separation).

Furthermore, whereas this Court indicated that it was unclear what could have been taken to avoid traumatizing young children in this situation (Mem. Op. & Order on Def.'s Mot. to Dismiss 30, ECF No. 62), many courts faced with similar allegations have found it was quite clear what could have been done: these families could have been reunited after the parent was released from criminal custody, which in most cases happened within days.  *See D.A. et al. v. United States*, 2023 WL 2619167, at *9  (deeming plaintiffs' separation "arguably arbitrary," as following the mother's incarceration, she could have been reunited with her children); *A.I.I.L.*, 2022 WL 992543 at *6 (finding that "for those Plaintiffs who were charged (or [the government] claims were

charged), the government fails to point to any reason why they were detained in adult facilities after their release") (internal citations omitted).

### 2. The government failed to exercise due care in its treatment of Plaintiff

Even if 6 U.S.C. § 679(g) and 8 U.S.C. § 1232(b)(3) are viewed as mandating Plaintiff's forcible separation, the Defendant did not exercise due care in the treatment of this child.  In addition to the cases previously cited,[7] to date, no other court has found that the due care exception shields the government from liability for its treatment of separated children. Due care requires "at least some minimal concern for the rights of others." *Myers & Myers, Inc. v. USPS*, 527 F.2d 1252, 1262 (2d Cir. 1975). When assessing due care, courts apply a "reasonableness" standard. *See Hydrogen Tech. Corp.* v. *United States*, 831 F.2d 1155, 1161 (1st Cir. 1987).

This Court's opinion notes that while the separation of the Plaintiff from her father would be "distressing, possibly traumatizing," "it is not clear what if anything federal officers could have done" . . . and no other facts alleged suggest that her treatment was unreasonable. Mem. Op. & Order on Def.'s Mot. to Dismiss 30, ECF No. 62. Contrary to these conclusions, the Complaint provided many allegations of the Government's unreasonable conduct that harmed the Plaintiff. Further, in jurisdictional challenges such as this, which make a facial attack on the complaint's allegations as to the existence of subject matter jurisdiction, the court must assume the factual allegations of the complaint to be true. *See Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001). In its presumption that the DCE applies (Mem. Op. & Order on Def.'s Mot. to Dismiss 30, ECF No. 62), the Court's DCE analysis did not properly apply this standard.

---

[7] *See A.P.F. v. United States*, 492 F. Supp. 3d 989, 994 (D. Ariz. 2020); *C.M. v. United States*, No. 19-CV-05217, 2020 WL 1698191 (D. Ariz. Mar. 30, 2020).

Contrary to the Court's conclusion (Mem. Op. & Order on Def.'s Mot. to Dismiss 30, ECF No. 62), nothing in the Complaint suggests or can be implied to suggest that the government's conduct was reasonable. Numerous allegations in the Complaint detailed the unreasonableness of the delay in providing i Plaintiff's father information regarding Plaintiff's whereabouts Compl. ¶¶ 72, 76, 79. Due to being kept in the dark, Plaintiff's father gave up on trying to find her and signed the documents to facilitate his removal. Compl. ¶¶ 81, 83. The Complaint sufficiently alleges that governmental agencies failed—for approximately two months—to facilitate *any* communication between Plaintiff and her parents, in violation of *Flore*s. *Id.* ¶ 59. The failure to afford communication between parent and child was particularly impactful in this case because Plaintiff was only two years old and spoke an indigenous language, effectively forcing her into linguistic isolation for the entire five-month period she was separated. *See* Compl. ¶¶ 63, 67, 86, 97. Although the Government was well aware that family separations would result in an inundation of children of tender years into ORR custody and that many families spoke indigenous languages, it remained profoundly unprepared for these young children. Compl. ¶¶ 31, 33, 40.[8] As alleged in the Complaint, Plaintiff and her father were initially processed by CBP without an interpreter (Compl. ¶67), and her age and language barriers meant she could not provide details of a potential sponsor, her grandmother in Florida. Compl. ¶¶ 86, 97.

The structural failures in the Government's family separation program demonstrated by these allegations depict the utter recklessness of the manner in which family separation was

---

[8] *See, e.g.*, Compl. ¶ 40 ("By September 2017, almost two months after the pilot program began, ORR leadership started to express concern with the increasing number of children, including infants, that were being transferred to ORR custody after separation from a parent. ORR was largely left in the dark for the entirety of the pilot program as DHS failed to provide a meaningful response to any of ORR's communications and concerns about the agency's ability to accommodate these separated children.").

implemented.[9] Plaintiff's predicament could have been avoided, or at the very least, minimized, but for the abject lack of preparation by the government. This malfeasance, especially because of its deleterious effect on young children like Plaintiff, can hardly be described as due care.

Other courts that have reviewed the due care exception in cases where plaintiffs alleged a failure to permit communication between parent and child have found similar communication failures to indicate a lack of due care; in many cases the denial of communication was far shorter than the two-month delay in this case. *See A.F.P.*, 2022 WL 2704570, at *3 (father denied communication with son for 22 days). This Court's opinion in *A.E.S.E.* presented Judge Brack with facts quite similar to those at bar. When analyzing the due care exception, Judge Brack noted the forcible removal of the child from her father, the failure to give parent information about child's location and the prolonged separation because of refusal to release child to grandparents do not illustrate due care. *A.E.S.E. v. U.S.* at *27. Each of these same factors were alleged in the Plaintiff's Complaint and equally compel a finding that due care was not used in this case. Compl. ¶ 89; *see also D.A. et al. v. United States*, 2023 WL 2619167, at *15; *K.O. et al. v. United States*, 2023 WL 131411, at *12; *E.S.M. v. United States*, 2022 WL 11729644, at *2, 5.

Furthermore, the Court erred by failing to consider the government's failure to timely begin investigating Plaintiff's grandmother as a potential custodian—a failure that revealed a clear lack of due care and that prolonged Plaintiff's detention and heightened the trauma she suffered. The government's failure to so much as commence efforts to reunify Plaintiff with her grandmother for approximately three months—despite having contact information for the grandmother—points

---

[9] Further, newly discovered evidence reveals that ORR was tasked with providing contact information for parents to locate their children, which it did not and that various agencies had considered using Skype, to facilitate calls between family members, but didn't. Further, CBP was not using an interpreter services, a failure that was internally criticized.

to a clear lack of due care. Thus, the continued separation of Plaintiff from her grandmother until January of 2018, after CBP was informed in August of the grandmother's ability to sponsor Plaintiff, was unreasonable. As described in detail in the previous section, there is no excuse the government's failure to try to locate Plaintiff's grandmother immediately. Compl. ¶¶ 70-71.

Further there is no reasonable explanation for why ORR apparently did nothing to reunite this family during this time. Lastly, the total five-month long separation, which included housing the Plaintiff in two different foster homes, is inexcusable. The Court observed that the Plaintiff's case manager began to work on a release plan in late November, and two months later, Plaintiff was able to join her grandmother in Florida. Mem. Op. & Order on Def.'s Mot. to Dismiss 32, ECF No. 62. This Court found this to be a reasonable fulfillment of the government's duties to place the Plaintiff with a suitable relative. *Id.* However, this long separation, which required the Plaintiff to be moved to a second foster home, forcing her to adjust to a new surrounding and new people, all of which she could not possibly have understood, was unnecessarily harsh treatment and cannot be deemed the execution of "due care." As shown above, at various key junctures, the Court failed to consider ways in which the government failed to exercise due care, further prolonging Plaintiff's detention and increasing the harms she suffered.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant her Rule 59(e) motion to alter or amend its judgment entered on March 6, 2023 (ECF Nos. 62, 63); and urges the Court to reopen proceedings so that Plaintiff may seek leave to file an amended complaint incorporating new, previously unavailable evidence in support of her claims; in the alternative, Plaintiff urges the Court to reconsider its decision in light of the above-specified errors in the Court's subject matter jurisdiction analysis. Furthermore, Plaintiff respectfully requests oral argument in this matter.

Submitted: April 3, 2023

Respectfully submitted by:

/s/ Rebecca Sheff
Rebecca Sheff, NM Bar No. 159065
ACLU OF NEW MEXICO
P.O. Box 566
Albuquerque, NM 87103
(505) 266-5915
rsheff@aclu-nm.org

/s/ Lisa Lehner
Lisa Lehner, Fla. Bar No. 382191
AMERICANS FOR IMMIGRANT JUSTICE
6355 NW 36 Street, Suite 2201
Miami, FL 33166
Phone: (305) 573-1106 Ext. 1995
Fax: (305) 576-6273
llehner@aijustice.org

/s/ Ian Ross
Ian M. Ross, Fla. Bar No. 091214
SIDLEY AUSTIN LLP
1001 Brickell Bay Drive, Ste. 900
Miami, FL 33131
(305) 391-5218
iross@sidley.com

*Counsel for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 3rd day of April, 2023, I filed the foregoing pleading electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

<u>/s/ Rebecca Sheff</u>
Rebecca Sheff
