# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

S.E.B.M., a minor, by and through her next friend, MARIA MENDEZ FELIPE,

    Plaintiff,

v.

THE UNITED STATES OF AMERICA,

    Defendant.

No. 21-cv-00095-JHR-LF

**PLAINTIFF'S REPLY IN SUPPORT OF**
**MOTION TO ALTER OR AMEND JUDGMENT**

Plaintiff submits this Reply in response to Defendant's Opposition (ECF No. 71) and in further support of her Rule 59 Motion to Alter or Amend Judgement (ECF No. 64).

**ARGUMENT**

**I.    Errors in the Court's Subject Matter Jurisdiction Analysis Demand Reopening.**

Defendant repeatedly and falsely contends that Plaintiff's arguments boil down to an improper retreading of old ground. ECF No. 71 at 10-17. Plaintiff's references to allegations in the Complaint and Opposition to Defendant's Motion to Dismiss ("MTD") highlight crucial analytical oversights in the Court's MTD decision, which Defendant does not dispute. *First*, the Court used an incorrect analytical starting point to assess the decision to separate S.E.B.M. from her father— that "S.E.B.M.'s separation from her father [was] a direct result of the government's decision to prosecute him." ECF No. 62 at 14. The Court, however, did not consider that the decision to prosecute S.E.B.M.'s father was, in fact, a direct consequence of the government's decision to embark on a policy that separated young children from their parents to deter asylum-seekers, and was undertaken for that specific purpose. This fact has been starkly demonstrated by recently unsealed new evidence, including a deposition in which a high-level government official attests that family separations were a "deterrence initiative," with a clear purpose: "separating children from families would send a message to the northern triangle that you'd lose your child if you crossed the border." *See* Ex. 1 (*A.P.F.* Opp Exhibits, ECF 432-1, p. 60). When assessing subject matter jurisdiction, the Court considered why S.E.B.M.—a then-two-year-old child who only spoke and understood Aketeko—was ripped from the arms of her father and subjected to months of government custody and linguistic isolation. Its failure to consider this purpose proved pivotal in shaping its reasoning in both its private actor and discretionary function exception analysis. *Second*, in analyzing Plaintiff's allegations regarding the prolonged nature of her separation from her father and her treatment during that period, the Court improperly omitted from its analysis

1

serious harms perpetrated by the government against S.E.B.M. These omissions were essential to the Court's private actor, discretionary function, and due care exception findings.

### a. The Court's Analysis Improperly Ignored, at the Motion to Dismiss Stage, the Government's Purpose in Separating S.E.B.M. from Her Father.

Many courts have considered the subject matter jurisdiction issues decided by the Court, but the Court stands alone in failing to consider the ultimate purpose of a child's separation from their parents under the Zero Tolerance Policy or Pilot Program and thus concluding that it lacks subject matter jurisdiction. *See, e.g.*, *C.D.A. v. United States*, No. CV 21-469, 2023 WL 2666064, at *14 (E.D. Pa. Mar. 28, 2023) ("All actions taken against the plaintiffs as described in their amended complaint—their respective separations, prosecutions, detentions, presentations of right-waiving forms, and so on—stem from the Trump administration's zero-tolerance policy."); *K.O. v. United States*, No. 20-12015-TSH, 2023 WL 131411, at *9 (D. Mass. Jan. 9, 2023) ("Indeed, **harming children was the point of this alleged conduct**—to deter other families from crossing the southern border.") (emphasis added); *D.A. v. United States*, No. 22-00295-FM, 2023 WL 2619167, at *8 (W.D. Tex. Mar. 23, 2023) ("[Plaintiffs assert that] Defendant's prosecution of Padilla Gonzales . . . was a pretextual means of cruelly separating her from her children and keeping them separated to 'deter them from pursuing legitimate immigration claims.'"); *I.T. et al. v. United States*, No. 4:22-05333-DMR, at *11 (N.D. Cal. Feb. 24, 2023) ("[Plaintiffs] explain that the complaint alleges that government officials engaged in tortious conduct by forcibly separating Plaintiff parents from their children without explanation and subjecting them to constant cruelty **for the express purpose of causing them harm**.") (emphasis added) (internal citations omitted); *D.J.C.V. v. United States*, 605 F. Supp. 3d 571, 593 (S.D.N.Y. 2022); *C.M. v. United States*, 2023 WL 3261612, at *39 (W.D. Tex. May 4, 2023); *C.M. v. United States*, 2020 WL 1698191, at *7 (D. Ariz. Mar. 30, 2020).

As these cases make clear, and notwithstanding the government's suggestion to the contrary, ECF No. 71 at 11, 15, the government's purpose in separating S.E.B.M. from her father is vital to determining whether the Court has subject matter jurisdiction. Plaintiff's Complaint stated pointedly that "the very point" of the prosecution was to separate S.E.B.M. from her father and cause them to suffer trauma. ECF No. 1 at 1. And, as the newly discovered documents underscore,[1] and S.E.B.M.'s Complaint alleged, the purpose of this was to weaponize the trauma of widespread family separations. ECF No. 1 at 1. However, in both its private actor analog and discretionary function exception analysis, the Court ignored this purpose. The Court held that S.E.B.M.'s separation from her father stemmed *solely* from the government's decision to prosecute him. ECF No. 62 at 14, 15, 27. This holding led the Court to find that "prosecutorial privilege" and "prosecutorial discretion" applied, which afforded the government sovereign immunity. But the separation was not simply a consequence of the prosecution. Rather, the prosecution—as part of the Zero Tolerance Policy Pilot Program—was undertaken to achieve the separation. That is, the very purpose of the prosecution was to separate families and instill fear in would-be migrants.

Moreover, the Court's analogies in both the private actor and discretionary function analyses are inapposite to this case and fail to account for the purpose of separation.[2] In its private actor analysis, the Court compared the government's right to separate S.E.B.M. from her father to a landlord's right to evict a parent. The Court determined that just as a landlord has the right to evict a parent even if eviction could mean the parent would lose custody of their child, the government could prosecute S.E.B.M.'s father even if doing so caused their separation. ECF No.

---

[1] As detailed below, the newly discovered documents on this point include the emails drafted by former ICE Executive Associate Director Matthew Albence (Ex. 2). *See infra* Section II.a.

[2] Further, as noted in ECF No. 65 at 10-11, the Court's IIED private actor analog analysis is incomplete, as it fails to account for harms the government committed against S.E.B.M. due to the manner with which it effected the separation.

3

62 at 14. This analogy is inapplicable: here, separation was not an unfortunate consequence of the prosecution but rather its very purpose. And because separation was not an unfortunate consequence of the prosecution but rather its very purpose, the other courts that have addressed the Zero Tolerance Policy have overwhelmingly held that Defendant was not entitled to shield its action from liability at the motion to dismiss stage.[3]

In its discretionary function analysis, the Court also determined that S.E.B.M.'s separation from her father was not conscience-shocking, citing *Delgado v. Immigr. & Naturalization Servs.*, 637 F.2d 762, 763 (10th Cir. 1980) as "nearly on-point" and "hardly distinguishable," ECF No. 62 at 28. In *Delgado*, the Tenth Circuit found that a father's deportation would not violate his children's constitutional right to family integrity despite "the **incidental impact** visited upon the children." *Id.* (emphasis added). Crucially, in *Delgado* there was no allegation that the purpose of the routine deportation was to separate the family.[4]  Here, that is precisely the allegation.

Other courts have found that this purpose is highly relevant to proving the conscience-shocking and thus unconstitutional nature of the government's conduct. *See A.P.F. v. United States*, 492 F. Supp. 3d 989, 996 (D. Ariz. 2020) (citing to *Ms. L. v. U.S Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1144-46 (S.D. Cal. 2018), *modified*, 330 F.R.D. 284 (S.D. Cal. 2019), *and enforcement granted in part, denied in part sub nom. Ms. L. v. U.S. Immigr. & Customs Enf't*, 415 F. Supp. 3d 980 (S.D. Cal. 2020), "[a] practice of this sort implemented in this way is likely to be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience,' interferes with rights "'implicit in the concept of ordered liberty[,]'" and is so "'brutal" and

---

[3] As of the filing of this brief, Plaintiffs are not aware of any Zero Tolerance Policy FTCA case that has been decided on summary judgment.

[4] In fact, as the *Delgado* court noted, separation was not an inevitable consequence of the father's deportation, as he could have elected to bring the children with him when deported. *Delgado*, 637 F.2d  at 763.

"offensive" that it [does] not comport with traditional ideas of fair play and decency.'")); *Nunez Euceda v. United States*, No. 20-10793-VAP-GJSx, 2021 WL 4895748, at *8 (C.D. Cal. Apr. 27, 2021); *K.O. et al. v. United States*, No. 20-12015-TSH, 2023 WL 131411, at *17.

### b. The Court's Subject Matter Jurisdiction Analysis Impermissibly Failed to Consider Harms Perpetrated by the Government During S.E.B.M.'s Detention.

Defendant mischaracterizes Plaintiff's arguments as to harms perpetrated by the government during S.E.B.M.'s prolonged separation from her father as attempts to "rehash" and "revamp" previous arguments. ECF No. 71 at 10, 13, 15, 17. In the Motion, Plaintiff demonstrates that the Court erred by failing to consider serious harms committed by the government, including: (1) the government's failure to reunite S.E.B.M. with her father after his release from criminal custody; (2) its approximately two-month delay in permitting S.E.B.M. any telephonic contact with her father; and (3) its approximately three-month delay in undertaking any efforts to release S.E.B.M. to her grandmother, who was her family's chosen custodian.

*First*, despite the absence of any legal authority mandating their continued separation, the government made no effort to reunite S.E.B.M. with her father after he was released from criminal custody (where he had been held for about 11 days).  Among other things, the directives of the government's National Standards on Transport, Escort, Detention, and Search ("TEDS") indicate that they should have been reunited.[5] At best, the failure to reunite—or to make any effort to reunite—would constitute negligence. Moreover, recent unearthed evidence (*see infra* Section II) reveals that this failure much more likely stemmed from the Zero Tolerance Policy Pilot Program,

---

[5] *See* ECF No. 65 at 17 (citing to TEDS 1.6, 1.9, which state, in relevant part: "Officers/Agents will consider the best interest of the juvenile at all decision points beginning at the first encounter and continuing through processing, detention, transfer, or repatriation" (1.6); and "CBP **will maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation**" (1.9) (emphasis added)).

which renders the government liable for IIED.[6]

In its private actor analog analysis, the Court determined that Plaintiff failed to state a claim under New Mexico tort law, without considering the tort of failing to *reunite* Plaintiff once her father was released from criminal custody—which is distinct from the tort of separating Plaintiff from her father. ECF No. 65 at 16-17. Defendant argues that, with respect to this claim, the Court could skip this analysis, since it found that the discretionary function and due care exceptions shielded the government from liability. ECF 71 at 11. As shown above, the discretionary function and due care exceptions do not shield Defendant from liability for the separation. But even if they did, that does not mean they shield Defendant for the separate tort of failing to reunite Plaintiff with her father upon his release from criminal custody. Thus, the Court should revisit and alter its conclusion that Plaintiff failed to state a claim under New Mexico law for this separate violation.

Defendant incorrectly suggests that government officials have the discretion to prolong a child's separation from their parent—here, for approximately 82 days—without running afoul of the Constitution and other laws. ECF No. 71 at 14.[7] As the Court stated, the first step of assessing whether the discretionary function exception applies is to determine whether "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." ECF 62 at 19 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). If it does, officials lack discretion to violate these prescriptions. Here, it is undisputed that the government was bound to a

---

[6] Here, again, the purpose of this separation (and the opportunity to obtain and present documentary evidence showing this purpose) proves vital to assessing Plaintiff's claims.

[7] Defendant also suggests, without basis, that S.E.B.M.'s argument on this point is an impermissible attempt to revamp an unmeritorious argument. ECF No. 71 at 13. This is erroneous, as S.E.B.M. could not foresee that the Court would fail to consider whether her prolonged separation from her father was shielded under the DFE. Her Complaint and MTD Opposition state her claim that the government should not have continued to detain her separately from her father after his release from criminal custody. This allegation suffices to require the Court to determine whether the government was shielded from liability for the prolonged separation.

policy demanding that officials maintain family unity to the greatest extent operationally feasible, absent legal requirements, safety concerns, or security concerns mandating separation. TEDS 1.9. Therefore, Defendant cannot credibly claim that TEDS permits federal employees to follow a course of action that directly opposes preserving family unity.[8] As such, the Court should have properly applied the *Berkovitz* test to the government's failure to reunite S.E.B.M. and her father.

Further, Defendant incorrectly contends that the inquiry into the constitutionality of S.E.B.M.'s continued separation can end here, because the TEDS Standards do not establish that the separation was unconstitutional. The Court, however, must still determine whether the failure to reunite "shocks the conscience." The Court undertook this inquiry solely with respect to the initial separation. As the court found in *C.M. v. U.S.*, post-criminal-custody separation presents a separate question, and the government cannot seek the protection of the discretionary function exception where it continues a plaintiff's separation from their parent without justification after the parent's release from criminal custody. *See C.M. v. United States*, 2023 WL 3261612, at *43. As such, the Court should consider whether a countervailing interest—apart from prosecutorial discretion (which no longer applied)—could warrant the government's continued intrusion into S.E.B.M.'s relationship with her father.

Lastly, with respect to the due care exception, Defendant contends that the Court "offered a detailed analysis of the applicable law . . . then applied this analysis to Plaintiff's factual allegations." ECF No. 71 at 16. Defendant fails to acknowledge that the Court did not consider, as a distinct tort, the government's decision not to reunite S.E.B.M. with her father. Instead, it looked to whether the due care exception applied to what it deemed a single action: "physically remov[ing]

---

[8] Indeed, as newly discovered evidence shows, DHS Office of Civil Rights and Civil Liberties expressed concern that family separations violated TEDS Standards. Ex. 13 (*A.P.F.*, ECF 364-10).

S.E.B.M. from her father's custody and keep[ing] them separated thereafter." ECF No. 62 at 26 (emphasis added). Instead, the Court should have separately determined whether the due care exception protected the government's continued separation of S.E.B.M. from her father.

*Second*, the Court should have assessed whether either the discretionary function or due care exception shielded the government from liability for preventing S.E.B.M. from having *any* telephonic contact with her father for two months. Instead, it only considered whether it was reasonable for the government to provide (as it eventually did) "short calls." ECF 62 at 30. This analysis was insufficient, as the Court should have taken into account that two months passed during which time the government failed to comply with its legal obligation, including under the *Flores* Agreement (*Flores* Agreement ¶ 12.A), to provide S.E.B.M. contact with her family.

*Third*, the Court failed to consider the three-month period during which there was *no* record of *any* efforts to unify S.E.B.M. with her grandmother, despite S.E.B.M.'s father having provided the grandmother's name and contact information to U.S. Customs and Border Protection ("CBP"). *See* ECF No. 65 at 19-21. This newly discovered evidence highlights the widescale systematic failures—which DHS was well aware of but chose not to address—that likely accounted for this delay and show the government's lack of due care. *See infra* Section II.b.

## II. Plaintiff Should Have the Opportunity to Amend the Complaint Based on Newly Discovered, Previously Unavailable Evidence.

Defendant makes three unavailing arguments against reopening this matter. First, Defendant claims that S.E.B.M. erred by failing to exhibit the new evidence because she merely provided descriptions of its contents and explained why this evidence would compel a different MTD finding should the Court allow Plaintiff to amend the complaint. ECF No. 71 at 5-6. But the single case cited by Defendants is distinguishable because the movant based his argument on issues already conceded by prior counsel and **did not** point to any new evidence or intervening caselaw.

8

*U.S. v. Eccleston*, 2020 WL 6392821, at *18, *19 (D.N.M. Nov. 2, 2020). Here, Plaintiff. has already provided detailed descriptions of the new evidence and cited it. Nonetheless, Plaintiff now exhibits this new evidence. *See* Exs. 1-16.

Second, Defendant erroneously claims, without citing any authority, that because certain documents in the *Atlantic* database were released prior to its publication, S.E.B.M. lacked due diligence in failing to reference them until the instant Motion. ECF No. 71 at 6-7. In *Barr v. City of Albuquerque*, No. 12-CV-01109, 2014 WL 11497833, at *1, *4 (D.N.M. Aug. 22, 2014), the court treated existing documents compiled in a report as newly discovered evidence because it would not have been feasible or permitted by the court for an individual plaintiff to review a voluminous amount of documents prior to the report's publication. Here, like in *Barr*, the extensive material underpinning the *Atlantic* report and compiled in its database was non-public, originated from various government sources, was not feasible for an individual plaintiff to find and review, and the Court would likely not have permitted the broad discovery requests required to obtain it.[9]

This new evidence also includes records from other family separation cases that were filed under seal but have since become public. The sealed nature of these cases, and the volume of documents accessible once several cases were unsealed, prevented S.E.B.M. from presenting this evidence prior to this Motion. *See C.M. v. United States*, No. CV-19-05217-PHX-SRB, 2020 WL 1698191 (D. Ariz. Mar. 30, 2020); *A.P.F. v. United States*, 492 F. Supp. 3d 989 (D. Ariz. 2020). In addition to the new evidence referenced in Plaintiff's motion to reopen, since the filing of that motion, new documents have been publicly filed in other family separation cases, which further demonstrate that reopening is warranted. This additional new evidence is also cited below.

---

[9] Importantly, key documents in the *Atlantic* database, including Exhibits 15 and 16, are from court files that remain sealed as of the date of this filing. As such, it would have been impossible for Plaintiff to review these documents prior to the database's publication.

9

### a. The New Evidence Would Change the Outcome of the Court's Findings Regarding Prosecutorial Privilege and the Discretionary Function Exception.

Defendant's argument that the new evidence adds "nothing new," ECF No. 71 at 8, ignores two key elements of the Court's judgment. First, new evidence that S.E.B.M.'s father was likely prosecuted for the *purpose* of separating him from his daughter contradicts the Court's premise that the separation was simply the byproduct of the government's routine decision to prosecute him. ECF No. 62 at 14, 15, 26. Indeed, the evidence shows that the government chose to prosecute to enforce a policy goal: taking children from their parents. Second, this evidence has profound implications for determining whether the government's conduct was conscience-shocking, and thus unconstitutional, as it reveals that: (1) the government's intent was to deprive parent-child relationships; and (2) the countervailing government interest to be weighed against this purposeful deprivation was the right to execute an inhumane immigration policy, not prosecutorial privilege.

The new evidence is astounding and illustrates that the policy was intended to strip children from their parents to instill fear in would-be migrants:

- In a recently unsealed deposition, Jonathan White (former Office of Refugee Resettlement ("ORR") Deputy Director for Children's Programs) discussed a February 2017 presentation by Matthew Albence (former ICE Executive Associate Director) and Kevin McAleenan (former CBP Commissioner), among others, where they proposed family separation policy as a "deterrence initiative," whose goal was that "separating children from families would send a message to the northern triangle that you'd lose your child if you crossed the border." Ex. 1 (*A.P.F.*, ECF 432-1, at 60). White noted that "it was [his] understanding that . . . if [he] raised issues of harm to children and families, that might be exactly what would make them want to do it more." *Id.* at 61-62. White's official internal summary of DHS policy proposals does not mention prosecutions; instead, it solely focuses on separating children from their parents and lists the "DHS Stated Purpose" as "Deterrence of Family Unit migration." Ex. 15, (*Atlantic* database; *see also* Ex. 16, HHS March 2017 Report (*Atlantic* database).

- Tricia Swartz (former ORR Associate Deputy Director) attested that "[w]e felt surprised that separating families was a goal," and "I walked [away] with the impression that they wanted to take children from parents keep them in different places. I don't think there was any conversations about bringing them back together, but that act of having them apart was going to send a message to the communities that they should not come." Ex. 3 (*A.P.F.*, ECF 432-1 at 69, 70).

10

- Albence's emails corroborate this goal and make clear that prosecution was a pretextual tool to justify the separation. Specifically, Albence states that family reunification is "not the consequence we had in mind" and reunification "obviously undermines the entire effort and [would make DHS] look completely ridiculous if we go through the effort of prosecuting only to send them to a [family residential center] and out the door." Ex. 2 (*Atlantic* database).[10] Then-Acting ICE Director Tae Johnson stated that families should only be reunified for the purpose of removing the families and that any other efforts by CBP to reunite parents with children would be a "fiasco." *Id.*

Further, newly discovered evidence proves that S.E.B.M.'s separation was undertaken in violation of clear federal mandates,[11] and thus was not protected by the discretionary function exception. For example:

- At the federal level, recently-unearthed documents show that New Mexico had embarked on a policy of separations and prosecutions unbeknownst to—and without the authorization of—DHS, which led DHS to "implement[] a stand down" on further separations. Ex. 4, Email between Carla Provost and Kevin McAleenan (Nov. 18, 2017) (*Atlantic* database); *see also* Ex. 5, Email of James Hutton, Deputy Executive of Admissibility and Passenger Programs, DHS, to "Border Security Asst Directors" dated Aug. 16, 2016 (*A.P.F.,* ECF 432-1, p. 54) (reiterating DHS policy that "[s]eparation of child from parent or legal guardian should be a rare occurrence, e.g. safety and well-being of child, active warrant, or similar circumstance").

    **b. The New Evidence Proves that the Government's Conduct Was Negligent and Unprotected by the Due Care Exception.**

New evidence demonstrates that the government failed to exercise due care in its treatment of S.E.B.M. during her separation from her father. For instance:

- CBP officers effecting separations not only lacked training on how to treat young children but expressly declined to receive such training.[12] *See* Ex. 6 Redacted Dep.

---

[10] Notably, government officials misrepresented this policy to the public. For example, in a May 2018 National Public Radio interview then-DHS Secretary Kirstjen Nielsen claimed, "It's not our intent to separate people one day longer than is necessary to prove that there is a custodial relationship," and falsely suggested that parents were separated from their children only while in criminal custody. Ex. 14 (A.P.F. ECF 364-8, p. 5).

[11] S.E.B.M.'s separation was also in violation of local mandates. *See* ECF No. 1 at ¶ 29.

[12] *See* Scott Shuchart, "Careless Cruelty," Washington Post (Oct. 25, 2018), https://www.washingtonpost.com/news/posteverything/wp/2018/10/25/feature/civil-servants-said-separating-families-was-illegal-the-administration-ignored-us/ (former DHS CRCL Senior Advisor writes that "Border Patrol agents dismissed our offer to train them on how to speak to children after ripping them from their families.").

(*A.P.F.* ECF 364-7 at 8); Ex. 7, Bonnie Arellano Dep. Tr., (*A.P.F.* ECF 364-6 at 78). Such training could have mitigated the acute trauma and lasting psychological damage suffered by S.E.B.M., who was ripped from the arms of her father and, as an extremely young Aketeko speaker, was forced into linguistic isolation while detained. ECF No. 65 at 10, 24.

- DHS did not implement necessary plans and systems to track children whom they had separated from their parents and to swiftly reunite them. Ex. 8 (*A.P.F.*, ECF 432-2); Ex. 9 (*A.P.F.*, ECF 432-2);[13] Ex. 10 (*A.P.F.*, ECF 432-3);[14] Ex. 11 (*A.P.F.*, ECF 432-3);[15] Ex. 12 (*A.P.F.* ECF 364-12). Notably, from the outset, DHS was aware that the lack of plans would impact children. *Id.*

This lack of planning and tracking had profound implications for S.E.B.M. and explains: (1) the two-month period during which she was provided no telephonic access to her father; and (2) the three-month period during which no efforts were undertaken to unite her with her grandmother, despite CBP possessing her grandmother's name and contact information. ECF No. 65 at 19-20.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant her Rule 59(e) motion (ECF No. 64) and urges the Court to reconsider its decision. In the alternative, Plaintiff requests that the Court reopen proceedings so that Plaintiff may seek leave to file an amended complaint incorporating new, previously unavailable evidence in support of her claims. Plaintiff respectfully requests oral argument in this matter.

---

[13] Jordan states that "once the child had been designated as an [unaccompanied child], there was no longer any link to the parent other than what would have to be manually searched through all of the A-files to try and link them up via A-number. At that time, we did not have any – anything that joined them in our system of record that the users at [BP] stations could see. So that would have required a manual hand search of all of the A-files coming back and all of the juvenile detainees that were in custody. . . . Our system wasn't set up to reunify . . . ." Ex. 9 at 3-4.

[14] Hamilton states: "There was a point in time that I became aware that DHS did not have a way, or it was not maintaining linkages between the parent and the child" Ex. 10 at 3.

[15] The email states: "This is becoming more and more outrageous. Another DHS [shitshow], and ORR is left holding the bag, while kids are harmed. . . . Congressman, attorneys, parents are allegedly calling the hotline and still not able to connect with their kids for days and days." Ex. 11.

Respectfully submitted: August 2, 2023

/s/ Rebecca Sheff
Rebecca Sheff
NM Bar No. 159065
ACLU OF NEW MEXICO
P.O. Box 566
Albuquerque, NM 87103
(505) 266-5915
rsheff@aclu-nm.org

/s/ Evelyn Wiese
Evelyn Wiese
Cal. Bar No. 338419
AMERICANS FOR IMMIGRANT JUSTICE
6355 NW 36 Street, Suite 2201
Miami, FL 33166
(305) 573-1106 Ext. 1995
ewiese@aijustice.org

/s/ Ian Ross
Ian M. Ross
Fla. Bar No. 091214
SIDLEY AUSTIN LLP
1001 Brickell Bay Drive, Ste. 900
Miami, Florida 33131
(305) 391-5100
iross@sidley.com

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of August, 2023, I filed the foregoing pleading electronically through the CM/ECF system which caused all parties or counsel of record to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

*/s/ Rebecca Sheff*
Rebecca Sheff